**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:24-CR-45 |
| | ) | |
| MARTIN ELLING | ) | |
| | ) | |

## SENTENCING MEMORANDUM OF MARTIN ELLING

We respectfully submit this Sentencing Memorandum on behalf of Martin Elling, to aid the Court in fashioning an appropriate sentence. While it is difficult to know a human being from written words alone, we hope this memorandum provides the Court with a sense of Martin's true nature and who he is known to be among his remarkably vast and deeply connected community of friends and family. A testament to the scope of Martin's impact is that 39 people who have known him over the years have written letters to the Court to share their perspectives of Martin.[1]

There is no question that Martin is deeply sorry for his conduct. As he told the Court in January, he sincerely regrets his actions, he understands their severity, and he fully accepts their consequences.

The law requires that the Court impose a sentence that is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). It is clear that against the backdrop of Martin's life story—marked by a devotion to caring for and supporting those he knows and loves, and to service, charity, and generosity to all people, whether he knows them or not—his offense conduct is an extraordinary aberration. Full consideration of the purposes of sentencing—deterrence, incapacitation, rehabilitation, retribution, and restitution—in light of who

---

[1] Consistent with this Court's order at ECF 34, all 39 letters submitted to the U.S. Probation Office are attached here, as a combined **Exhibit A** (Tabs 1-39).

Martin is and his contributions to the world, call for a sentence of probation and a fine. Martin has already paid a great price for his actions. He has lost his career of thirty years—the only profession he ever knew. He resigned his New York law license and appropriately notified the Connecticut Bar of his guilty plea, accepting the inevitability of disbarment.[2] His reputation has suffered irrevocably. And he has to live with what he has done. In other words, Martin not only fully understands the gravity of his crime, but he has faced consequences already and his life is forever changed by his actions. We respectfully submit that he is not in need of rehabilitation, nor is he remotely at risk of reoffending.

Not only would incarceration be far greater than necessary to accomplish the purposes of sentencing, it would be, respectfully, disproportionately severe in Martin's case. This is because if Martin is sentenced to any period of incarceration, he would not be permitted to enter his new home of Thailand ever again.[3] This would be devastating to Martin and a great loss to the many people in his community there who have come to know, love, and rely on Martin's presence.

For all of these reasons, as further detailed below, we ask the Court to impose a non-incarcerative sentence, as anything more would be far "greater than necessary" to accomplish the purposes of sentencing. Indeed, because he would lose the wonderful life he has built in Thailand, incarcerating Martin would be excessive.

---

[2]    The New York Court accepted Martin's resignation and ordered his disbarment on April 1. *See* Order, *Matter of Elling*, No. 2025-00673 (Apr. 1, 2025), attached as **Exhibit B**. Martin also notified the Connecticut Bar of his guilty plea, and counsel was advised that nothing more is needed at this time.

[3]    This is the legal opinion of experienced Thai immigration counsel, who advises that an exception to this outcome is unpredictable and unlikely. *See* Letter from Aim-on Larpisal, Fragomen (Thailand) Ltd. Co., to Marjorie Peerce and John Hundley, Ballard Spahr LLP (Mar. 14, 2025) (hereinafter "Fragomen Letter"), attached as **Exhibit C**.

**BACKGROUND**

**1. Martin's Personal History**

The conduct which brings him before this Court is an extreme outlier in the truly incredible life story of Martin Elling. At his core, Martin is a person of integrity, generosity, and unwavering optimism. It is our hope that when the Court considers Martin's personal history and characteristics, as it must, it will see that Martin is, to his core, a person of integrity and rare generosity who is, quite simply, devoted to making the world a better place.

The details of Martin's life are evident both in the PSR and in the extraordinary number of letters of support[4] from people across the globe who know Martin best, and who want the Court to understand who he is and why the world is a better place with Martin in it.

*a.  Martin's Childhood and Formal Education*

Martin Elling was born in 1964 in Mt. Lebanon, Pennsylvania, just south of Pittsburgh, though he spent much of his childhood in central Connecticut.[5] Martin grew up in a loving home, to parents who met in Europe after World War II. After the war, Martin's mother, born in Austria, returned to the United States with Martin's father to start their family. Martin has two brothers, but tragically lost his brother Gerard in 2015. Martin's mother, a polio survivor, also died young, from cancer while Martin was in his first year of law school. His father passed away in 2018 after a long period of serious illness. While Martin is no stranger to incredible loss, he has never become hardened or cynical, but instead has demonstrated inspiring optimism and perseverance in these

---

[4]     *Compare United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005) (referring to 14 character letters as a "small flood"), *aff'd* 552 U.S. 38 (2007); *United States v. Novak*, 174 F. Supp. 3d 214, 217 (D.D.C. 2016) (describing 36 letters as a "rather remarkable number of character letters").

[5]     PSR ¶ 47. Martin's family also lived for a brief period in Geneva, Switzerland (when Martin was ages seven to nine).

periods of his life—choosing to devote his energy to caring for his family (his brother Ronald considers Martin the "glue" of their family)[6] and buckling down on his lifelong devotion to serving others. As his friend Tyrel Holston reflects, one of Martin's greatest qualities is his undying faith in humanity.[7]

Since childhood, Martin has "always been motivated to improve his community and make the world at large a better place."[8] His lifelong friend Lauren Weidner remarks that "[e]ven in high school, Martin not only showed many small kindnesses to the people around him, but he cared about improving his community and the world."[9] Martin was student body president in high school, and by that time was already keenly interested in international relations, organizing a leadership conference for the student body that featured community and government leaders Martin invited to speak.[10] In Lauren's view, "Martin's world view was greatly influenced by his mother, a polio survivor, born in Austria."[11] He graduated from high school in 1982.

Martin attended the University of Chicago to study political science, graduating with his Bachelor of Arts degree in 1986, with honors. Like in high school, Martin's college years were marked by his long-held commitment to community and civic engagement, locally and globally. At his school, he "founded the first student run credit union," which "provided much needed banking services to University of Chicago students at a much lower cost than commercial banks."[12] As a junior, Martin studied international law for one year in Vienna, Austria, where his mother

---

[6]    Ex. A-10 (Ronald Elling). For readability and uniformity, quotes from letters may contain slightly altered capitalization, spelling (e.g. replacing "organisation" with "organization"), and punctuation (e.g. adding Oxford commas).

[7]    Ex. A-20 (Tyrel Holston).

[8]    Ex. A-37 at 2 (Lauren Weidner).

[9]    *Id.*

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*; PSR ¶¶ 47, 52-53, 57.

was born and raised.[13] In addition to his studies, Martin committed himself to learning German "on his own initiative, partly so that he could communicate better with his grandmother in Salzburg."[14]

After college, Martin continued his formal education in international relations, earning his Master of Arts degree in International Relations from Yale University in 1988.[15] Around this time, Martin was awarded a Fulbright Scholarship to study at the Ludwig Maximillian University of Munich, in Germany. The family that hosted him during his year in Munich, the Ebrecht family, developed such a strong bond with Martin that he remains a dear friend to them still.[16] Caspar Ebrecht, who was 14 when Martin lived with them, notes that Martin "became like an older brother to me", and describes him as "a very generous and caring person" with a "fantastic talent to bring together people from different backgrounds and countries."[17] Martin served as best man when Caspar married in 2005.[18] Today, Caspar's wife Ana considers Martin a "very important person" in their family, and most admires "his curiosity about the world, his genuine interest in people, his generous heart, . . . and his unwavering optimism."[19]

After his time in Munich, Martin attended Harvard Law School, from where he would graduate with his Juris Doctorate *cum laude* in 1992.[20] During law school, he served as President of the International Law Society, transforming it into "one of the largest and most active student organizations on campus."[21] His classmate Sylvia Rottman remembers Martin's positive impact

---

[13]    PSR ¶ 47.
[14]    Ex. A-8 at 2 (Katharina Ebrecht).
[15]    PSR ¶¶ 47, 52, 54.
[16]    *See generally* Exs. A-7 (Caspar Ebrecht), A-8 (Katharina Ebrecht), A-24 (Ana Malheiro).
[17]    Ex. A-7 at 2 (Caspar Ebrecht).
[18]    *Id.*
[19]    Ex. A-24 at 2 (Ana Malherio).
[20]    PSR ¶¶ 52, 55.
[21]    Ex. A-11 at 1 (Dean Falvy); PSR ¶ 52.

in that role, reflecting that under his leadership, the Society became "the most welcoming on-campus organization" for international students like her.[22] Another classmate Rebecca George similarly shares that Martin helped her "find [her] feet" as an international student at Harvard.[23]

Following law school, Martin returned to Germany when he was 28, this time the recipient of a Robert Bosch Fellowship.[24] As a research intern for the German Parliament, Martin observed—and in a small way participated in—"the post-Cold War transformation in Eastern Europe."[25] Martin also embraced the opportunity to further study "how the global community might work together to make the world a better place."[26]

After completing his second fellowship program in Germany, Martin's formal education would come to an end, but his devotion to learning about and engaging with communities and people all over the world, and his passion for helping others, would prove to be lifelong.

### b. *Martin's Professional Life*

In 1993, Martin began his nearly 30-year career with McKinsey & Company, Inc., a global management consulting firm. He quickly developed a reputation among colleagues and clients for being hardworking, ethical, and kind. Li-Kai Chen—retired Global Head of Education Practice at McKinsey—describes Martin as a "true servant leader" with a "strong ethical compass," "deep conviction and compassion," and a "deep sense of stewardship and personal responsibility toward others, particularly junior colleagues."[27] Martin seemed to have a natural ability to cultivate strong

---

[22]    Ex. A-27 at 1 (Sylvia Rottman).
[23]    Ex. A-14 at 1 (Rebecca George).
[24]    The Robert Bosch Foundation was created during the Cold War to introduce American professionals to Germany. *See* Ex. A-12 at 1 (Fred Fucci).
[25]    Ex. A-12 at 1 (Fred Fucci).
[26]    Ex. A-23 at 1 (Margaret Knudson).
[27]    Ex. A-5 at 1-2 (Li-Kai Chen).

and lasting relationships with clients, who valued his integrity and honesty.[28] Tyrel Holston, one of Martin's first clients, considers Martin one of his closest friends 30 years later. Tyrel remarks: "I am proud to be counted among Martin's friends and believe I am a better person for knowing him."[29]

Within the company, many junior associates and partners came to see Martin as a trusted mentor, and a champion for their success. He made himself available for these purposes informally, and eventually his "commitment to mentoring the next generation" and "dedication to learning and personal development"[30] led to his appointment to lead the Firm's Global Learning agenda as "Head of Learning."[31] In that role, he created novel and inclusive programs for junior colleagues to excel.[32] He was particularly keen on supporting women, "often overlooked in the 'male-dominated' environment of business consulting."[33] Outside of the workplace, Martin demonstrated the same commitment to supporting women. Martin's law school classmate Sung Hui Kim remembers one vivid display of this part of Martin, during a Nature Conservancy fundraiser Martin had invited her to:

> The program displayed photos of its leadership, and we all noticed that there were few or no women in the leadership of The Nature Conservancy. Martin was genuinely disturbed by the lack of female representation in the senior leadership and committed to raising this issue with the board. The fact that he volunteered to do something about the dearth of women in the leadership made quite an impression on me.

---

[28]     Ex. A-6 at 1-2 (Tian-Cho Chu).
[29]     Ex. A-20 at 2 (Tyrel Holston).
[30]     Ex. A-19 at 2 (Judith Hazlewood).
[31]     *Id.*; *see also* Exs. A-13 at 1 (Catherine George), A-30 at 2 (Kevin Sneader).
[32]     Ex. A-19 at 1 (Judith Hazlewood).
[33]     *Id.* at 3.

Martin's support for his colleagues to receive fair treatment and to thrive professionally was "a consistent pattern of behavior."[34] As Catherine George writes, he "advocated for younger colleagues, ensuring that everyone was given the chance to succeed and was treated fairly."[35] Judith Hazlewood put it this way: "Martin always stood out to me as someone I could rely on to really care for, give time to, and provide wise counsel to those less experienced colleagues."[36] And Kevin Sneader: Martin was a "truly valued coach to hundreds of colleagues who benefitted from his generosity of time even though there were many more financially rewarding ways in which he could have spent the countless hours to which he devoted himself to help others succeed."[37]

Throughout his career, Martin traveled all over the world.[38] Everywhere he traveled, he "engaged with the people" of each country, "trying to learn from their diverse and unique experiences,"[39] and treating everyone—from friends and clients to "drivers, waiters, vendors, [and] doormen"—with "integrity, generosity, respect, understanding, and curiosity."[40] At McKinsey, it became clear to those around Martin that "[h]e cared passionately about the personal wellbeing of his clients."[41] Because of his cultural understanding, "clients across industries and geographies would seek Martin's advice."[42] As a former Global Managing Partner explains, Martin drew on

---

[34]    Ex. A-5 at 2 (Li-Kai Chen); *see also* Exs. A-15 at 2 (Tracey Griffin), A-19 at 3 (Judith Hazlewood).
[35]    Ex. A-13 at 1 (Catherine George).
[36]    Ex. A-19 at 3 (Judith Hazlewood).
[37]    Ex. A-30 at 2 (Kevin Sneader).
[38]    Ex. A-13 at 2 (Catherine George).
[39]    Ex. A-1 at 1 (Margarida Afonso).
[40]    Ex. A-14 at 1 (Rebecca George).
[41]    Ex. A-29 at 1 (Michael Silber); *see also* Exs. A-30 at 2 (Kevin Sneader), A-6 at 1-3 (Tian-Cho Chu).
[42]    Ex. A-30 at 2 (Kevin Sneader).

his "diverse experiences to bring insights into how different cultures would see a variety of situations," which was crucial for multinational clients.[43]

Although based in the United States, Martin was supportive of efforts to improve resources for his colleagues in McKinsey's Asian and European offices.[44] As Head of Learning, he advocated within the company "for investment in learning infrastructure in Asia."[45] In this and other ways, "Martin showed courage and a willingness to expend his own political capital [because he] believed [it] was the right thing to do for the sake of these colleagues."[46]

Martin's appreciation and respect for Thai culture in particular would eventually lead to his own move in 2019, to Bangkok. He would continue his work from McKinsey's Bangkok office until the company ultimately terminated his employment in 2021.[47]

### c. Martin's Life in Thailand

Martin has developed a "strong connection and love for his adopted home Thailand."[48] Since moving there, Martin has impressively integrated himself into the country's culture and society. His "commitment to understanding and supporting Thai culture is evidenced by his learning to speak the Thai language and his efforts to learn to write it too (something very few foreigners even attempt)," as well as his extensive exploration of the country as a whole, including provinces "underdeveloped, remote, and seldom visited by foreigners."[49] He has also developed a

---

[43]    Id.
[44]    Ex. A-19 at 2 (Judith Hazlewood).
[45]    Id.
[46]    Id.
[47]    PSR ¶ 47, 52.
[48]    Ex. A-28 at 1 (Harry Seip).
[49]    Ex. A-3 at 2 (Simon Blade); see also Ex. A-21 at 2 (Hermes Taikan Huang) (noting that Martin has taken the time to "deeply understand Thailand through language and through slow methodical exploration walking around neighborhoods and provinces").

"broad understanding of Thai politics and the Buddhist religion,"[50] and befriended people from all walks of life, from well-known figures of Thai society to local art students, musicians, language teachers, taxi drivers, apartment staffers, and Buddhist monks.[51] As Rawit Assamongkol, born and raised in Bangkok, notes, Martin has made Bangkok "more his home than it is mine."[52] Martin fervently hopes to return to his home in Thailand after sentencing.[53]

### d. Service and Philanthropy

One major way that Martin connects with and contributes to the Thai community is through his active involvement with the Rotary Club of Bangkok.[54] A primary focus of this work for Martin is on "community service projects across Thailand."[55] He contributes his time to support this work, whether it is volunteering to tutor children, traveling to upcountry orphanages to spend time with children, or "handing over water purification systems in remote areas of the country."[56] Martin is also one of the most generous donors to the organization, writes its former president Pornchai Wessatada.[57] Martin has been "actively involved" in various charity initiatives,[58] including the Club's "fund to eradicate polio, a disease which his mother barely survived in WWII-era Austria."[59]

In addition to his charity work with the Rotary, Martin's service to his Thai community involves supporting local "initiatives that provide education to disadvantaged youth, clean up the

---

[50]    Ex. A-3 at 2 (Simon Blade).
[51]    Ex. A-17 at 2 (Tim Havermann); Ex. A-37 at 2 (Lauren Weidner).
[52]    Ex. A-2 at 2 (Rawit Assamongkol).
[53]    PSR ¶ 47.
[54]    Ex. A-3 at 2 (Simon Blade).
[55]    *Id.* at 2; *see also* Ex. A-6 at 2 (Tian-Cho Chu) ("More importantly, he is generous with his time.").
[56]    Ex. A-38 at 1 (Pornchai Wessatada); Ex. A-33 at 1 (Nicklas Ulander).
[57]    Ex. A-38 at 1 (Pornchai Wessatada).
[58]    Ex. A-4 at 2 (Paul Bromberg).
[59]    Ex. A-11 at 2 (Dean Falvy).

environment through neighborhood action, and offer emergency relief after floods or other disasters."[60] He "always makes a general donation when [visiting] temples" and "donates to the Red Cross, the Mercy Centre orphanages, and the Children of the Forest education program in Thailand."[61] He plans to launch a children's charity in the country as well, and has dedicated part of his estate to funding Thai schools.[62]

Martin also supports charitable causes by organizing fundraisers and encouraging others to attend and contribute.[63] In the same vein, he routinely asks his friends and family to forgo gifts for his birthday and instead to donate to nonprofits helping those in need.[64] Martin's efforts have had a material and positive impact. As Nora von Ingersleben-Seip writes: "Without Martin's encouragement and leadership, these donations would never have been made."[65]

Martin has a long history of donating to charitable causes elsewhere as well, including Medecins sans Frontieres (Doctors Without Borders), START-scholarship (an education program for migrant students in Austria), the Nature Conservancy of New Jersey, Habitat for Humanity, City Harvest (a food rescue organization in New York City), and other charities helping students, refugees, and the impoverished.[66] "Martin's aim has always been to do good in the areas of health, education, and the environment."[67]

---

[60]     Ex. A-33 at 1 (Nicklas Ulander).
[61]     Ex. A-4 at 2 (Paul Bromberg).
[62]     *Id.*; *see also* Ex. A-37 at 2 (Lauren Weidner).
[63]     Ex. A-37 at 2 (Lauren Weidner); Ex. A-33 at 1 (Nicklas Ulander) (noting that Martin secured the charitable donation of a famous Thai singer).
[64]     Ex. A-18 at 2 (Nina Hans); Ex. A-22 at 2 (Sung Hui Kim); *see also, e.g.*, Exs. A-34 at 2 (Nora von Ingersleben-Seip), A-35 at 2 (J.S. Watson), A-24 at 2 (Ana Malheiro), A-20 at 1 (Tyrel Holston).
[65]     Ex. A-34 at 2 (Nora von Ingersleben-Seip).
[66]     *See* Exs. A-4 at 2 (Paul Bromberg), A-8 at 2 (Katharina Ebrecht), A-22 at 1 (Sung Hui Kim), A-23 at 2 (Margaret Knudson), A-32 at 3 (Sarinpas Thaweekong), A-9 at 1 (Marilyn Elling), A-18 at 2 (Nina Hans).
[67]     Ex. A-8 at 2 (Katharina Ebrecht).

Martin's generosity to charitable causes and most recently his service work in Thailand are, indeed, a lynchpin of his life's work. And his commitment and impact is truly extraordinary.[68] According to Margaret Knudson, a development professional with three decades of fundraising experience: "I have known no other person that has spread his good fortune so selflessly, and I have been in the fundraising business a long time."[69]

Notably, despite his extraordinary generosity, Martin's "gifts are generally anonymous and he doesn't need to be photographed 'doing good' like many [others]. For him, knowing he has helped someone is reward enough."[70]

### e. *Martin's Global Community of Friends and Family*

Martin's willingness to help others also manifests in his relationships. A number of people in Martin's wide web of friends and family look to him still as a mentor and role model.[71] This lasting faith in him despite his conduct, which these same friends and family acknowledge as serious, is a testament to whom Martin has demonstrated himself to be over the course of his life.

Martin acts as godfather to several friends' children—a role he considers a great privilege and one which he takes very seriously.[72] While Martin has never had children of his own, he

---

[68]     Because it is exceptional, Martin's devotion to civic and charitable work should be considered by the Court in determining an appropriate sentence. *United States v. Tomko*, 562 F.3d 558, 572-73 (3d Cir. 2009) (*en banc*) (affirming, post-*Booker*, that a sentencing court may consider a defendant's charitable contributions under 18 U.S.C. § 3553(a)(1)); (; *Rita v. United States*, 551 U.S. 338, 364-65 (2007) (Stevens, J., concurring) (same); *United States v. Cherry*, 366 F. Supp. 2d 372, 378 (E.D. Va. 2005) (citation omitted) (same); *see, e.g.*, *United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (affirming a downward departure based in part on a defendant's "exceptional" community and charitable activities); *United States v. Jones*, 158 F.3d 492, 500 (10th Cir. 1998) (same); *United States v. Woods*, 159 F.3d 1132, 1136-37 (8th Cir. 1998) (same); *United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (same).

[69]     Ex. A-23 at 1 (Margaret Knudson).

[70]     Ex. A-38 at 1 (Pornchai Wessadata).

[71]     *E.g.*, Exs. A-11 at 2 (Dean Falvy), A-12 at 2 (Fred Fucci), A-26 at 1 (Sue Mezzanotte).

[72]     *E.g.*, Exs. A-11 at 2 (Dean Falvy), A-12 at 2 (Fred Fucci), A-26 at 1 (Sue Mezzanotte).

cherishes the relationships he has with his godchildren.[73] His goddaughter Nina Hans writes that "Martin has always been there for me, offering and providing guidance, support and advice – always with my best interest at heart."[74] To her:

> Martin is more than family. He is a mentor, role model and he has always been a guiding figure, providing moral support, wisdom and practical advice no matter, if on a personal or professional level. His influence has been crucial in shaping my values, discipline and sense of responsibility. He has always encouraged me to the right thing, to stay grounded and to take responsibility for my actions. His influence has been a major part of my upbringing and I can honestly say that without him, I would not be the same person today.[75]

Many speak of Martin as a mentor, expressing gratitude for the time and counsel he has generously given over the years. Susan Sorenson, his friend of nearly 40 years, writes that Martin's "power of example continues to make a positive impact on my life," but importantly, Martin gives advice without being "overbearing or pushy" and "instead, he offers suggestions with gentleness and clarity."[76] Martin is also considered a mentor to members of the Bangkok Rotary Club and his apartment building's Residents Committee.[77]

Martin is a deeply caring person. Those who know and have known him express awe and admiration at the degree to which Martin commits himself to the well-being of others, from close friends and family to people he meets for the first time:

> Martin takes a genuine interest in every person he meets, and listens carefully to how they view the world. No one, having met Martin, is ever treated as a stranger. His natural empathy, openness, and gregariousness have allowed him to bridge cultures and bring different people together.[78]

---

[73]     Exs. A-18 at 1 (Nina Hans), A-12 at 1 (Fred Fucci), A-26 at 1 (Sue Mezzanotte), A-31 at 1 (Susan Sorenson), A-34 at 2 (Nora von Ingersleben-Seip).

[74]     Ex. A-18 at 1 (Nina Hans).

[75]     *Id.*

[76]     Ex. A-31 at 1 (Susan Sorenson).

[77]     Exs. A-38 at 2 (Pornchai Wessatada), A-3 at 1 (Simon Blade).

[78]     Ex. A-11 at 2 (Dean Falvy); *accord* Exs. A-8 at 2 (Katharina Ebrecht) ("He is extremely interested in other people, makes contacts and friends quickly, and cultivates those friendships

The diversity of people who make up Martin's vast community of loved ones is evidence of his worldview and deeply held value of supporting others. As Dean Falvy writes, "Martin has always treated friends, classmates, and colleagues, from every part of his life, as having unique and intrinsic worth."[79] Catherine George describes Martin's "most distinctive character trait" as his "commitment, energy, and generosity to being a loyal and true friend."[80] This regard for Martin's exceptional and consistent strength of character is echoed by friends, family, and colleagues. Here is Susan Sorenson again:

> Martin's kindness extends far beyond ordinary friendship. When my mother was diagnosed with cancer, Martin was there to visit her in the hospital with me. When my father passed away, Martin attended his wake, despite just having returned from an international flight. He showed the same level of support when my mother passed, comforting me during one of the most difficult times of my life. These acts were a testament not only to his friendship but also to his caring and compassionate character.[81]

Like when he makes anonymous donations to charity[82], Martin exhibits humility in his devotion to family and friends. Susan Sorenson has observed that when he has spoken of instances he has been able to help others, Martin "approaches these moments with a mix of joy and humility, always expressing gratitude for being able to support those he loves."[83]

The ways in which Martin has helped his family and friends are abundant and impossible to outline in full here. But as described throughout, Martin has always supported his family, acting

---

carefully."), A-1 at 1 (Margarida Afonso) ("He is very sociable and truly interested in exchanging ideas with people from different backgrounds and different cultures.").
[79]    Ex. A-11 at 1 (Dean Falvy); *see also* Exs. A-5 at 1, 3 (Li-Kai Chen), A-33 at 1 (Nicklas Ulander), A-35 at 2 (J.S. Watson).
[80]    Ex. A-13 at 2 (Catherine George).
[81]    Ex. A-31 at 1 (Susan Sorenson).
[82]    Ex. A-38 at 1 (Pornchai Wessatada) (noting Martin is "quite humble" and that "his gifts [to Rotary Club causes] are generally anonymous").
[83]    *Id.*

as the "glue" says his brother Ronald, to keep anyone from becoming estranged.[84] He supports family members emotionally and financially, and has helped nieces and nephews purchase homes or finance schooling when they needed support.[85] And since losing his father in 2018, Martin has shown up for his stepmother, checking in on her regularly and providing support.[86] Here is how his brother puts it:

> Without Martin, I probably would have dropped out of contact with my stepmother when my father died. And, without Martin, I would have lost contact with my sister-in-law and her children and grandchildren when my middle brother died. But that would not have been the kind of world that Martin lives in and for.

Martin's love for his friends manifests in the same ways: consistent acts of kindness, showing up in the most difficult times of life, and reaching out to check on friends regularly.[87] Martin has "never hesitated to extend his time, his counsel, or his help when friends (or friends of friends) [are] in need."[88]

Gretchen Hachmeister writes: "While my mother was dying of colon cancer and I was caring for her in 1988, Martin telephoned me daily to see how my mom was and how I was holding up." And Tyrel Holston: "He was often my first call for a family medical scare[.]" According to

---

[84]     Ex. A-10 at 2 (Ronald Elling); *see also* Exs. A-9 at 1 (Marilyn Elling) ("Martin has been a strong lynchpin helping to keep his far-flung family together."), A-16 at 2 (Gretchen Hachmeister) (noting that Martin is the "center" of his extended family).

[85]     Exs. A-20 at 2 (Tyrel Holston), A-23 at 2 (Margaret Knudson), A-12 at 2 (Fred Fucci), A-9 at 1 (Marilyn Elling) (noting that Martin financed preschool "for the daughter of one of his nieces who was struggling"), A-15 at 2 (Tracey Griffin), A-16 at 1 (Gretchen Hachmeister) (noting that Martin helped support and finance higher education for his nieces and nephews).

[86]     Exs. A-7 at 3 (Caspar Ebrecht), A-11 at 1 (Dean Falvy), A-12 at 2 (Fred Fucci), A-22 at 1 (Sung Hui Kim).

[87]     Exs. A-4 at 2 (Paul Bromberg), A-10 at 1 (Ronald Elling), A-23 at 1 (Margaret Knudson), A-26 at 1 (Sue Mezzanotte), A-27 at 2 (Sylvia Rottman), A-32 at 2 (Sarinpas Thaweekong), A-10 at 1 (Ronald Elling), A-8 at 2 (Katharina Ebrecht), A-7 at 1-2 (Caspar Ebrecht), A-29 at 1 (Michael Silber); *see also* Ex. A-11 at 2 (Dean Falvy) (noting that Martin's friendships extend "beyond individuals to their families and beyond").

[88]     Ex. A-11 at 1 (Dean Falvy).

Nicklas Ulander: "If you or a family member falls ill, he's the first to reach out." Martin also supports others by helping newcomers to his communities feel welcome. For example, by helping them find apartments, tour neighborhoods, acclimate to the new culture, and meet new people.[89] And when he is the visitor, he brings "carefully selected presents"—not extravagant gifts, but rather gifts that show he really knows about and cares for a person, like a favorite chocolate bar, vitamins, herbal candy, or a Moo Deng toy.[90]

Those who know Martin best say that his character is "defined by acts of kindness" and making others "feel valued."[91] Martin shows "integrity, generosity, respect, understanding, and curiosity" to everyone, no matter who they are, and he genuinely cares for humanity and society.[92] Importantly, Martin "evaluates people without prejudice, recognizing and appreciating their true character."[93] Accordingly, he "never ignore[s] someone in need, no matter how busy he [is], or the circumstances," even stopping to talk to strangers in mental distress or "on the fringe of society."[94] Tylor Holston writes: "I believe Martin's greatest quality is his faith in humanity. Empathetic and kind, he believes the best in people."[95] Martin is known to be "selfless and kind-hearted,"[96] and "a

---

[89]    Exs. A-2 at 2 (Rawit Assamongkol), A-3 at 2 (Simon Blade), A-6 at 2 (Tian-Cho Chu), A-7 at 3 (Caspar Ebrecht), A-8 at 1 (Katharina Ebrecht), A-11 at 2 (Dean Falvy), A-17 at 2 (Tim Havermann), A-24 at 2 (Ana Malheiro), A-30 at 2 (Kevin Sneader), A-27 at 2 (Sylvia Rottman), A-34 at 1 (Nora von Ingersleben-Seip).

[90]    Exs. A-7 at 3 (Caspar Ebrecht), A-32 at 2 (Sarinpas Thaweekong), A-34 at 1 (Nora von Ingersleben-Seip).

[91]    Exs. A-5 at 1, 3 (Li-Kai Chen), A-31 at 1 (Susan Sorenson).

[92]    Ex. A-14 at 1 (Rebecca George); *see also* Exs. A-17 at 2 (Tim Havermann), A-24 at 2 (Ana Malheiro), A-28 at 2 (Harry Seip), A-37 at 2 (Lauren Weidner).

[93]    Ex. A-17 at 2 (Tim Havermann); *see also* Ex. A-8 at 2 (Katharina Ebrecht).

[94]    Ex. A-5 at 3 (Li-Kai Chen); *see also* Ex. A-17 at 2 (Tim Havermann).

[95]    Ex. A-20 at 1 (Tyrel Holston).

[96]    Ex. A-5 at 4 (Li-Kai Chen); *accord* Ex. A-6 at 1 (Tian-Cho Chu) ("Martin is the most genuine caring and generous person I know.").

most welcoming, humane, and altruistic person, always willing to share whatever he can contribute for the benefit of others."[97]

Against this backdrop, Martin's conduct in this case stands in stark contrast to a life remarkably well lived. His friends and family have expressed what a deviation this conduct was in the context of Martin's inspiring life story. Frederick Fucci, for instance, writes that when he read the emails at issue, "I found them uncharacteristic and difficult to reconcile with the person I had known for over 30 years."[98] Still:

> . . . this does not obscure his many years of active community participation, support for not just his own family and mine but also for many other friends and acquaintances, as well as his extraordinarily generous contributions and devotion of his time to charitable organizations whose missions are to enhance civil society, provide medical care to those who cannot afford it, and to protect our living environment.[99]

## 2. Offense Conduct

As stated in the Information, Martin was part of a team at McKinsey that advised Purdue Pharma, LP ("Purdue Pharma"). ECF 1 at ¶ 2. He "served as the Director of the Client Services Team (CST) for approximately thirty of McKinsey's engagements with Purdue Pharma," but by 2016—as Senior Partner—stepped back from most day-to-day work with the company. ECF 1 at ¶ 3.

On July 3, 2018, the Financial Times reported that the Massachusetts Attorney General's Office had named a former member of Purdue Pharma's Board of Directors in a lawsuit relating to unfair and deceptive marketing practices for the company's product OxyContin. ECF 1 at ¶ 5.

---

[97]    Exs. A-35 at 2 (J.S. Watson), A-39 at 1 (Lori Winters).
[98]    Ex. A-12 at 2 (Fred Fucci).
[99]    *Id.*

The next day, Martin reached out to a colleague at McKinsey ("Individual 1") in an email, from his McKinsey account to Individual 1's personal account, commenting:

> Just saw in the FT that [a Purdue Pharma board member] is being sued by states attorneys general for her role on the [Purdue Pharma] Board. It probably makes sense to have a quick conversation with the risk committee to see if we should be doing anything other that [sic] eliminating all our documents and emails. Suspect not but as things get tougher there someone might turn to us.

ECF 1 at ¶ 7. Individual 1 replied: "Thanks for the heads up. Will do."

On August 22, 2018, Martin emailed himself a note to "delete old [Purdue Pharma] documents from laptop." ECF 1 at ¶ 11. On August 25, he emailed himself to "Remove Purdue folder from garbage." ECF 1 ¶ 12(b). On August 26, Martin initiated the process to permanently delete items from a "Purdue Pharma" folder in his Outlook. ECF 1 ¶ 12(c). The Government's forensic analysis also shows that sometime between April 2018 and September 2018, Martin "removed a folder titled 'Purdue' (which included a subfolder entitled 'Strategy') from his Windows operating system." ECF 1 ¶ 12(d).

On January 10, 2025, Martin pleaded guilty—pursuant to a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement with the Government—to one count of violating 18 U.S.C. § 1519, which prohibits knowingly concealing or destroying records, documents, or tangible objects with intent to impede, obstruct, or influence a federal investigation. *United States v. Spirito*, 36 F.4th 191, 202 (4th Cir. 2022); ECF 1 (Information); ECF 22 (Guilty Plea Form).[100]

---

[100]    The nature of the documents is not an element of 18 U.S.C. § 1519. *E.g.*, *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012), *abrogated on other grounds by* U.S.S.G. Amendment 794.

**SENTENCING GUIDELINES**

### 1. Legal Standard

Application of the U.S. Sentencing Guidelines ("Guidelines") is a "multistep process." *United States v. Pauley*, 511 F.3d 468, 471 (4th Cir. 2007). First, the Court assesses a defendant's offense conduct and past crimes (if any) to establish an advisory sentencing range. *Id.* There is no presumption that the Guidelines range is reasonable. *Id.* at 473.

Second, after calculating the Guidelines range, the Court "must give both the government and the defendant an opportunity to argue for whatever sentence they deem appropriate" to satisfy the aims of sentencing in 18 U.S.C. § 3553. *Id.* at 473. Those aims are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for [the defendant according to the Guidelines].
>
> (5) any pertinent policy statement [issued by the U.S. Sentencing Commission].
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Third, if the Court finds that the advisory Guidelines range is "greater than necessary" to satisfy these sentencing aims, the Court shall impose a sentence that varies downward from the Guidelines range. 18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 91, 101, 109 (2007); *Pauley*, 511 F.3d at 473. It is especially appropriate for the Court to vary downward when there is a "sufficiently compelling" reason to do so, *Pauley*, 511 F.3d at 473, such as if a case is "outside the heartland" to which the Guidelines are intended to apply. *Kimbrough*, 552 U.S. at 109 (citation omitted).

Put simply, the Court is in a "'superior position' to the Guidelines to 'find facts and judge their import' under 18 U.S.C. § 3553." *Id.* (citation omitted).

## 2. Guidelines Calculation

Martin's Guidelines calculation is stipulated in the Plea Agreement as follows:

| U.S.S.G. § 2J1.2 | 14 | Base Offense Level |
|---|---|---|
| U.S.S.G. § 3E1.1 | - 2 | Acceptance of Responsibility |
| U.S.S.G. § 4C1.1 | - 2 | Adjustment for Zero-Point Offenders |

ECF 2 (Plea Agreement) at 3. This results in a Total Offense Level of 10. Because Martin has no criminal history, he is a Criminal History Category of I, which with an Offense Level of 10 places him in Zone B of the Sentencing Table. ECF 2 at 3; U.S.S.G. Ch. 5 Pt. A (Sentencing Table). The Guidelines recommend a sentence of six to twelve months. ECF 2 at 3; U.S.S.G. Ch. 5 Pt. A.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agreed that Martin "shall be sentenced within the range of zero months to twelve months' imprisonment," which "is a reasonable sentence considering all of the facts and circumstances of this case." ECF 2 at 2. Martin understands that the Government will recommend a sentence "within the [G]uidelines

range of imprisonment of 6 to 12 months," ECF 2 at 4, which may be satisfied by either a term of imprisonment or a sentence of probation that includes intermittent confinement, community confinement, or home detention as a substitute for imprisonment. U.S.S.G. § 5C1.1(c); *United States v. Deppert*, 850 F. App'x 63, 66-67 (2d Cir. 2021). And the Government understands that Martin will request a "non-incarcerative sentence of probation." ECF 2 at 4. Because Martin is a Zero-Point Offender in Zone B,[101] the Guidelines endorse a probationary sentence, recommending that "***a sentence other than a sentence of imprisonment . . . is generally appropriate***." U.S.S.G. § 5C1.1 Application Note 10(a) (emphasis added).[102]

## PROBATION IS AN APPROPRIATE SENTENCE

In this case, the 18 U.S.C. § 3553 factors weigh heavily in favor of sentencing Martin to a non-incarcerative sentence, such as a term of probation that would allow Martin to return to his home in Thailand.[103]

---

[101] A "Zero-Point Offender" is a defendant who has no Criminal History points and whose offense is not enumerated as a disqualifying violent or serious crime in U.S.S.G. § 4C1.1(a). Martin's offense—obstruction of justice in violation of 18 U.S.C. § 1519—is not one of the disqualifying crimes listed. *See* U.S.S.G. § 4C1.1(a)(2)-(11). Therefore, Martin "is a Zero-Point Offender." PSR ¶ 35; *accord* ECF 2 (Plea Agreement) at 3.

[102] The commentary reads, in full: "If the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate. *See* 28 U.S.C. § 994(j)." U.S.S.G. § 5C1.1 Application Note 10(a).

[103] If the Court is inclined to impose a sentence of probation, we respectfully request that the Court consider allowing Martin to serve any term of probation in Thailand. *See* 18 U.S.C. § 3563(b)(14) (authorizing the Court to set geographical parameters on probation); U.S.S.G. § 5B1.4(a)(1) (same). Courts across the country have granted similar requests, including in the Fourth Circuit. *See, e.g.*, ECF 30 (Judgment), *United States v. Jeffrey Chow*, No. 1:17-CR-466 (E.D.N.Y. 2017) (permitting defendant convicted of conspiracy to defraud the United States to serve probation in **Singapore**); ECF 29 (Minute Entry), *United States v. Hue Ngoc Nguyen*, No. 3:17-CR-2389 (S.D. Ca. 2017) (permitting defendant convicted of felony theft of public property to serve unsupervised probation in **Vietnam**); ECF 285 (Sentencing Hearing Transcript) at 5-7, *United States v. Takayuki Yagami*, No. 1:14-CR-272 (S.D.N.Y. 2014) (permitting defendant convicted of conspiracy to commit wire and bank fraud to serve supervised release in **Hong Kong**);

### 1.    The Guidelines Recommend Probation

As stated, Martin's advisory Guidelines range is six to twelve months, which is in Zone B of the Sentencing Table. However, for a Zero-Point Offender like Martin, Application Note 10(a) to U.S.S.G. § 5C1.1 actually recommends that a "sentence other than a sentence of imprisonment"—such as probation—is "generally appropriate."

Application Note 10(a) is not a suggestion pulled out of thin air by the U.S. Sentencing Commission ("Commission"). Rather, the note "implements Congress's direction at 28 U.S.C. § 994(j) that the Commission ensure the Guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." *2023 Amendments in Brief, Part B: Decreasing Offense Levels, Expanding Alternatives for Zero-Point Offenders*, U.S.S.C. (2023)[104]; *see generally* 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"). Thus, Application Note 10(a) underpins Congressional "calls for

---

ECF 28 (Minute Entry), *United States v. Eric Logan*, No. 3:12-CR-2392 (S.D. Cal. 2012) (permitting defendant convicted of mail fraud to serve probation in **Philippines**); ECF 312 (Judgment) and ECF 314 (Judgment), *United States v. Pakpoom Hanprap and Payongyut Vongvichuankul*, No. 1:11-CR-368 (S.D. Ala. 2011) (permitting two Thai defendants convicted of violating an anti-pollution treaty to serve unsupervised probation in **Thailand** after repatriation); ECF 21 (Judgment), *United States v. Chin Eng Yap*, No. 4:95-CR-87 (W.D. Mo. 1995) (permitting defendant convicted of making counterfeit securities to serve unsupervised probation in **Malaysia**); ECF 24 (Judgment), *United States v. Richard Yane*, No. 8:93-CR-202 (D.S.C. 1993) (permitting defendant convicted of making false statements under 18 U.S.C. § 1001 to serve probation with a condition of home confinement in **Singapore**).

[104]    Available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments -in-brief/AIB_821.pdf.

leniency" for nonviolent, low-level, first-time offenders like Martin. *United States v. Paredes*, No. 15-CR-582, 2023 U.S. Dist. LEXIS 208683, at *17 (E.D.N.Y. Nov. 21, 2023).

Consistent with Application Note 10(a), courts frequently sentence Zero-Point Offenders to probation.[105] For example:

- ***United States v. Kevin Crotty*, No. 1:24-CR-198 (N.D. Ill. 2024).** Crotty pleaded guilty to one count of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. His total Offense Level was 8, with a Criminal History Score of I, resulting in an advisory Guidelines range of zero to six months. *Id.*, ECF 13 (Plea Agreement). The Government recommended a within-Guidelines sentence of three years of probation. *Id.*, ECF 19 (Sentencing Memorandum). Crotty was sentenced to two years of probation and 200 hours of community service, with no fine. *Id.*, ECF 22 (Judgment).

- ***United States v. Zachariah Boulton*, No. 1:23-CR-284 (D.D.C. 2023).** Boulton pleaded guilty to entering and remaining in a restricted building in violation of 18 U.S.C. § 1752(a)(1) after participating in the January 6, 2021 riots at the U.S. Capitol. His total Offense Level was 4, with a Criminal History Score of I, resulting in an advisory Guidelines range of zero to six months. *Id.*, ECF 19 (Plea Agreement). The Government recommended a within-Guidelines sentence of three months of imprisonment, arguing that Boulton minimized the seriousness of his conduct, including by telling the Atlanta Journal-Constitution that he expected only a "slap on the wrist." *Id.*, ECF 26 (Sentencing Memorandum). Nevertheless—in accordance with Application Note 10(a)[106]—Boulton was sentenced to two years of probation, with a $500 fine and $500 restitution. *Id.*, ECF 31 (Judgment). His sentence was later annulled by Presidential pardon.

- ***United States v. Madhu Shivalingegowda and Chintan Sandesara*, No. 4:23-CR-28 (N.D. Ga. 2023).** Shivalingegowda and Sandesara both pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. *Id.*, ECF 135 and 136 (Minute Entries).

---

[105]    To conduct this research, we performed a Boolean search for the terms ("4C1.1" AND "5C1.1" AND "Application Note 10(a)") on Lexis' database of "Briefs, Pleadings, and Motions." We narrowed the results by title for "Sentencing Memorandum," and reviewed all memorandum where a defendant (1) had a total Offense Level in Zone A or B of the Sentencing Table, (2) qualified for the Zero-Point Offender reduction under U.S.S.G. § 4C1.1, and (3) argued for a sentence of probation under Application Note 10(a). We then verified the sentence ultimately received by each defendant on the court's docket.

[106]    The sentencing court issued a memorandum opinion concluding that U.S.S.G. § 4C1.1 applied to Boulton despite his involvement in the January 6 riot because he did not commit a "crime of violence." *United States v. Tyng Jing Yang*, No. 23-100 (JDB), 2024 U.S. Dist. LEXIS 22938, at *14-15 (D.D.C. Feb. 9, 2024). In a footnote, the court quoted Application Note 10(a)'s directive that "[i]f a defendant receives a § 4C1.1 adjustment and has a Guidelines range in Zone A or B of the Sentencing Table, 'a sentence other than a sentence of imprisonment . . . is generally appropriate.'" *Id.* at *8 n.1.

After the Government moved for a substantial-assistance cooperation reduction pursuant to U.S.S.G. § 5K1.1, their total Offense Levels were 11, with Criminal History Scores of I. *Id.*, ECF 183 and 184 (5K Motions). Both Shivalingegowda and Sandesara received a sentence of one year of probation, with eight months of home detention and approximately $1 million in joint-and-several restitution. *Id.*, ECF 193 and 194 (Judgments).

- *United States v. Tommy Hendrickson*, No. 5:23-CR-40041 (D. Kan. 2023). Hendrickson pleaded guilty to two counts of theft of government property in violation of 18 U.S.C. § 641. His total Offense Level was 11, with a Criminal History Score of I, resulting in an advisory Guidelines range of eight to fourteen months. The Government agreed to recommend a sentence at the low end of the Guidelines range (i.e. eight months of imprisonment). *Id.*, ECF 12 (Plea Agreement). Hendrickson was sentenced to three years of probation and $237,000 restitution. *Id.*, ECF 21 (Judgment).

- *United States v. Brian Rubin*, No. 1:23-CR-552 (N.D. Ill. 2023). Rubin pleaded guilty to one count of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b-5. His total Offense Level was 10, with a Criminal History Score of I, resulting in an advisory Guidelines range of six to twelve months. *Id.*, ECF 24 (Plea Agreement). The Government recommended a within-Guidelines range of imprisonment, despite acknowledging Application Note 10(a). *Id.*, ECF 31 (Sentencing Memorandum). Rubin was sentenced to three years of probation, and a $90,000 fine. *Id.*, ECF 37 (Judgment).

- *United States v. Calvin Bautista*, No. 8:22-CR-308 (N.D.N.Y. 2022). Bautista pleaded guilty to one count of smuggling goods (Burmese pythons) into the United States, in violation of 18 U.S.C. 545. His total Offense Level was 5, with a Criminal History Score of I, resulting in an advisory Guidelines range of zero to six months. The Government agreed to recommend a sentence at the low end of the Guidelines range (i.e. probation). *Id.*, ECF 25 (Plea Agreement). Bautista was sentenced to one year of probation, with a $5,000 fine. *Id.*, ECF 35 (Judgment).

Although the sentencings in these cases are not binding in  Martin's unique situation, *see generally* 18 U.S.C. § 3553(a), they exemplify the purpose of Application Note 10(a), which reflects Congress' intent that for nonviolent, first-time offenders with a low Guidelines range like Martin, a non-incarcerative sentence like probation is generally appropriate.[107]

---

[107]    Amendment 821, U.S.S.C. (effective Nov. 1, 2023), https://www.ussc.gov/guidelines/ amendment/821 ("The changes to the Commentary to § 5C1.1 respond to Congress's directive to the Commission at 28 U.S.C. § 994(j), directing the Commission to ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense. The Commission determined that the revised Commentary [including Application Note 10(a)] serves Congress's intent in promulgating § 994(j). . .").

### 2. A Sentence of Probation Will Not Result in a Sentencing Disparity.

A sentence of probation for Martin will not result in unwarranted sentence disparities with similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6) (requiring the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

As a threshold matter, there is a dearth of data on the average sentence received by defendants similarly situated to Martin. For example, the Judicial Sentencing Information (JSIN) database—which provides the average sentences received by defendants with specific Guidelines ranges—contains "insufficient" data about defendants with similar Guidelines to Martin, i.e., a primary offense under U.S.S.G. § 2J1.2 (Obstruction of Justice) and a total Offense Level between 9 and 11 (Zone B of the Sentencing Table). *Accord* PSR at p. 19 (detailing the lack of JSIN information). Moreover, even if there were sufficient data concerning defendants convicted under 18 U.S.C. § 1519, that would not inform whether sentencing Martin to probation would result in a disparity. This is because the requirement is to avoid sentencing disparities between defendants "who have been found guilty of similar ***conduct***," not just similar crimes. 18 U.S.C. § 3553(a)(6) (emphasis added); *United States v. McVey*, 752 F.3d 606, 610 (4th Cir. 2014) ("Sentencing under the Sentencing Guidelines involves consideration of the *actual* conduct in which a defendant engaged, 'regardless of the charges for which he was indicted or convicted.'"). Thus, as the statute at issue (18 U.S.C. § 1519) was written in "broad language" to cover a wide variety of conduct, *United States v. Hunt*, 526 F.3d 739, 744 (11th Cir. 2008), any data on the average sentence for a Section 1519 conviction would not be meaningful as a point of reference in sentencing. It is unlikely that such a sentence is appropriate for Martin, who—for the many reasons stated in this

Sentencing Memorandum—falls "outside the heartland" of the average case. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (citation omitted).

Notwithstanding the lack of data, there are at least two reasons why sentencing Martin to a term of probation will not result in a sentencing disparity as compared to others convicted under 18 U.S.C. § 1519.

First, the Guidelines recommend probation for individuals with Martin's total Offense Level (Zone B) and Criminal History Score (I). *See* U.S.S.G. § 5C1.1 Application Note 10(a) (advising that, in general, a non-incarcerative sentence is "appropriate" in such circumstances). Because the Guidelines were designed to avoid disparities in sentencing, following the guidance in Application Note 10(a) inherently reduces the risk of any disparity. *United States v. Arnold*, 302 F. Supp. 2d 637, 641 (W.D. Va. 2003) (Jones, J.) (explaining that the primary "purpose" of the Guidelines is to "create uniformity in sentencing"); *United States v. McIntosh*, 124 F.4th 199, 205 (3d Cir. 2024) (stating that the Guidelines facilitate "uniformity" and "proportionality"). A Guideline sentence of probation presents little risk of any sentencing disparity between Martin and similarly situated low-level first-time offenders.

Second, within the last five years, courts have regularly sentenced individuals convicted under 18 U.S.C. § 1519 to probation. Examples include:

- *United States v. Martique Vanderpool*, No. 8:23-CR-00234 (D. Md. 2025) (three years of probation)

- *United States v. Braxton Norwood*, No. 9:23-CR-00035 (D. Mont. 2024) (four years of probation with $2,500 fine and $165,446 restitution)

- *United States v. Justin Newkirk*, No. 1:23-CR-00371 (N.D. Ga. 2024) (two years of probation)

- *United States v. Mark O'Mara*, No. 1:23-CR-00072 (S.D.N.Y. 2023) (30 months of probation and $224,687 restitution)

26

- *United States v. Michael Puehler*, No. 1:22-CR-00080 (S.D. Oh. 2023) (three years of probation)

- *United States v. Eric Lugo*, No. 3:18-CR-00089 (D.P.R. 2023) (two years of probation)

- *United States v. Kassandra Toran*, No. 1:19-CR-00086 (S.D. Oh. 2023) (three years of probation)

- *United States v. Matthew Torres*, No. 2:19-CR-00352 (D.N.J. 2022) (three years of probation and $3,800 restitution)

- *United States v. Kenny Nunez*, No. 1:19-CR-00519 (E.D.N.Y. 2021) (three years of probation and $6,720 restitution)

- *United States v. Rafia Shareef*, No. 5:20-CR-00058 (C.D. Cal. 2021) (three years of probation and $5,500 fine)

- *United States v. Ronald Sherry*, No. 1:19-CR-20732 (S.D. Fla. 2020) (five years of probation)

- *United States v. Theodore Gerstle*, No. 5:20-CR-00047 (E.D. Ky. 2020 (three years of probation and $50,000 fine)

- *United States v. Amber Adams*, No. 5:19-CR-00117 (E.D. Ky. 2020) (three years of probation and $2,500 fine)

- *United States v. Mikolaos Vastardis*, No. 1:19-CR-00066 (D. Del. 2020) (three years of probation and $7,500 fine)

- *United States v. Dale Emmons*, No. 5:18-CR-00106 (E.D. Ky. 2020) (three years of probation)

- *United States v. Alexandro Loredo*, No. 3:18-CR-03201 (W.D. Tex. 2020) (five years of probation and $250 fine)

- *United States v. Derrick Moore*, No. 1:19-CR-00190 (N.D. Ill. 2020) (one year of probation)

At bottom, a sentence of probation for Martin will not be an outlier. Rather, it is a common,

appropriate, and sufficient punishment for his offense conduct under 18 U.S.C. § 1519.

### 3. A Sentence of Probation Will Alleviate the Devastating Collateral Consequence of Barring Martin from His Home in Thailand

It is well established that this Court may consider the collateral consequences of conviction when varying downward from the Guidelines. *See, e.g., United States v. Pauley*, 511 F.3d 468, 470 (4th Cir. 2007) (affirming a downward departure from 78-97 months of prison to 42 months because the defendant "lost his teaching certificate and his state pension as a result of his conduct").[108] One major collateral consequence that the Court may consider is the effect of conviction on immigration status. *United States v. DeBeir*, 186 F.3d 561, 569-70 (4th Cir. 1999); *see, e.g., United States v. Reyes*, 721 F. App'x 284, 285 (4th Cir. 2018) (holding that the district court "did not err in considering the immigration consequences that resulted from [a defendant's] sentence").

Here, Martin very likely faces the harsh collateral consequence of being ***barred permanently from his new homeland of Thailand*** if he receives a sentence of imprisonment.[109] As explained by experienced Thai immigration counsel at Fragomen, a preeminent immigration law firm, Martin "is currently holding a Thai 10-years Long Term Resident visa," and intends to continue living in Thailand. Ex. C at 1 (Fragomen Letter). However, Section 12(6) of the Thai Immigration Act, B.E. 2522 (1979) bars foreigners from entering and residing in Thailand if they have been "imprisoned by . . . a judgment of a court of a foreign country," with narrow exceptions

---

[108]    While the Guidelines recommend that some form of confinement accompany any probationary sentence imposed for someone like Martin in Zone B, we urge that the Court exercise its discretion to vary downward and not impose any alternative confinement but instead sentence Martin to straight probation, perhaps with community service.

[109]    For clarity, a sentence to "time served," with or without supervised release, would still constitute a sentence of imprisonment. *See, e.g., Rodriguez v. United States*, 111 F. Supp. 2d 112, 114 (D. Conn. 1999) ("A judge's sentence of time served necessarily incorporates the time a defendant was imprisoned prior to trial, unless specifically stated otherwise. A sentence of time served . . . *does* constitute a sentence of imprisonment."); *United States v. Jacobs*, 400 F. App'x 712, 715 (4th Cir. 2010) ("Crediting a defendant for time served does not equate to imposing a sentence of probation only.").

that do not apply to Martin's felony offense. Ex. C at 2 (Fragomen Letter). Accordingly, counsel at Fragomen has advised that it is her legal opinion that:

> [I]f [Martin] is sentenced to any term of imprisonment, he will be prevented from returning to Thailand. If an appeal is made to the Minister of Interior requesting permission for him to be allowed to return to Thailand, the process would take time, be complicated, and the outcome is uncertain.

Ex. C at 3 (Fragomen Letter).

This collateral consequence would be ***severe***. As explained, Martin has developed a "strong connection and love for his adopted home Thailand." Ex. A-28 at 1 (Harry Seip). He has integrated himself into the country's arts and culture, language, and society. *E.g.*, Exs. A-3 at 2 (Simon Blade), A-21 at 2 (Hermes Taikan Huang). He explores rarely visited provinces, befriends locals ranging from Buddhist monks to taxi drivers, supports Thai arts, and gives both his time and finances to Thai charities. Martin has truly made Bangkok his home. Ex. A-2 at 2 (Rawit Assamongkol). Taking that away from him would be extraordinarily punitive.

District courts have granted downward variances to avoid harsh collateral immigration consequences in other cases.

For example, in *United States v. Jeremy Wada*, the defendant—a citizen and resident of the United States—had a total Offense Level of 21 (37 to 46 months), but argued for a sentence of probation because a sentence of 12 months or more in prison would foreclose future entry to Japan, his ancestral homeland, under Japanese immigration law. *See* ECF 424, 425, and 434, *United States v. Jeremy Wada*, No. 1:18-CR-36 (S.D.N.Y. 2019). The Probation Office also recommended a sentence of 11 months in prison to avoid the 12-month cutoff. *Id.* At sentencing, Southern District of New York Judge J. Paul Oetken agreed with the defendant, reasoning:

> [A] sentence of over a year incarceration would prevent Mr. Wada from visiting Japan, and that would be extremely punitive and I

> think more punitive than is necessary, and, in fact, [P]robation has
> recommended a sentence of 11 months in light of that fact. . . . All
> these factors lead me to conclude that a guidelines sentence would
> be greater than necessary and, therefore, a variance below the
> guidelines and indeed below 12 months is appropriate in light of the
> other consequences of the felony conviction and, in particular, the
> inability to visit Japan if the sentence is greater than 12 months."

*Id.*, ECF 441 (Sentencing Hearing Transcript) at 30-31, attached as **Exhibit D**. Judge Oetken

thereafter varied downwards from the defendant's Guidelines range of 37 to 46 months, and

sentenced him to 9 months of prison. *Id.*, ECF 438 (Judgment).

Likewise, in *United States v. Andrew Pearse*, the defendant—a citizen of New Zealand but

lifelong resident of the United Kingdom—had a total Offense Level of 32 (121 to 151 months),

but received a strong motion for downward departure from the government pursuant to U.S.S.G.

§ 5K1.1. *See* ECF 777 and 781, *United States v. Andrew Pearse*, No. 1:18-CR-681 (E.D.N.Y.

2024). He also argued for a lighter sentence because a sentence of 12 months or more in prison

would foreclose reentry to his home in the United Kingdom under English immigration law. *Id.*

Eastern District of New York Judge Nicholas Garaufis expressly considered this harsh

immigration consequence in varying downward. At the sentencing hearing, Judge Garaufis noted

that the "consequence of being barred from reentering the UK" was "serious," and questioned

defense counsel about whether a non-incarcerative sentence would implicate the UK's

immigration law. After explaining his philosophy that sentencing should result in "the most

positive and fewest negative consequences" as possible, Judge Garaufis imposed a sentence that

acknowledged defendant's clean criminal record, immigration status, and substantial cooperation

with the government: nominal "time served." *Id.*, ECF 790 (Sentencing Hearing Transcript),

attached as **Exhibit E**.

Similarly, in *United States v. Andrew Keeling*, the defendant had a total Offense Level of 17 (24 to 30 months), but requested a sentence of six months in prison because a sentence of 12 months or more would—according to Australian immigration law—prevent his relocation to Australia, where he had a pregnant girlfriend and promising job. ECF 56, *United States v. Andrew Keeling*, No. 5:16-CR-00125 (C.D. Cal. 2017). The Probation Office and government recommended 364 days in prison so defendant could still relocate to Australia post-conviction. *Id.*, ECF 55. Although there is no transcript of the sentencing hearing available, Central District of California Judge Jesus Bernthal varied downward and sentenced the defendant to four months in prison. *Id.*, ECF 61.

Like in *Wada*, *Pearse*, and *Keeling*, we respectfully submit that this Court's sentence of Martin should not be one that carries the devastating collateral consequence of permanently barring him from Thailand.

Indeed, on its own—even without a sentence of imprisonment—Martin's felony conviction restricts his international travel, because some countries prevent entry of felons.[110] As the Supreme Court has acknowledged, any "[l]oss of the ability to travel abroad is itself a harsh penalty." *Vartelas v. Holder*, 566 U.S. 257, 268 (2012). After all, "[f]reedom of movement across frontiers . . . may be as close to the heart of the individual as the choice of what he eats, or wears, or reads." *Kent v. Dulles*, 357 U.S. 116, 1264 (1958); *see also Aptheker v. Sec'y of State*, 378 U.S. 500, 520 (1964) (Douglas, J., concurring) (noting the importance of international travel to culture, politics,

---

[110]    *E.g.*, Fred Aaron, *Traveling Abroad with a Criminal Conviction*, Interrogating Justice (Apr. 28, 2022), https://interrogatingjustice.org/challenges-after-release/traveling-abroad-with-a-criminal-conviction%ef%bf%bc/ (listing the United Kingdom, Jamaica, Canada, Russia, China, and Israel as examples of countries that bar entry of felons).

and society). But the "harsh" collateral consequence of limited international travel pales in severity compared to permanently barring Martin from his adopted homeland.

### 4. A Sentence of Probation Adequately Fulfills the Goals of Punishment, Deterrence, Protection, and Rehabilitation.

Martin must receive a sentence "sufficient, but not greater than necessary" to reflect the seriousness of his 18 U.S.C. § 1519 offense, promote respect for the law, provide just punishment, afford adequate deterrence (both general and specific), and provide any needed rehabilitation. 18 U.S.C. § 3553(a)(2)(A)-(D). A sentence of probation accomplishes these goals.

First, a sentence of probation provides just punishment that reflects the seriousness of his obstruction of justice offense and serves as a general deterrent. Probation would not be a slap on the wrist. *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled."); *Doe v. Lee*, 518 F. Supp. 3d 1157, 1197 (M.D. Tenn. 2021) (noting that "probation unquestionably is a form of punishment, and indeed is not even at the very lowest end of the punishment spectrum"). Further, the very process of criminal prosecution—including being arraigned, complying with bond conditions, pleading guilty, and being sentenced—has been stressful for Martin. A sentence of probation stretches this process for an additional term of years. That, combined with the irreparable consequences discussed here, is an adequate general deterrent—especially to other risk-averse business consultants—from violating 18 U.S.C. § 1519.

Second, there is no need for rehabilitation, including any addiction or education programs here. Martin "has grappled deeply with the situation, which has weighed heavily on him mentally and emotionally." Ex. A-17 at 3 (Tim Havermann). He knows what he did was wrong, and he is remorseful. *See generally* ECF 17 (Guilty Plea Hearing Transcript) (apologizing to the Court, the Government, and anyone else effected by his crime). "His primary focus [is] to resolve the matter

responsibly and respectfully, without avoiding accountability, demonstrating his unwavering commitment to doing the right thing." Ex. A-17 at 3 (Tim Havermann). For example, after pleading guilty, Martin voluntarily resigned from the New York State Bar, without requiring a contested proceeding, acknowledging that disbarment was a necessary consequence of his offense conduct rather than fighting the result. *See* Ex. B. He has also notified the Connecticut Bar of his guilty plea, and counsel has been informed that no further action is required by Martin with respect to his Connecticut license.

Finally, along the same lines, there is, respectfully, no need to protect the public from Martin or to deter him from reoffending with a term of prison. As shown, his offense conduct is an anomaly in his life. He is an upstanding member of society who overwhelmingly lives by strong ethics, great care for others, and an undying commitment to do his part to make the world a better place. To be sure, Martin "is an immensely positive force in the world, which would be better if there were more people like him." Ex. A-39 at 2 (Lori Winters); *see also* Ex. A-38 at 2 (Pornchai Wessatada) ("[H]e is a good person and . . . will use the years ahead to do more good in countless big and little ways."). He will not reoffend.

## CONCLUSION

Martin Elling is deeply sorry for his conduct. As detailed here, and described by the many who know, love, and admire him, Martin is a good person who made an uncharacteristic and regrettable decision. Given the consequences he has already faced—losing his career and law license, and the humiliation of letting down the many people who look up to him—we respectfully ask that the Court consider his character and sentence him to a Guideline sentence of probation. Nothing more restrictive is needed to accomplish the purposes of punishment, and keeping Martin from his beloved new home in Thailand would be more severe than the law requires.

MARTIN ELLING

By:    */s/ Thomas J. Bondurant, Jr.*
       Thomas J. Bondurant, Jr. (VSB No. 18894)
       Jessiah S. Hulle (VSB No. 95828)
       GENTRY LOCKE
       10 Franklin Road S.E., Suite 900
       P.O. Box 40013
       Roanoke, Virginia 24022-0013
       (540) 983-9300; Fax: (540) 983-9400
       bondurant@gentrylocke.com
       hulle@gentrylocke.com

       Marjorie J. Peerce (admitted *pro hac vice*)
       BALLARD SPAHR LLP
       1675 Broadway, 19th Floor
       New York, NY 10019-5820
       (212) 223-0200
       peercem@ballardspahr.com

       John F. Hundley (VSB No. 36166)
       BALLARD SPAHR LLP
       1909 K Street, NW, 12th Floor
       Washington, DC 20006-1157
       (202) 661-2200
       hundleyj@ballardspahr.com

       Katherine L. Oaks (admitted *pro hac vice*)
       BALLARD SPAHR LLP
       1735 Market Street, 51st Floor
       Philadelphia, PA 19103-7599
       (215) 665-8500
       oaksk@ballardspahr.com

       *Counsel for Martin Elling*

       DATED: May 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2025, the foregoing was electronically filed with the

Clerk of Court using the CM/ECF system, which provides an electronic copy to all counsel of

record.

/s/ Thomas J. Bondurant, Jr.
Thomas J. Bondurant, Jr., Esq.