# EXHIBIT D

Case 1:24-cv-00045-RSB-PMS Document 40-4 Filed 10/25/15 Page 2 of 36
Case 1:18-cr-00036-JPO Document 140-4 Filed 05/15/25 Page 1 of 35
Pageid#: 408
1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                         18 CR 36 (JPO)

 5   JEFFREY WADA,

 6              Defendant.                 Sentence

 7   ------------------------------x

 8                                         New York, N.Y.
                                           October 11, 2019
 9                                         12:05 p.m.

10   Before:

11
                      HON. J. PAUL OETKEN,
12
                                           District Judge
13
                           APPEARANCES
14
     GEOFFREY S. BERMAN
15        United States Attorney for the
          Southern District of New York
16   BY:  JORDAN ESTES
          MARGARET GRAHAM
17        Assistant United States Attorneys

18   BROWN RUDNICK LLP
          Attorneys for Defendant
19   BY:  STEPHEN R. COOK
          SELBIE L. JASON
20        -and-
     LATHAM & WATKINS LLP
21   BY:  JASON M. OHTA
          -and-
22   JUSTIN S. WEDDLE

23

24

25
```

Case 1:24-cr-00045-RSB-PMS Document 40-4 Filed 10/15/25 Page 3 of 36   2
Case 4:24-cr-00045-RSB-PMS Document 40-4 Filed 10/15/25 Page 3 of 36
Pageid#: 409

1          (Case called)

2          MS. ESTES:  Good afternoon, your Honor, Jordan Estes

3  and Margaret Graham for the government.

4          THE COURT:  Good afternoon.

5          MR. COOK:  Stephen Cook with Selbie Jason, Justin

6  Weddle, and Jason Ohta on behalf of Jeffrey Wada, who is

7  present.  Good afternoon, your Honor.

8          THE COURT:  Good afternoon.

9          We are here for sentencing in this case.  Following a

10  jury trial in February and March of this year, the defendant,

11  Mr. Wada, was found guilty of two counts of wire fraud and one

12  count of conspiracy to commit wire fraud.  He was acquitted of

13  one count of conspiracy to defraud the Securities and Exchange

14  Commission.

15          In preparation for today I want to start by making

16  sure I have received everything I should have.  I have reviewed

17  the presentence report by the probation department with an

18  addendum and sentencing recommendation, the submission by

19  defense counsel, dated September 27, with attached letters from

20  members of Mr. Wada's family, including his wife and father and

21  other family members, as well as from friends and certain other

22  information, all of which I have read, and I've read the

23  submission by the government, dated October 4, and I also

24  reviewed the victim impact statement that was previously

25  submitted by the PCAOB on June 4.  I have also considered the

1    parties' filings regarding the guidelines loss amount and

2    restitution, as well as the arguments of counsel during the

3    August 1 hearing on those issues.

4            Do I have everything I should have?

5            MS. ESTES:  Yes, your Honor.

6            MR. COOK:  Yes, your Honor.

7            THE COURT:  Mr. Cook, have you read the presentence

8    report and discussed it with your client?

9            MR. COOK:  I have.

10           THE COURT:  Mr. Wada, have you read the presentence

11    report and discussed it with your lawyer?

12           THE DEFENDANT:  Yes, your Honor.

13           THE COURT:  Ms. Estes, have you read the presentence

14    report?

15           MS. ESTES:  Yes, your Honor.

16           THE COURT:  I know there are a few factual objections

17    in the defendant's sentencing submission.  Other than those,

18    are there any additional objections to the factual recitation?

19           MR. COOK:  No, your Honor.

20           MS. ESTES:  No, your Honor.

21           THE COURT:  I am going to go through the objections.

22    These are indicated at pages 10 and 11 of the defendant's

23    sentencing submission.

24           The first objection is as to paragraph 16, which

25    discusses the details regarding the PCAOB's connection to the

1   SEC and the purpose of the PCAOB inspection reports.  I am

2   going to overrule the objection because I think it's accurate

3   and relevant.  However, I will add the sentence that

4   corresponds to the sentence in Mr. Middendorf's presentence

5   report, which is at the end of that paragraph I will add

6   Jeffrey Wada was acquitted of the conduct in Count One of the

7   indictment which alleged a conspiracy to defraud the U.S. and

8   the SEC by using confidential information from the PCAOB to

9   fraudulently affect PCAOB inspection outcomes, thereby impeding

10  and obstructing the lawful function of the SEC.  I do think

11  it's relevant and accurate, but I also think it's only fair to

12  include the fact that he was acquitted of that count.  Is there

13  any objection to my at, given that I am overruling the

14  objection otherwise?

15         MR. COOK:  No, your Honor.

16         THE COURT:  With respect to paragraph 25, the next

17  objection to the PSR, that objection is overruled.  I think

18  that there was a sufficient evidence to provide an inference,

19  and I certainly believe by a preponderance of the evidence to

20  support what's in there, and I also find the references to 2015

21  should not be removed because the evidence did show that, at

22  least towards the final months of 2015, Mr. Wada was involved

23  in providing confidential information to Ms. Holder, so that

24  objection in paragraph 25 is overruled.

25         With respect to paragraphs 27 and 28, which describe

1    conduct relevant to Ms. Holder's and Mr. Sweet's activities, I

2    am going to sustain the objection insofar as it really doesn't

3    relate to Mr. Wada.

4         The next objections are to paragraphs 32 to 36.  The

5    objection is overruled as to paragraph 32 because there is a

6    reference to Holder's promise to Mr. Wada to keep his name out

7    of it, and I find that that is relevant context and it was part

8    of the trial evidence.

9         However, with respect to paragraphs 33 to 36, it

10   really is only about Sweet's and Holder's obstruction and is

11   not relevant to Wada, so I am going to sustain the objection

12   and delete paragraphs 33 to 36.

13        On paragraph 92, which is about the retention of

14   counsel, I am going to overrule the objection.  I think it's

15   only there insofar as it's relevant to the financial status of

16   Mr. Wada and not for any other purpose.  Therefore, I don't

17   think there is anything improper about it.

18        And on paragraph 104, the objection is overruled.

19   This has to do with the costs of prosecution.  And while it's

20   true that under 5E1.5 this isn't one of the statutes that

21   mandates considering costs of prosecution, it is also the case

22   that under 5E1.2(d)(7) of the guidelines, it's appropriate to

23   make it a factor.  It is a factor in considering a fine.

24   Therefore, the objection to 104 is overruled.

25        In other respects I adopt the facts set forth in the

Case 1:24-cv-00045-RSB-PMS Document 40-4 Filed 05/15/25 Page 7 of 36 6
Case 1:20-cr-00360-FCM Document 440-4 Filed 05/15/25 Page 6 of 35
Pageid#: 413

1   presence report as my findings of fact.

2          Are there any other objections to the presentence

3   report?

4          MS. ESTES:  No, your Honor.

5          MR. COOK:  No, your Honor.

6          THE COURT:  I am going to go through the guidelines

7   calculation.  Again, there are a couple of issues that I'll go

8   through that are addressed in the papers.

9          As you know, the Court is not required to follow the

10  sentencing guidelines.  There is no mandatory minimum in this

11  case.  However, the guidelines do still provide a starting

12  point and benchmark for sentencing.

13         I'll go through a couple of the disputed issues on the

14  guideline calculation.  First, the guidelines define loss as

15  reasonably foreseeable pecuniary harm from the offense, which

16  in turn is defined as harm that is monetary or that otherwise

17  is readily measurable in money, and the Court must make a

18  reasonable estimate of the loss.

19         This case involved the misappropriation and use of

20  confidential PCAOB information, in particular, its confidential

21  inspection lists which were central to its regulatory function.

22         As I have explained in connection with the sentencings

23  of Ms. Holder and Mr. Middendorf, I find that the PCAOB's

24  evidence of its response costs, that is, its estimate of the

25  personnel cost to the PCAOB of re-creating the 2017 inspection

1  list and the costs of additional inspections for 2016,

2  constitutes a reasonable estimate of loss amount for purposes

3  of the guidelines.

4      I note Mr. Wada's objection and arguments on this

5  issue, and I incorporate my explanation from the prior

6  sentencings here and overrule the objections.

7      Accordingly, I find the reasonable estimate of loss to

8  the PCAOB from the defendant's criminal conduct is $829,863.

9  That is the total response costs in conducting the additional

10  reviews for 2016 and re-creating the inspection list for 2017.

11      Next issue is the minimal or minor role adjustment.

12  Mr. Wada argues that he should receive a minimal or minor

13  role adjustment under the guidelines.  I'm not persuaded by this

14  argument.  The defendant played a critical role in this scheme.

15  Indeed, he was the party who had been entrusted with the means

16  to obtain the PCAOB's confidential inspection information.  He

17  is the one person who was still at the PCAOB throughout this

18  conspiracy.  And he had a direct ethical duty not to disclose

19  the information.

20      He took steps to disguise his leak of the confidential

21  information, revealing that he knew the wrongfulness of what he

22  was doing.  He gave the information to someone who was

23  obviously in a position to use it exactly as it was most

24  obviously not supposed to be used, to an employee at KPMG, the

25  subject of the inspections.

```
 1            The defendant's counsel's theory that he had no idea

 2     how Ms. Holder was going to use the information is unpersuasive

 3     and it was also rejected by the jury.

 4            In addition, the evidence of circumstances showed that

 5     Mr. Wada was providing the information in order to get a

 6     personal benefit, unlike his codefendants.  He was hoping to be

 7     rewarded with a job at KPMG, and I think the evidence

 8     established that.

 9            Finally, the defendant's conduct was not a one-time or

10     short-lived event.  Rather, it occurred over the course of two

11     years.

12            With all that in mind, I adopt the guideline

13     calculation in the presentence report.  The base offense level

14     is 7.  Under 2B1, because the loss amount was over 550,000 but

15     less than 1.5 million, the offense level is increased 14 levels

16     to 21.  Offense level of 21 and criminal history category of I,

17     because the defendant had no prior convictions, results in a

18     guideline range of 37 months to 46 months' imprisonment and a

19     fine range of 15,000 to 150,000.

20            As I have said, I have read all your submissions, but

21     I would like to give each of you an opportunity to add or

22     highlight anything today.

23            I'll start with defense counsel.  Mr. Cook.

24            MR. COOK:  Thank you, your Honor.  With the Court's

25     permission, we like to split our presentation between myself
```

 1   and Mr. Ohta.

 2        THE COURT:  Sure.

 3        MR. COOK:  May I use the podium?

 4        THE COURT:  Sure.

 5        MR. COOK:  Your Honor, all of this at this table are

 6   aware and mindful of the Court's decision in connection with

 7   the sentencings of Ms. Holder and Mr. Middendorf, and

 8   particularly we are aware of the Court's position that this is

 9   serious conduct for which a punishment that is both, as the

10   Court has said, real, and meaningful is appropriate.

11        Nothing that I am going to say or that Mr. Ohta is

12   going to say or that you will hear from Mr. Wada is intended to

13   challenge the Court's conclusion on those points.  However, we

14   submit, your Honor, that the punishment that Mr. Wada has

15   endured and will continue to endure for the rest of his life is

16   real and is meaningful and is sufficient to satisfy the factors

17   set out in 3553(a).

18        I'd like to talk about those factors and, as part of

19   that discussion, discuss some of the issues raised in the

20   government's sentencing submission.

21        First, the nature and circumstances of the offense.  I

22   think it's clear, from everything we heard at trial, everything

23   that we saw in the government's sentencing submission, we can

24   all agree that Jeff Wada was not the mastermind of the scheme

25   that is described in the indictment and that was presented at

1 trial.

2 It was Brian Sweet who first brought confidential

3 information to the PCAOB, who shared it with the upper echelons

4 within that firm. And depending on who we believe at trial,

5 they either encouraged him, threatened him, or wanted him to

6 continue that flow of information.

7 And then it was Cindy Holder who next brought

8 confidential information with her to the PCAOB which was

9 circulated and disseminated within the firm. And once they had

10 a taste for it, they wanted more and encouraged both Brian and

11 Cindy to obtain more.

12 There was no evidence that Mr. Wada was the one who

13 approached Cindy and offered to provide this information to

14 her. We are not minimizing the fact that that information,

15 that the jury found that that information was provided by

16 Mr. Wada, but it's important to understand the context of how

17 this scheme developed and what Mr. Wada was not involved in,

18 the discussions about the dissemination of that information,

19 soliciting other confidential information from other people at

20 the PCAOB, how that information would be used, who it would be

21 shared with, who would be within the circle of trust. Mr. Wada

22 was not involved in any of that.

23 Was his role in this conspiracy, at least as to 16 and

24 17, necessary? Yes. There is no question about that. But his

25 level of culpability relative to the other defendants is

1  impacted by his level of involvement and how this information

2  was used.  Everything we saw at trial and that we heard at

3  trial was that Cindy Holder approached Mr. Wada.  And because

4  of their friendship, Mr. Wada provided this information to her.

5       Could he have anticipated how it would have been used?

6  Certainly, the Court has concluded, and the jury did, that,

7  yes, he could and should have done that, but there was no

8  evidence that he was involved in any of the discussions with

9  any of the other coconspirators about just how broadly, how

10  widely this information would be used, the scope and the effort

11  that would be undertaken by senior members within KPMG to use

12  it.  None of that was in evidence at trial, and we saw none of

13  that, and that is a factor that can be considered when

14  considering Mr. Wada's involvement in this case.

15       In some of the examples used by the government to try

16  and insinuate Mr. Wada more closely into this conspiracy

17  actually illustrate just how far removed he was from it.  For

18  example, they cite the text message between Brian Sweet and

19  Cindy Holder in which Brian says, tell Wada we owe him big and

20  we will get him beers next time he is in New York.

21       If you read that context, that message had nothing to

22  do with inspection lists.  It had to do with nonconfidential

23  e-mail addresses for PCAOB board members, not the kind of

24  confidential information that we are talking about here.

25       Say hi to Mr. Sweet and Hector for me, another example

Case 1:24-cr-00045-RSB-PMS Document 140-4 Filed 05/15/25 Page 13 of 36 12
Case 4:18-cr-00656-RM Document 440 Filed 10/25/19 Page 13 of 36
Pageid#: 419

1   that was used.  Asking Cindy to say hi to Mr. Sweet is somehow

2   meant to suggest that he knew that Mr. Sweet was using this

3   information nefariously and it omits the fact that he asked to

4   say hi to Hector Santana, who had no involvement in this

5   conspiracy, was not a coconspirator and was not, as far as we

6   know, in any position to help Mr. Wada.

7          THE COURT:  But there were things like the voice mail

8   message about the grocery list and everything you will need for

9   the year.  Admittedly, Ms. Holder is his friend, but he

10  obviously knew she is working at KPMG.  Everything you will

11  need for the year.  What did he think she is going to do with

12  that other than use it exactly how they used it?

13         MR. COOK:  Respectfully, your Honor, I don't think

14  that's the only way she could have used that information.  I

15  don't think there was any evidence, and it is an assumption.

16  Whether it's reasonable or not is debatable.  But it is an

17  assumption to conclude that not only would Cindy Holder use it

18  to help herself and her career to prepare for her own

19  inspections and do whatever she needs to do to be more prepared

20  for what she is going to do for KPMG, but, instead, she would

21  pass it along and that within KPMG, one of the most prominent

22  and respected accounting firms in this country, that this

23  information would be given to multiple senior partners within

24  that firm and they would not only take it, they would want

25  more, disseminate it and use it to conduct re-reviews.  I think

1   that is a step too far in assuming that Mr. Wada knew that it

2   would be used to that extent, and there is nothing in any of

3   his communications with Cindy.

4         And when you read those and you get the flavor for

5   them, it's plain that their conversations were in the context

6   of their friendship.  Yes.  Giving that information was wrong.

7   Yes, any way in which she used it would be wrong, no question

8   about it.  But full knowledge of just how deep this conspiracy

9   went and how extensive use would be made of that information, I

10   don't think that can be placed at Jeff Wada's doorstep.

11         There is also that text message they refer to about

12   getting a big partner title and a big fat payday.  Again,

13   seconds before that text message was sent, if you read the

14   context, Jeff Wada said he was not interested in a job at KPMG.

15   This was almost a year before he first sent his résumé to Cindy

16   Holder.  He said he wanted to wait until he got promoted to

17   associate director at PCAOB before he started looking outside

18   of the government so that he could be entitled to a title like

19   partner.  That is an exaggeration.  I think it misstates what

20   was going on.  Yes, he did send his résumé to Cindy Holder, but

21   it was not until much later.  And at the time this first

22   transmission was made of confidential information in 2016, he

23   expressly was not interested in going to work at KPMG.  Again,

24   illustrates that this was done in the context of a friendship.

25   Wrong?  Yes.

Case 1:24-cr-00045-RSB-PMS Document 140-4 Filed 05/15/25 Page 15 of 36 14
Case 4:18-cr-00665-RSB-PMS Document 140-4 Filed 10/25/19 Page 14 of 35
Pageid#: 421

1          I can't repeat enough.  None of what I'm saying is

2   intended to suggest that giving these lists was somehow OK,

3   that it wasn't wrong, unethical, immoral, a violation of

4   PCAOB's course of conduct or that, pursuant to the rulings of

5   this Court, that it wasn't criminal.

6          My point is to illustrate the relative culpability of

7   Jeff relative to the other members of this conspiracy.  I

8   submit he is nowhere close to that of the other defendants.  I

9   understand that your Honor has ruled on the minimal and minor

10  role issue.  This is still a factor I believe your Honor and

11  the Court should take into account in considering the sentence.

12         Regarding the concept that the government raised that

13  we are attempting to minimize the significance of the conduct

14  for which Mr. Wada was convicted, that is simply not true.  I

15  think what we saw at trial and what we have seen in some of the

16  plea colloquies in this case is that none of the defendants

17  understood at the time they engaged in the conduct that their

18  conduct was in fact criminal.

19         We saw that in the testimony of the two cooperators at

20  trial who both said that, the plea colloquy of Brian Sweet

21  initially where he said he didn't know it was criminal then,

22  but he knows now.  Mr. Middendorf said something similar when

23  he said he didn't believe it was illegal, but he knew it was

24  wrong.

25         Why is that significant, given your Honor's rulings?

1    It's significant because I think you're dealing with, as your

2    Honor and the Court has recognized, a unique case.  If this

3    were a situation, if this were a typical even white collar

4    case, where not only did the defendant's conduct, was it

5    plainly wrong, but it was also plainly illegal, insider

6    training, Ponzi scheme, kickback, bribery, and yet the

7    defendant still determined to engage in that conduct, that is

8    different from the situation where we have here where, yes, it

9    was wrong, immoral, illegal because of the ruling of this

10   Court, yes, but not known to the defendants at the time.

11   Doesn't mean they can't be convicted.  Doesn't mean they can't

12   be sentenced.  But it is a factor that I believe the Court can

13   and should consider.

14           Finally, the concept of general deterrence, which I

15   think is really the focus of the government's position as to

16   why a custodial sentence is necessary here.  The government

17   says that any sentence other than one that includes

18   incarceration would be a pass.  Could not be more wrong, your

19   Honor.

20           Mr. Wada has lost his CPA license.  He has lost the

21   job he has dreamed about since he was a child.  He has lost his

22   career, and he lost it at an early stage, relatively early

23   stage in his career relative to the other defendants.  He will

24   be branded for the rest of his life as a felon both in the

25   records of this Court and as published in major newspapers and

1     every trade publication of any note in this country.  His

2     global Internet footprint will follow him for the rest of his

3     life and that of his children and his family.  He will owe

4     significant restitution and, your Honor, as we noted in our

5     papers, if he is sentenced to a year or more in prison, he will

6     lose forever his opportunity to enter Japan and see his family

7     there.

8             There is also, of course, the SEC enforcement action

9     that remains looming.  I submit, your Honor, those are real

10    punishments.  Those are significant punishments.  That is not a

11    pass.  But I understand that the question still remains, is

12    that a general deterrence?  Is that sufficient deterrence?

13            And I think the next question has to be, who are we

14    attempting -- who do we want to deter?  What type of person is

15    this case designed to deter?  I submit that that would be other

16    professionals working for regulators, any other CPA, any

17    professional working in a regulated industry.  Those are the

18    targets for whom a case like this could serve as a valuable

19    deterrent.

20            The next question is, what is necessary to deter a

21    rational CPA, a rational, current future or former employee of

22    the PCAOB?  I submit, your Honor, that if losing everything

23    that you have worked for is not a sufficient deterrent to keep

24    a person from engaging in this conduct, particularly conduct

25    that was not known to be criminal at the time, that message has

1    been sent, it's been sent loud and clear, and no additional

2    deterrence is necessary.

3           If we are talking about irrational people, they are

4    going to engage in that conduct anyways and incarceration is

5    not going to make a difference.  If this were narcotics

6    trafficking, human trafficking or a violent crime or even a

7    white-collar Ponzi scheme or bribery, kickback, healthcare

8    fraud, any of those types of crimes in which the conduct itself

9    is clearly criminal, in addition to wrong, and a person still

10   engages in this, then, yes, incarceration may be a valuable

11   deterrent for other people who would engage in clearly criminal

12   activity.  That's not the type of case that this is.

13          This case has already sent the message loud and clear,

14   and I cannot imagine any rational professional who hears, has

15   heard, or will hear anything about what happened in this case

16   deciding to engage in any conduct that comes anywhere close to

17   the line that was crossed here.

18          Finally, your Honor, concerning the history and

19   characteristics of Mr. Wada, the government has noted that in

20   virtually every case in which incarceration is imposed that a

21   defendant's family often experiences hardship.  We acknowledge

22   that forthrightly transparently in our sentencing memorandum.

23   In fact, we state clearly that in some cases, notwithstanding

24   those harsh impacts on family members, imprisonment is

25   nonetheless necessary.

Case 1:24-cr-00045-RSB-RMS   Document 40-4   Filed 05/15/25   Page 19 of 36
Case 1:18-cr-00056-BRM   Document 140-4   Filed 10/25/19   Page 18 of 35   18
Pageid#: 425

 1          But we are not here to determine an appropriate

 2   sentence for anyone else but Jeff Wada.  The history and

 3   characteristics of this defendant, particularly when considered

 4   with all of the other characteristics that we have talked

 5   about, warrant leniency.

 6          Mr. Ohta will complete this discussion.

 7          THE COURT:  Thank you.

 8          Mr. Ohta.

 9          MR. OHTA:  Thank you.  May I approach the podium?

10          THE COURT:  Yes, please.

11          MR. OHTA:  Your Honor, thank you for giving me the

12   opportunity to speak in support of my best friend, Jeff Wada.

13   I would like to begin with how I met Jeff and discuss the depth

14   of our friendship.

15          I first met Jeff in the early 1980s when we played

16   basketball for a Japanese American basketball league, the same

17   league that Jeff's kids now participate in.  Our relationship

18   grew substantially from middle school through high school

19   because we essentially had almost every class together.  After

20   high school we both decided to attend UCLA in 1997 -- sorry.

21   1993.

22          Jeff chose UCLA because of its outstanding accounting

23   department.  Jeff always thought about the future and how he

24   could make his dreams of becoming a CPA true.

25          After our freshman year, against Jeff's better

judgment, we decided to become roommates for the next three

years.  Jeff's determination to become a CPA was incredible.  I

can remember Jeff pulling allnighters to study for his

accounting and his other business classes.  I remember when

Jeff was first hired by Deloitte in his senior year of college.

Jeff's hard work was really paying off and his dreams were

finally becoming a reality.

          After we graduated in 1997, Jeff was hired full time

at Deloitte.  Jeff was so happy, and we were both looking

forward to starting our professional lives together.

          Throughout the 2000s, Jeff was always present during

my major life milestones.  In September 2004, Jeff was standing

next to me as a groomsman when I got married.  In December

2006, Jeff brought food over to my house when my wife and I

brought our first son home.  In November 2009, Jeff helped take

care of my first son when my second son was born.  Jeff was

always there for me, and he is always there for everyone.  Both

of my boys love their Uncle Jeff because he is so kind and

funny.  My wife and I completely trust Jeff with the health and

welfare of both our children.

          Because of my close relationship with Jeff, I also

have the privilege of knowing all the individuals who have

written letters to your Honor in support of our mutual friend.

And I cannot state this enough.  I wholeheartedly agree with

every statement shared with your Honor.  Jeff is a loving,

1  dedicated husband and father who is also a very loyal friend.

2      We have already discussed Jeff's background in our

3  sentencing memorandum.  However, I would like to highlight a

4  few facts in open court today.  Jeff's love and devotion to his

5  friends, of always thinking of others first was instilled by

6  his mother, who I knew and loved.  She treated me like a son

7  and Jeff was never jealous, even when she started packing Jeff

8  extra lunch so he could share with me, since I loved her

9  cooking.

10      When Jeff's mother passed away, in our culture the

11  responsibility to care for the other parent falls on the oldest

12  child.  Jeff is the youngest in his family, but there was never

13  a doubt who was going to take on that responsibility.  Jeff's

14  dad is 77 years old, retired, and Jeff is his dad's best

15  friend.  Jeff takes care of everything for his father, just

16  like Jeff's mother did for their family.

17      I met Jeff's wife, Marian, during college before she

18  and Jeff started dating.  As Jeff would agree, he definitely

19  married up.  Your Honor, Marian, his wife, is in the courtroom

20  here today, and, Marian, I want to thank you for being an angel

21  and a rock for Jeff during this difficult time.  Make no

22  mistake about it, he would not be here today without your help,

23  love, guidance, and support.  I love you.

24      Your Honor, Jeff and Marian have two beautiful

25  children together, as we discuss in our sentencing memo.

1    Jeff's presence is essential to his children for the reasons

2    stated in our submission.  I have witnessed these issues

3    personally, and both Jeff and Marian must be present at their

4    home, especially during this time in their children's young

5    lives to help them cope with everything.

6         Finally, in regards to Jeff's character, I have seen

7    Jeff take in his sick mother-in-law in his home without

8    hesitation.  I have seen them together, how he treats her, with

9    love and respect.  He has the patience that I wish, frankly, I

10   possessed.  She absolutely adores Jeff and would be lost

11   without him.

12        Your Honor, I would like to turn to our sentencing

13   recommendation.  Since I also have the privilege of

14   representing Jeff, I was present during the entire trial and

15   for Cindy Holder's and David Middendorf's sentencing hearings.

16   I recognize that since your Honor has already sentenced

17   Ms. Holder and Mr. Middendorf to prison time, there is a

18   certain momentum in favor of a sentence of incarceration for my

19   best friend.  However, I'm begging, your Honor, I'm pleading to

20   overcome that inertia and sentence Jeff to a term of probation.

21   A prison sentence simply is not necessary and appropriate to

22   satisfy the purposes of Section 3553(a).  As Mr. Cook says,

23   Jeff has been more than sufficiently punished for these felony

24   convictions and will continue to suffer emotionally and

25   economically for the rest of his life.

1      If you send Jeff home now, no reasonable person would

2  ever state that Jeff has received a pass here.  Jeff's felony

3  convictions alone reflect the seriousness of the offense and

4  provides just punishment.  Jeff will never be a CPA again, and

5  he can no longer work in a profession where he has been working

6  full time since he graduated college in 1997.  Jeff's

7  reputation is forever tarnished.  I just Googled his name

8  yesterday.  Many of Jeff's friends have disappeared since he

9  was arrested and handcuffed in his home in January 2018.  Any

10 custodial sentence, your Honor, would only serve to punish

11 Jeff's children, especially Jeff's son, as described in the

12 character letters and who clearly needs his father's presence

13 during these difficult times.

14      One statement about general deterrence.  Your Honor,

15 the felony convictions, the loss of one's professional license,

16 the loss of one's reputation, and all other collateral

17 consequences that accompany a federal criminal prosecution are

18 enough here.  In fact, the filing of the indictment has been

19 and will be enough to deter any PCAOB employee from discussing

20 any business information with a public auditor.  It's my

21 opinion we will never see a criminal case like this again now

22 that every PCAOB employee understands that this conduct now is

23 classified as a federal crime.

24      In closing, your Honor, Jeff's situation is completely

25 different from every defendant who has been or will be

1   sentenced in this case.  Because of Jeff's unique role in the

2   alleged conspiracy, the particular aspects of the collateral

3   punishment he has and will continuously endure, and the

4   unnecessarily harsh impact imprisonment will have on his young

5   children and the family that he takes care of, please have

6   mercy on my friend.  Thank you.

7           THE COURT:  Thank you.

8           Ms. Estes, counsel for the government, I have read

9   your submission.  Anything you would like to add?

10          MS. ESTES:  Yes, your Honor.

11          First, I want to start with defense counsel's point

12  that Jeff Wada was not the mastermind of this scheme.  Now,

13  it's true that in 2015 Brian Sweet was the one who disseminated

14  the information.  But in 2016 and 2017, it was Wada who

15  provided it.  And in doing that he made a choice.  He made a

16  choice to disclose the most confidential information that his

17  employer had, these inspection lists.  If he had not made that

18  decision, if he had not made that choice, we might not even be

19  here because things may not have happened in 2016 or in 2017.

20  So he was absolutely critical to the scheme in 2016 and 2017.

21  It's true he was not the mastermind, but he was the reason

22  everything happened those years.

23          When he did that, he did that for personal gain, as

24  your Honor recognized, and that's significant.  He did that

25  because he wanted a job at KPMG.

1        Now, I know defense counsel has said that he did this

2   because he was friends with Cindy Holder, but I think that's

3   belied by the evidence at trial.  It's true they were friends.

4   But when he disclosed the January 9 list, shortly after that he

5   sends Cynthia Holder his résumé.  He was clearly trying to get

6   a job at KPMG.  He was trying to get that higher pay day, and

7   he thought this was something that would help him do that.

8        Now, your Honor has recognized how serious his conduct

9   is, so I am not going to go into that here.  But just to

10  emphasize, that because his conduct is so serious, that's why a

11  custodial sentence here is absolutely warranted.

12       Now, everybody who has been sentenced so far was a

13  KPMG employee, and here we have somebody who was an employee at

14  the regulator.  It's absolutely critical that there also is a

15  message of deterrence to people who work at regulators that

16  they can't just leak this information, that they can't betray

17  the trust of their employer and disclose confidential

18  information.

19       If Mr. Wada was to get a noncustodial sentence, as

20  defense counsel suggests, that will send that message that if

21  you're at the regulator, maybe it's OK to leak the information,

22  but you just can't use it if you're at one of these auditing

23  firms.  That can't be the message that is sent.  A custodial

24  sentence is warranted here because, as I said, Mr. Wada is the

25  reason everything happened in 2016 and 2017.

Case 1:24-cr-00045-RSB-RMS Document 140-4 Filed 10/25/19 Page 26 of 36 25
Case 4:18-cr-00056-P Document 140-4 Filed 05/15/25 Page 26 of 36
Pageid#: 432

1          Also, your Honor, just from a fairness perspective,

2    your Honor sentenced Cynthia Holder to eight months'

3    imprisonment.  Mr. Wada and Ms. Holder were, if anything, equal

4    levels of culpability and Mr. Wada made the choice to go to

5    trial.  Ms. Holder accepted responsibility and she pled guilty.

6    And because of that, it would be extremely unfair and

7    inconsistent with 3553(a) factors to give him a noncustodial

8    sentence when Ms. Holder received a sentence of eight months'

9    imprisonment.

10          Your Honor, with that, we would rest on our

11    submission.

12          THE COURT:  Thank you.

13          Mr. Wada, you're not required to speak, but if there

14    is anything you would like to say today, you may.

15          THE DEFENDANT:  Your Honor, may I speak from the

16    podium?

17          THE COURT:  Yes.

18          THE DEFENDANT:  Your Honor, before April 2018, the

19    closest I came to experiencing courtrooms, government agents,

20    or handcuffs was watching television and movies.  Living

21    through the 20-plus grinding months of this process and then

22    watching the foreperson of a jury stand and say the word

23    guilty, knowing that he was speaking to me, was nothing less

24    than surreal.

25          I have never thought myself to be a criminal or have

```
1    any criminal inclinations whatsoever.  As far as I know, the

2    same is true for everyone who has ever known me.  Until this

3    point my life has been one of order and predictability,

4    devotion and service to family, a respect for my Japanese

5    heritage that was instilled by my parents, and hard work have

6    always been my priorities.

7         I have known what I wanted to do with my life since I

8    was very young.  I worked hard both in and out of school in

9    order to accomplish my goal of becoming a CPA.  Obtaining my

10   license was one of my greatest personal and professional

11   accomplishments.  Until all of this, I anticipated many more

12   years of service in public accounting.  Public accounting is a

13   profession of order and one I was proud to have been a part of.

14   It was part of my identity, a part that is now lost to me at a

15   time in my life and the lives of my young children when my

16   needs to provide for them is at its greatest.

17        My ability to instill in my children the same respect

18   for their Japanese heritage that my parents taught me by

19   traveling with them to Japan is now in jeopardy.  My personal

20   and professional reputations have been irreparably damaged.  I

21   carry the embarrassment and shame of the indictment and verdict

22   with me every day.  If you have any doubt about an example

23   being made out of this matter, you should know that the message

24   has been delivered.  If you have any doubt about me engaging in

25   any criminal conduct, you should know that I will never do
```

1    anything to make me have to relive this experience.

2         Your Honor, I know that it is your job to determine an

3    appropriate punishment.  In doing this, please consider all the

4    ways in which I have been and will continue to be punished

5    without jail time.  I understand that I must endure those

6    punishments, and I know that they will stand as warnings to

7    everyone within my former profession and many others.

8         I ask, respectfully, that you not send me to prison,

9    but, instead, that I be permitted to rebuild my life, find a

10   new career, and take care of my family.

11        I want to thank my wife, who is here with me today,

12   for her unwavering love and patience.  I will be forever

13   indebted to her for her understanding and empathy, considering

14   all of the events that have occurred over the course of the

15   past two years and what is still to come.

16        Thank you for your time.

17        THE COURT:  Thank you.

18        Is there any reason why sentence may not be imposed at

19   this time?

20        MS. ESTES:  No, your Honor.

21        MR. COOK:  No.

22        THE COURT:  In preparing to sentence the defendant, I

23   have considered the presentence report, the recommendation of

24   probation, and the written and oral statements of defense

25   counsel, the defendant, and the government and all the letters

Case 1:24-cr-00045-RBS-RMS Document 140-4 Filed 05/15/25 Page 29 of 36
Case 1:18-cr-00036-JPO Document 440 Filed 10/23/19 Page 29 of 36
Pageid#: 435

1    and other information submitted on behalf of the defendant.

2         I have considered all the factors set forth in the

3    statute that governs my decision, 18 U.S.C. Section 3553(a),

4    which includes, of course, the sentencing guidelines, but, in

5    addition to that, the nature and circumstances of the offense,

6    the defendant's history and characteristics, and the purposes

7    of sentencing, the need to reflect the seriousness of the

8    offense and promote respect for the law and provide just

9    punishment, the need to afford adequate deterrence and protect

10   the public, and the need to provide any treatment or training,

11   and I am required to consider the need to avoid unwarranted

12   sentencing disparities among similarly situated defendants and

13   the need to provide restitution to any victims.

14        I am required to impose a sentence that is sufficient

15   but not greater than necessary to comply with the sentencing

16   purposes in the statute.

17        As I've mentioned previously in connection with other

18   sentencings in the case, the criminal conduct in this case was

19   serious.  It was serious because it involved the corruption of

20   a regulatory process which was established by federal law to

21   ensure that audits of public companies are done accurately and

22   independently.

23        The PCAOB was established by Congress as the inspector

24   of the country's auditors, and its inspection process is

25   supposed to function with independence and integrity and that

Case 1:24-cr-00045-RSB-PMS Document 40-4 Filed 05/15/25 Page 30 of 36
Case 4:18-cr-00566-PMS Document 440 Filed 10/25/19 Page 29 of 35   29
Pageid#: 436

1    process was compromised by the conduct in this case.

2          It's also serious simply because it involved the

3    misappropriation of a company's property.  It is different from

4    many fraud cases because it did not involve the taking of money

5    or tangible property.  Instead, it involved the taking and use

6    of confidential information, the PCAOB's work product.  As I

7    found, that was a serious crime with an actual loss.

8          Unlike Mr. Wada's codefendants, he was not an employee

9    of KPMG.  He was not working for the regulated entity in

10   finding a way effectively to cheat in the inspection process.

11   Rather, he worked for the regulator.  He had a job and duty to

12   make the inspection process work as it was designed, and he

13   leaked information to his friend at KPMG to allow them to

14   cheat.

15         So he was not a high-level executive, but he was

16   critical to the scheme.  He was the only person who actually

17   had access to the confidential inspection information at the

18   PCAOB while he was working there, at least in the 2016 and '17

19   time periods.  He was entrusted with that information and he

20   violated his duty directly to his employer by leaking it.  That

21   makes him in some ways more culpable than his codefendants, at

22   least in the sense that he was an insider at the regulator who

23   had the most direct and immediate duty to maintain the

24   confidentiality of the information.  And unlike his

25   codefendants, he stood to gain personally, not directly from

```
 1    some immediate profit, but indirectly, at least with the hope

 2    of a job with KPMG.

 3          It's also true that I am required to consider the

 4    history and characteristics of the defendant.  Obviously,

 5    Mr. Wada has no prior criminal conduct.  The statements from

 6    the letters, statements from Mr. Ohta today make clear, he is

 7    someone who is a devoted father and husband, a loyal friend.

 8    He came from a humble background and has worked hard throughout

 9    his life.

10          In his career, apart from the conduct at issue in this

11    case, he has been regarded as an honest and devoted person, an

12    ethical person.  He has a wife and two young children who

13    certainly would suffer from a likely term of incarceration.

14          And I have no illusions about the collateral

15    consequences of this felony conviction to Mr. Wada himself,

16    professional and otherwise, they are significant, and I don't

17    downplay those facts.

18          It also appears to be the case that a sentence of over

19    a year incarceration would prevent Mr. Wada from visiting Japan

20    and that would be extremely punitive and I think more punitive

21    than is necessary, and, in fact, probation has recommended a

22    sentence of 11 months in light of that fact.  I'm taking all of

23    that into consideration.

24          As I said, the guidelines range is 37 to 46 months and

25    probation recommended 11 months.  I do not believe that
```

Case 1:24-cr-00045-RSB-PMS Document 140-4 Filed 05/15/25 Page 32 of 36
Case 1:18-cr-00036-PDM Document 140-4 Filed 10/25/19 Page 31 of 35 31
Pageid#: 438

1    Mr. Wada causes a significant risk of recidivism and for that

2    reason the statutory purposes of specific deterrence and

3    protecting the public do not call for a sentence in the

4    guideline range.

5         All these factors lead me to conclude that a

6    guidelines sentence would be greater than necessary and,

7    therefore, a variance below the guidelines and indeed below 12

8    months is appropriate in light of the other consequences of the

9    felony conviction and, in particular, the inability to visit

10   Japan if the sentence is greater than 12 months.

11        At the same time, this is a case where the need for

12   general deterrence and the need to promote respect for the law

13   and the need to reflect the seriousness of the offense call for

14   meaningful punishment.  That is particularly so in light of the

15   defendant's crucial role in the scheme and his violation of his

16   direct duty to the PCAOB in leaking confidential information

17   about planned inspections.

18        And for those reasons I do think that a sentence that

19   includes incarceration is necessary and appropriate.  I

20   sentenced Ms. Holder to eight months in part because she

21   accepted responsibility and expressed remorse for her conduct,

22   and I sentenced Mr. Middendorf to a year and a day in light of

23   his high-level responsibility at KPMG.

24        Factoring all those things into account, I conclude

25   that a sentence of nine months' incarceration on all counts to

1   run concurrently is sufficient but not greater than necessary

2   to serve the purposes of sentencing.

3           I'll ask counsel if you would like to state any

4   objection for the record or know of any legal reason why that

5   sentence may not be imposed.

6           MS. ESTES:  No, your Honor.

7           MR. COOK:  No, your Honor.

8           However, would the Court permit me to make one

9   suggestion, in light of your Honor's decision?

10          THE COURT:  Yes.

11          MR. COOK:  In light of the specific concerns regarding

12  the care of one of Mr. Wada's children, would your Honor

13  consider allowing a portion of his sentence to be served as

14  home confinement?  Any portion at all would be helpful to the

15  family.  It could be accomplished by way of a reduced sentence

16  of incarceration with a special condition of supervised release

17  that that balance be served as home confinement.

18          THE COURT:  Does the government want to address that?

19          MS. ESTES:  Your Honor, we would object to that.  I

20  think the entire purpose of the sentence is to recognize

21  Mr. Wada's level of culpability with respect to his

22  codefendants, to recognize the seriousness of his behavior in

23  betraying the trust of his employer, a regulator, and leaking

24  information.  And by allowing him to serve part of it in his

25  home, I think that undermines all of the purposes your Honor

1   has stated for the sentence.

2          THE COURT:  I agree.  Nine months is a significantly

3   below-guidelines sentence, and I really think it's necessary

4   that that really is the minimum that I think I could justify.

5   Your request is noted.  But I am not persuaded that it's

6   appropriate.  Therefore, I do intend to impose a sentence of

7   nine months' incarceration and three years' supervised release.

8          Anything else before I impose sentence?

9          MS. ESTES:  No, your Honor.

10          MR. COOK:  Your Honor, may we request a facility

11   designation?

12          THE COURT:  Yes.

13          MR. COOK:  To the minimum-security satellite camp at

14   SCP Lompoc in California.

15          THE COURT:  Yes.  I will make that recommendation.

16   Ultimately, the Bureau of Prisons decides, but I can make a

17   recommendation that he be designated to the minimum-security

18   facility at SCP Lompoc.

19          MR. COOK:  Correct.

20          Your Honor, we would request, and I believe the

21   government does not object, to bail pending appeal.

22          THE COURT:  Is that correct?

23          MS. ESTES:  Yes, your Honor.

24          THE COURT:  Bail will be granted pending appeal.

25          MR. COOK:  Thank you, your Honor.

Case 1:24-cr-00045-RSB-PMS Document 140-4 Filed 05/15/25 Page 35 of 36
Case 1:18-cr-00056-RJS Document 440-4 Filed 10/21/19 Page 34 of 35
Pageid#: 441

```
 1              THE COURT:  Mr. Wada, it is the judgment of this Court

 2    that you be committed to the custody of the Bureau of Prisons

 3    for a period of nine months.  Following release you will be

 4    placed on supervised release for three years.

 5              The following conditions will apply to the period of

 6    supervised release:  You will not commit another federal,

 7    state, or local crime.  You will not possess or use an illegal

 8    controlled substance.  The mandatory drug testing condition is

 9    waived because I find the defendant poses a low risk of

10    substance abuse.  You will cooperate in the collection of DNA

11    as directed by probation.  You will make restitution in an

12    amount that I am going to order in a subsequent order.

13              The standard conditions are imposed in addition to the

14    following special conditions:  You will provide probation with

15    access to any requested financial information.  You shall not

16    incur any new credit charges or open additional lines of credit

17    without approval of probation unless you are in compliance with

18    the payment schedule.

19              You will report to the nearest probation office within

20    72 hours of release.  You will be supervised by the district of

21    residence.  There will be no fine, in light of the restitution

22    obligation, and restitution will be paid in an amount that I

23    will set.  As I said, you will pay at least 10 percent of gross

24    monthly income toward restitution.  There is a mandatory $100

25    special assessment on each count for a total of $300, which is
```

1    hereby imposed.

2            I will note that this is a variance below the

3    guidelines under Section 3553(a).  To be clear, the sentence is

4    nine months on all counts to run concurrent and supervised

5    release of three years on all counts concurrent.

6            I'm granting bail pending appeal.  All the conditions

7    of your pretrial release will continue to apply during any

8    appeal and to the date of sentencing.

9            You have the right to appeal from your conviction and

10   sentence.  If you cannot pay the cost of an appeal, you may

11   apply for leave to appeal *in forma pauperis*.  Any appeal must

12   be filed within 14 days of the filing of the judgment.  And a

13   corrected copy of the presentence report will be provided to

14   the BOP and sentencing commission.  The clerk will prepare the

15   judgment.

16           Is there anything further?

17           MS. ESTES:  No, your Honor.

18           MR. COOK:  No, your Honor.

19           THE COURT:  Thank you.  We are adjourned.

20           (Adjourned)

21

22

23

24

25