# EXHIBIT E

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,       : 18-CR-681(NGG)
                                :
                                :
        -against-               : United States Courthouse
                                : Brooklyn, New York
                                :
ANDREW PEARSE,                  : Thursday, March 6, 2025
                                : 10:30 a.m.
          Defendant.            :
                                :
                                :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   UNITED STATES ATTORNEY
                      EASTERN DISTRICT OF NEW YORK
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                      BY:JONATHAN A. SIEGEL
                        Assistant United States Attorney

                      U.S. DEPARTMENT OF JUSTICE - MLARS
                        1400 New York Avenue NW
                        Washington, D.C. 20005
                      By:MORGAN J. COHEN
                        Trial Attorney

For the Defendant:    LISA CAHILL, PLLC
                        747 Third Avenue - 32nd Floor
                        New York, New York 10017
                      BY:LISA CAHILL, ESQ.


Court Reporter:       LINDA A. MARINO, OFFICIAL COURT REPORTER
                      225 Cadman Plaza East/Brooklyn, NY 11201
                      lindacsr@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

*Proceedings*                                                                  2

1          THE COURT:  Good morning.

2          MR. SIEGEL:  Good morning, your Honor.  Jonathan

3    Siegel, Morgan Cohen for the United States, and joined at

4    counsel table by Special Agents Babatunde Adediran and Taylor

5    LaGrange.

6          THE COURT:  Good morning.  Everyone may be seated.

7          This is a sentencing for Andrew Pearse.

8          Mr. Pearse, are you satisfied with the assistance

9    your attorney has given you thus far in this matter?

10         THE DEFENDANT:  Yes, your Honor, I am.

11         THE COURT:  Well, she has provided an excellent

12   submission in connection with sentencing, and I thank her for

13   that.

14         MS. CAHILL:  Thank you, your Honor.

15         THE COURT:  Now, I didn't take your guilty plea.

16         That was Judge Kuntz who took your guilty plea?

17         THE DEFENDANT:  Correct, your Honor.

18         THE COURT:  And the case was transferred to me after

19   the Boustani trial.

20         MS. CAHILL:  Correct.

21         THE COURT:  But Mr. Pearse did testify at the Chang

22   trial in front of me, so I'm very familiar with his testimony.

23   I just point that out at the very beginning.

24         I'd like to just go over the materials that I have

25   reviewed for sentencing.

*Proceedings*                                                                    3

1          Have you received the preliminary order of

2    forfeiture?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Which I only received yesterday, so I

5    wanted to make sure everybody had it.

6          I've signed it.

7          MR. SIEGEL:  Thank you, your Honor.

8          THE COURT:  It will be attached to the judgment.

9    So, that's taken care of.

10         There's a presentence investigation report that is

11   dated February 11, 2025.

12         Has the Government seen the report?

13         MR. SIEGEL:  Yes, your Honor.

14         THE COURT:  And the defense?

15         MS. CAHILL:  We have, your Honor.

16         THE COURT:  You've reviewed the report with your

17   client?

18         MS. CAHILL:  Yes, we have.

19         THE COURT:  And answered all his questions?

20         MS. CAHILL:  Yes.

21         THE COURT:  There is an addendum to the presentence

22   report reviewing objections by the Government -- there were no

23   objections by the Government.

24         MR. SIEGEL:  That's correct, your Honor.

25         THE COURT:  And the defense objections in the

*Proceedings*                                                                4

1    defense letter of February 20, 2025.

2           MS. CAHILL:  That's correct, your Honor.

3           THE COURT:  You've received that document covering

4    your objections?

5           MS. CAHILL:  Are you referring to the addendum?

6           THE COURT:  Yes, the addendum.

7           MS. CAHILL:  Yes, we've seen that.

8           THE COURT:  And you reviewed that with your client?

9           MS. CAHILL:  Yes, we have.

10          THE COURT:  Is there anything that you want to bring

11   to my attention after reviewing the probation department's

12   addendum?

13          MS. CAHILL:  No, your Honor, nothing beyond what

14   we've already written.

15          THE COURT:  Is there anything for me to decide?

16          MS. CAHILL:  Not in our view, your Honor.

17          THE COURT:  So, I'll simply accept the probation

18   department presentence report and addendum as has been

19   received.  And thank you very much.

20          I have an extensive submission from the defense

21   dated February 12, 2025, including Exhibits A through K.

22          MS. CAHILL:  Correct.

23          I'm sorry, your Honor.  Actually, it's Exhibits A

24   through N.

25          THE COURT:  Oh, the additional exhibits.

*Proceedings*                                                        5

1          MS. CAHILL:  Yes.

2          THE COURT:  Right.  All those exhibits, I've

3    reviewed all of the exhibits.

4          And I'm particularly interested in discussing

5    Exhibit K today, which is the exhibit which deals with the

6    Defendant's right to return to his home in England.  So, we'll

7    talk about that later.

8          I have the Government's submission in aid of

9    sentencing dated February 18, 2025, which includes an

10   application under Guideline Section 5K1.1 and

11   18 U.S.C. 3553(e), which would permit the Court to sentence

12   the Defendant below any statutory minimum, which there isn't,

13   and below the guideline.

14         Have you seen that?

15         MS. CAHILL:  Yes, we have, your Honor.

16         THE COURT:  And shared it with your client?

17         MS. CAHILL:  Yes.

18         THE COURT:  And then, of course, I already mentioned

19   the defense letter of February 20, which -- of the probation

20   officer regarding corrections and objections.  So, you've seen

21   that.

22         MR. SIEGEL:  Yes, your Honor.  Thank you.

23         THE COURT:  All right.  I think that's it.

24         Is there anything more?  Am I missing anything?

25         MS. CAHILL:  No, your Honor.

*Proceedings*                                                                6

1         MR. SIEGEL:  That's everything from the Government's

2    perspective.

3         THE COURT:  Okay.  The next step is to determine the

4    appropriate sentencing guideline.  And I note that in the

5    Defendant's cooperation agreement he agreed not to appeal or

6    otherwise challenge the sentence I impose upon him if it is

7    240 months or less.  And 240 months is the statutory maximum.

8         Mr. Siegel, is that correct?

9         MR. SIEGEL:  Yes, your Honor.

10        THE COURT:  The Defendant pleaded guilty on July 19,

11   2019, to the cooperation agreement, pleading to Count One of

12   the indictment in 18-CR-681, conspiracy to defraud.  It

13   carries a sentence of zero to 20 years in the custody of the

14   Attorney General.

15        Counts Two, Three, and Four remain open.

16        MR. SIEGEL:  Correct, your Honor.

17        THE COURT:  According to the probation department,

18   the Defendant's total offense level is a 32, he's in criminal

19   history category I with no prior convictions for a felony, and

20   the sentencing range under the guidelines is 121 months to 151

21   months in the custody of the Attorney General.

22        Do you agree with that?

23        MR. SIEGEL:  Yes, your Honor.

24        THE COURT:  Does the defense agree as well to the

25   guideline?

*Proceedings*                                                          7

 1          MS. CAHILL:  Yes, we do, your Honor.

 2          THE COURT:  And the Court agrees as well, so we can

 3     move on from there.

 4          The next step is to hear from the parties regarding

 5     the Government's motion and the factors that the Court needs

 6     to consider before sentencing the Defendant under 18 U.S. Code

 7     Section 3553(a).

 8          MR. SIEGEL:  Thank you, your Honor.

 9          Starting on the motion and just to talk about the

10     value of Mr. Pearse's cooperation, as we lay out in our

11     letter, I don't think that value can be overstated.

12          He testified at two separate trials, which is

13     obviously unusual.  But it wasn't just his testimony that was

14     really incredibly valuable, it was the documents he provided.

15     All of his Palomar e-mails.  Some of the key documents your

16     Honor saw at the Chang trial are documents he and his counsel

17     provided that were obtained -- they were internal Privinvest

18     documents that we were not able to get through U.S. process.

19     They were entered in the UK litigation.  Mr. Pearse and his

20     counsel advised us of those and we were able to get it through

21     lawyers in the UK.  And those were really some of the key

22     documents at the Chang trial that your Honor oversaw.

23          There was his cooperation against Credit Suisse and

24     the information that he provided as to Credit Suisse leading

25     to a guilty plea and huge amount of fines and real impact on

*Proceedings*                                                    8

1   banks and the controls that banks look at and the ways that

2   banks deal with these kind of issues.

3           That cooperation, it's not just the information that

4   he had, it's the way he handled himself.  He has always

5   been -- in every experience that I've seen and in reviewing

6   the transcripts from both trials, he has been patient,

7   dedicated, careful, respectful, clear about what he knows and

8   what he doesn't know, and I think as the jury found in Chang

9   and as I suspect the jury ultimately found in Boustani totally

10  credible.

11          I don't think -- I don't see how these trials could

12  have gone forward without Mr. Pearse.

13          Mr. Bini is here, who originally indicted the case

14  and who handled Mr. Pearse's testimony at the first trial.

15  He's come to show his support.

16          THE COURT:  Where is he?

17          MR. BINI:  Here, your Honor.

18          THE COURT:  Welcome.

19          MR. BINI:  Thank you, your Honor.

20          THE COURT:  Why did you leave?

21          MR. BINI:  Well, I do have two daughters --

22          THE COURT:  Okay, enough.  Now I understand.

23          MR. SIEGEL:  A credit to Mr. Bini for indicting this

24  case without a cooperator.  But had it gone forward as the

25  evidence stood, having seen the way the trial went, I don't

*Proceedings*                                                              9

1    know what would have happened at that trial without the

2    witnesses and without the information Mr. Pearse provided.  He

3    was absolutely critical to the conviction of Manuel Chang and

4    for Boustani, who was not acquitted for, as it seems,

5    technical venue reasons; even for that, to really let the

6    world know what Mr. Boustani, what Privinvest, what all the

7    co-conspirators did, Mr. Pearse was absolutely essential for

8    that.

9              I also think in evaluating the 5K, this is a key

10   case to think about the need to incentivize cooperation.

11   Mr. Pearse could have fought extradition.  He could have

12   fought it like Manual Chang did.  But as your Honor knows from

13   other cases, in the UK it is possible to fight and win and

14   never come.

15             Who knows what would have happened had Mr. Pearse

16   decided to stay and fight that?

17             THE COURT:  Well, one example is in the Johnson

18   case.

19             MR. SIEGEL:  That's exactly right.

20             THE COURT:  Where one of the Defendants fought and

21   avoided extradition.

22             MR. SIEGEL:  That's right.

23             That is not what Mr. Pearse did.  Within just a few

24   months of his arrest, he made the choice to start meeting with

25   the Government and proffering with the Government and

*Proceedings*                                                              10

1   ultimately chose to voluntarily come here and plead guilty.

2   That is a truly laudable choice.

3            So many defendants choose to not come to the United

4   States, not face the charges, whether it's in the UK, whether

5   it's Allam, who is still in Lebanon.  He made that choice and

6   that choice should be rewarded and recognized and there should

7   be incentive to other people to make that choice.

8            Even when he came here to face the charges, he could

9   have just pleaded guilty.  I don't think I'm saying anything

10  that isn't well known:  Defendants who just come and accept

11  responsibility and plead guilty in white collar cases, the

12  sentences tend to not be extraordinary.

13           He could have just made the choice, plead guilty,

14  throw himself on the mercy of the Court, and taken what came.

15  That would have spared him what is for everyone a difficult

16  course of cooperation.  It also would have spared him some of

17  the personal humiliation that came out of this case.  Had he

18  just pleaded guilty, had he not testified, I don't see how any

19  of that would have come out and a lot of consequences that he

20  suffered wouldn't have come out.

21           But he made the choice to cooperate, to go all in on

22  trying to make what he did right, and committing himself to

23  truthfulness.  That's a difficult choice for any person who is

24  facing what Mr. Pearse or another defendant is facing.  It's a

25  difficult choice for a lawyer to counsel somebody on.

*Proceedings*                                                                11

 1          And I think it's important that the sentence that

 2   your Honor gives makes it so that people want to make the

 3   choice that Mr. Pearse has made even with all the difficulties

 4   he's faced, that future lawyers counseling future clients can

 5   really lay out and point to examples and say:  This is the

 6   right thing to do.  And it's not just the right thing to do,

 7   but it is worth it to do.

 8          I think that's particularly critical here in light

 9   of the acquittal of Mr. Boustani.  Every defendant is an

10   individual and every sentencing is individual.  And the fact

11   that Mr. Boustani perhaps escaped justice, in some ways it

12   doesn't really apply to the 3553(a) factors for Mr. Pearse.

13   But in terms of thinking about incentives and thinking about

14   why people should cooperate, what Mr. Boustani very clearly

15   shows is that you can go to trial -- putting aside you can

16   fight extradition, putting aside you can just plead guilty,

17   you can go to trial and maybe you will get lucky and you will

18   win.  And anyone who is assessing what to do when faced with

19   charges like this is weighing all of those options.

20          And I think this case makes it very clear that maybe

21   if Mr. Pearse would have just gone to trial with Mr. Boustani

22   that he would have been acquitted too.  Had the same jury.  I

23   don't know what evidence there would have been without

24   Mr. Pearse, but he could have just gone to trial.  And I think

25   the sentence needs to make it clear even with that possibility

*Proceedings*                                                    12

1   it's important for people to choose to cooperate, for them to

2   feel that's the right choice and a worthwhile choice.

3          And then the final thing, your Honor, I don't want

4   to spend too much time on it because I think it's very clear

5   from Mr. Pearse's submissions, Mr. Pearse has been -- there

6   has been in some ways infinite punishment for Mr. Pearse.

7   What he has lost from his cooperation is profound.

8          I can speak for myself from the times that I've met

9   Mr. Pearse and spoke to him, things that are talked about in

10  his letter are genuine.  And it has been impactful to me every

11  time I have spoken to him or heard him speak about it.  It was

12  impactful to me to read his letter and his submission.

13         Obviously, prison, incarceration, is very difficult.

14  I think most people given the option would gladly choose years

15  in jail to come home to their wife and children.  I don't

16  think anyone can look at Mr. Pearse and look at the facts of

17  this case and think:  I want to engage in a scheme like

18  Mr. Pearse because I think it was worth it.

19         For all the money he took -- and I don't think

20  there's any dancing around that this was a crime motivated by

21  greed and motivated by money -- he has not profited.  Far from

22  it.

23         This case is a warning to everyone about the cost of

24  dishonesty and the cost of greed and I don't think there is

25  any sentence that the Court could give that someone would look

*Proceedings*                                                        13

1   at and say:  Well, in that case, it's worth it to me and I

2   want to risk it.

3           And I think in light of that, which is -- in some

4   ways, those consequences are here no matter what sentence the

5   Court gives.  But those consequences are very real for

6   Mr. Pearse and in some ways I think those consequences are

7   more there for cooperators because they have to admit

8   everything, they have to put everything in full light.  And I

9   just think that's just one additional reason why it's

10  important to weigh all that and think about what are the

11  incentives for cooperators, what is necessary to ensure that

12  cases like this can be brought with cooperators and that

13  people will make the choice to try to make what they did right

14  and try to come forward and tell the truth and advance justice

15  has opposed to just fighting.

16          THE COURT:  Can I just ask a question about

17  restitution in this case?

18          MR. SIEGEL:  Yes, your Honor.

19          THE COURT:  The sum of restitution that I understand

20  should be imposed is $641,202,613.

21          Is that what the Government believes should be the

22  amount of restitution?

23          And that would be severally liable; Mr. Chang and

24  the Defendant and also the other Defendant who pleaded guilty.

25          MR. SIEGEL:  Your Honor, just in terms of the number

*Proceedings*                                                        14

1   that you read, I'm not sure if that's from the PSR or from our

2   recent restitution --

3            THE COURT:  That's in connection with the PSR from

4   the probation department.

5            MR. SIEGEL:  In the submission that we made as to

6   Mr. Chang, some of that we don't think is appropriate

7   restitution, so there's a lower total amount.

8            THE COURT:  I was looking -- I read it, but where is

9   it in your submission?

10           It says that the total gain -- is it regarding the

11  guidelines calculation, the total gain reasonably foreseeable

12  by Mr. Pearse is $63,700,000?

13           MR. SIEGEL:  No, your Honor.

14           So, what the Government's proposing is, since we're

15  currently still litigating the amount of restitution as to

16  Mr. Chang, and there's already a brief before your Honor with

17  that, it's that what we are proposing is that the Court should

18  defer the calculation of restitution so that whatever legal

19  objections or factual objections there are as to Mr. Chang, we

20  can get that resolved.  Once that's resolved, I expect that it

21  will be fairly easy as to Mr. Pearse.

22           The first level question is calculating the total

23  amount of restitution owed by everybody.

24           THE COURT:  Right.

25           MR. SIEGEL:  Once that's done as to Mr. Chang, and

*Proceedings*                                                      15

1    then I expect it will be fairly easy as to Mr. Pearse, there's

2    a question as to how you allocate that.

3              THE COURT:  Right.

4              MR. SIEGEL:  And the Court has wide discretion among

5    defendants to say to what extent Mr. Pearse has to be jointly

6    and severally liable as to that whole amount, some percentage

7    of that amount, based on his culpability and his economic

8    circumstances.

9              THE COURT:  So, that can continue to be litigated

10   after the sentencing is what you're saying.

11             MR. SIEGEL:  That's right, your Honor.

12             What we would propose is that your Honor proceed

13   with sentencing today and then set some control date for

14   within 90 days but after you expect to have a resolution as to

15   Chang.  At that point, to the extent there are any legal or

16   factual issues that Mr. Pearse wants to raise, he would have

17   the opportunity to do that.

18             But then more importantly, Mr. Pearse and his

19   counsel can make whatever arguments they have about how that

20   total number should be allocated.

21             MS. CAHILL:  We have no objection to that, your

22   Honor.

23             THE COURT:  Thank you.

24             Ms. Cahill?

25             MS. CAHILL:  Thank you, your Honor.

*Proceedings*                                                    16

1            I am not going to spend a lot of time this morning

2    talking about the rough road Andrew Pearse has been on these

3    last several years since the indictment.  Everything bad that

4    has happened to him since 2019 is what he deserves for his

5    criminality.  He knows this.

6            But what I do want to talk to your Honor about this

7    morning is something that's not in our sentencing memo, it's

8    not in the 5K, it's not in the presentence report.  And that

9    is my personal reflections about Andrew Pearse.

10           Andrew and I first met in July 2019.  If I'm being

11   honest, that Andrew Pearse was a little smug, a lot entitled,

12   quick to blame other people, and quick to make excuses for his

13   criminal conduct.

14           That is not this Andrew Pearse.  This Andrew Pearse

15   is different.  He has changed.  He is a better man.

16           And how do I state that with such confidence?

17           Because, your Honor, Andrew Pearse and I have been

18   to Hell and back these last five and a half years.  I have

19   seen him at his worst.  I have seen him at his best also.  But

20   I have seen him at his most vulnerable, his most scared, his

21   most depressed.

22           He and I have had fights that would make a married

23   couple blush.  We have both been through personal trials since

24   2019.  I lost both my parents.  Andrew figuratively has lost

25   one of his sons, who has not spoken to him in years.  He saw a

*Proceedings*                                                    17

1   beautiful relationship crumble over the stress of this case.

2          In those difficult times, though, I saw his

3   compassion firsthand.  I saw his thoughtfulness.  I saw how

4   much he cares for the people in his life.

5          What I'm trying to say to your Honor is that you

6   cannot have gone down the very lengthy road and at times very

7   dark road that I have been down with Andrew and not come to

8   know him profoundly.  So, let me cut to it and tell you why I

9   think he is a different person today.

10          I think the first reason is the cooperation journey.

11   They say that the first step for addicts in recovery is to

12   admitting that they are addicts.  I think for Andrew, it was

13   admitting to himself that he was a criminal.  Stop with the

14   excuses.  I think it was like walking into a figurative

15   confession booth for him.  He let it all out and he walked out

16   of that booth a cleaner man.  The excuses stopped.  The

17   blaming of others stopped.

18          Secondly, your Honor, Andrew Pearse has lost all his

19   wealth.  The only commodities he has to trade on now are his

20   goodness, his wit, his intelligence, and his general joie de

21   vivre.  He's a lovely person to spend time with sometimes.  I

22   think that the people that gravitate to Andrew now do so

23   because they like him, plain and simple, not because of what

24   he has.  And if I may, your Honor, in all our submissions,

25   there is one that really leaped off the page at me and I'd

*Proceedings*                                                    18

1  like to pass it up to your Honor, if I may.

2          This is a photo of Andrew and his fellow volunteers

3  at the soup kitchen that he works at every Friday.  And I

4  don't mean to disparage the other volunteers here, but they

5  don't strike me as especially glamorous, especially famous,

6  powerful, or wealthy.  But to me, Andrew looks like there's no

7  company he'd sooner be with than these people.

8          Another new relationship in his life is Reverend Ann

9  Kansfield, who is here today from Greenpoint to support

10 Andrew.

11         THE COURT:  Yes, and thank you for your submission.

12 I appreciated and enjoyed reading it.

13         Go ahead.

14         MS. CAHILL:  I also think, your Honor, that there's

15 a blessing in disguise to Mr. Pearse's loss of wealth, which

16 is that the supposed friends who were only with him because of

17 his wealth have fallen by the wayside.  The old friends are

18 the ones --

19         THE COURT:  I never had that problem.

20         MS. CAHILL:  Nor me.

21         The old friends who were always there with Andrew

22 because they liked Andrew are still there.

23         Thirdly, your Honor, I believe what Andrew said in

24 his letter to the Court about burning down the house and just

25 starting fresh.  I think he looked hard at himself in the

*Proceedings*                                                              19

1   mirror, despised what he saw, and resolved not to give up but

2   to just start anew.  And I've watched him brick by brick

3   rebuild himself and rebuild his relationships.  We have

4   written at length about his community service and the Waste

5   Not business that he started.  I'm not going to belabor that,

6   but I simply want to say that I marvel at how far he has come.

7          The greatest days in Andrew's life now are ones that

8   I think most people would consider the most modest of

9   successes.  But to Andrew, they mean the world.  I'm talking

10  about a pleasant hour with one of his two children who are

11  still speaking to him.  Gaining the respect of a fellow

12  volunteer.  Working a hard honest day.  And I like this one

13  most of all:  Andrew recounted, told me, that when he brought

14  out his Christmas yuletide logs at the soup kitchen -- he is

15  their lead baker -- everyone that was there gave him a

16  standing ovation because they know the love that he pours into

17  what he's bringing to them.

18         Rupert Butler, who was Andrew's UK lawyer, I guess

19  still is, said in his letter to your Honor that he likes this

20  Andrew.

21         So do I.  He is humbled.  He's got his head screwed

22  on straight.  He's adjusted his values and his priorities.  I

23  think he's found purpose.  I think he has true friends.  All

24  he wants today, all he covets, is to lead a decent life and to

25  have an honest day's living.

*Proceedings*                                                     20

1          There's something else that I want to say to your

2     Honor.  This may or may not resonate with you, but I'm going

3     to try.  You and I were at the same city bar function a few

4     weeks ago.  It was Judge Sullivan talking about the vanishing

5     trial.  And there was something that Judge Sullivan said that

6     night that really stuck with me in terms of this case.

7          Judge Sullivan was giving reasons why he thought

8     there were fewer trials today than in the past.  And one

9     reason he proffered was that defense lawyers and their clients

10    look at each other and say to themselves:  All right, well, if

11    we go to trial, the judge is going to see and hear all this

12    terrible evidence.  Suppose we get convicted.  It is going to

13    be very difficult for the judge to unsee or unhear all that

14    evidence.  Maybe we shouldn't run the risk.

15         And it got me thinking about the leap of faith that

16    we, as defense lawyers, ask our clients to make.  We tell them

17    all the time:  Do not worry about this.  You're going to spill

18    your guts to the Government about the crime.  You're then

19    going to tell the Government about every lousy personal and

20    professional thing you've ever done and you're probably going

21    to have to say the same things to a judge and jury at trial.

22    And you're definitely not going to be able to tell the judge

23    about good things you've done in your life.  But do not worry,

24    it will all be fine.

25         And I thought to myself, my God, for a foreigner,

*Proceedings*                                                    21

1  who is not familiar with the American justice system, that's

2  asking a lot for them to accept that.  And I think five years,

3  five and a half years ago, it was a huge leap of faith for

4  Andrew.

5          But your Honor, no longer.  And the reason is Andrew

6  Pearse has seen the American judicial system up close and

7  personal for five and a half years.  He has seen the solemnity

8  of this courtroom.  He has seen the respect and dignity that

9  your Honor shows everyone who walks in here and how you treat

10 your staff.  He has been treated with kindness by all the

11 professionals he has encountered; the FBI officers -- some of

12 whom are here today -- his pretrial service officers, the

13 prosecutors.  And they have treated him like a human being,

14 not a criminal.  He has seen how dutiful these public servants

15 are.

16         So, it is with real faith, not blind faith, that

17 Andrew Pearse is here today.  He and I both know that your

18 Honor in arriving at a fair and just sentence will consider

19 the good as well as the bad and the ugly.

20         Thank you, your Honor.

21         THE COURT:  Thank you.  Before I turn to the

22 Defendant for any statement he wishes to make, could we talk

23 about the --

24         MS. CAHILL:  Exhibit K?

25         THE COURT:  -- that was provided to me by Hafsah

*Proceedings*                                                                   22

1   Masood, a barrister in London --

2           MS. CAHILL:  Certainly, your Honor.

3           THE COURT:  -- regarding the rules for individuals

4   who are not UK citizens and who have been found guilty of a

5   crime outside of the UK with regard to the length of custodial

6   sentences?

7           I understand the new rule that he discussed and

8   analyzed whereby a custodial sentence of twelve plus months is

9   likely to have the serious consequence of being barred from

10  reentering the UK.  That would be forever.

11          MS. CAHILL:  That's correct, your Honor.

12          THE COURT:  But I also wonder, and I was looking for

13  it, about other components of a possible sentence, like

14  supervised release, probation, and whether those would be

15  covered by this regulation as well.

16          MS. CAHILL:  Your Honor, I want to respond frankly

17  to what you just said.

18          We had initially thought of proposing an alternative

19  of a sentence of under twelve months or probation.  And I had

20  lunch with the pastor two years ago or so and we had seriously

21  thought about suggesting that Andrew stay in Brooklyn on

22  probation.  But the reality is he simply can't afford to do

23  that.  So, but for his financial circumstances, frankly, we

24  would have proposed that.

25          But my understanding of Ms. Masood's opinion is that

*Proceedings*                                        23

1   a supervisory release term or probationary term would not

2   trigger a bar to his reentry.

3                   THE COURT:  I see.  Okay.  Thank you.

4                   Anything from the Government on that, having read

5   the exhibit?

6                   MR. SIEGEL:  No, your Honor.

7                   THE COURT:  Thank you.  All right.

8                   Well, Mr. Pearse, we spent some time together last

9   year.

10                  Is there anything you would like to say to the Court

11  before I sentence you?

12                  THE DEFENDANT:  If I may, your Honor.

13                  THE COURT:  Of course.  And just speak into the

14  microphone so everybody can hear you.  Just pull it over.

15  Thank you.

16                  THE DEFENDANT:  Is that okay, your Honor?

17                  THE COURT:  It's fine.

18                  THE DEFENDANT:  First of all, thank you, Lisa.

19                  And good morning, your Honor.  Thank you for hearing

20  me.  I was trying to commit this to memory but, unfortunately,

21  I didn't do a good enough job.  So, if you'll forgive me for

22  reading parts of it --

23                  THE COURT:  That's fine.

24                  Have you shared what you're planning to say with

25  your attorney?

*Proceedings*                                                    24

1              MS. CAHILL:  Yes, he has.

2              THE COURT:  It's always a good idea.  I always ask a

3    defendant if a written statement has been discussed with the

4    attorney.  Almost always.

5              THE DEFENDANT:  In this case, definitely, your

6    Honor.

7              Your Honor, I'm grateful to have this opportunity to

8    address you and to address the Court and to convey my sincere

9    regret for my actions but I think most importantly to

10   apologize to all of those that I have harmed.  And I wanted to

11   speak today because although I've written you a letter in the

12   past, I think it's important to say these things publicly as

13   well.

14             Twelve years ago, I made a decision to accept a

15   kickback from Mr. Boustani and Mr. Safa.  That was the start

16   of my journey into criminality.

17             Looking back, I cannot convey how disappointed I am

18   in myself.  I had the opportunity to say no.  At every turn.

19   But instead I said yes.  I should have protected my employer.

20   I should have protected the people of Mozambique, frankly.

21   But instead, I gave two men I barely knew the keys to the

22   castle.

23             Those are my decisions, your Honor.  I knew they

24   were wrong.  And in doing so, I let down everyone that I know

25   and love.  I let down my employer.  I exposed investors to

*Proceedings*                                                    25

1   risks they would not have taken had they known of my crimes.

2   I helped create projects that made an economic crisis in

3   Mozambique worse than it otherwise would have been.

4            In those years, I showed the world the very worst of

5   myself, a man who could not be trusted by his family, his

6   employer, or almost anyone.  I have become the poster child

7   for the worst of banker stereotypes.  Thankfully, your Honor,

8   and contrary to popular belief, not all bankers are crooks.

9   But your Honor, I was.

10           I'm also relieved to be sitting before you to accept

11  the consequences of my actions.  This is a scary moment for me

12  but the overwhelming emotion is one of relief to finally come

13  to the conclusion of what has been a very long journey.  I've

14  been saying sorry to my family for the last six years, but now

15  I am grateful to have the opportunity to publicly apologize to

16  everyone else that my actions have harmed.

17           Your Honor, I am truly sorry.

18           To the investors I harmed, I am sorry.

19           To the people of Mozambique, I am so sorry.

20           I will never get over the guilt and shame that I

21  feel.  The actions that I took at that time haunt me.

22           While my decision to get involved with Mr. Boustani

23  and Mr. Safa was the worst of my life, my decision to

24  cooperate was one of my best.  Cooperating has given me the

25  opportunity to tell the truth and to accept responsibility for

*Proceedings*                                                      26

1   my actions.  And I hope that by shining a light on the events

2   surrounding my crimes and those of my co-conspirators I have

3   demonstrated my remorse and, more importantly, helped my

4   victims achieve justice and, therefore, closure; not just

5   here, but also in the UK, where my trial testimony was used as

6   a backbone for Mozambique's case against Mr. Safa and

7   Privinvest.  Successful case.

8           Cooperating is a long and perilous road to navigate,

9   but the end is worth every anxious, difficult, and at times

10  terrifying moment.  It forced me to reveal the worst of myself

11  in public; not once, but multiple times.  But by doing so,

12  I've been able to restore my values and take pride in doing

13  the right thing.  Once I look back with shame and guilt at the

14  man I was, I take some pride in my achievements since then.

15          In large part, this is because I had the benefit of

16  two very good pieces of advice.  I did share these with you in

17  my letter, your Honor, but one of those people is here so I

18  would like her to hear it.

19          First, from an officer in this building, pretrial

20  services, incredibly he has been an inspiration to me in so

21  many ways.  I only say "incredibly" because it was from a

22  source from which I never expected to find inspiration.  One

23  thing will always stay with me.  He said in order to rebuild

24  my life, I will need to tear it down.  I will need to tear

25  down the whole house and start again.

*Proceedings*                                                        27

1          That is not easy because it requires taking a long,

2    hard, honest look at yourself and to wholeheartedly accept

3    responsibility for all the bad things, without mitigation,

4    without blaming others.  This was my fault, these were my

5    decisions, and I shall live with the consequences.

6          That journey was aided by the second piece of advice

7    from another Brooklyn resident.  She is here, your Honor.

8    Pastor Ann, who wrote the most fabulous letter.  I'm grateful

9    for her for that.

10         She told me a story about one of New York's finest

11   fire department chiefs, who when asked how he kept going

12   further and further into a burning building said simply:  I

13   count to ten and take another step.

14         Your Honor, over the last five years, I've counted

15   to ten on more occasions than I would care to remember.  But I

16   have kept going.  I've tried to do the right thing.

17         I'm proud of the work that I've done within the

18   community over the last six years.  Becoming a founding

19   volunteer and project leader at the Walden Soup Kitchen is

20   something I hold most dear.  It gave me back my purpose.

21         Who would have thought that baking cakes would be so

22   beneficial?

23         I now know I can contribute to society.  And by

24   doing so, I gain so much more than I give.  I am grateful for

25   the support and kindness I have gotten from so many people,

*Proceedings*                                                        28

1   many of whom, if not the majority, were strangers to me five

2   years ago.

3           To my fellow volunteers and those in need, it's been

4   my privilege to be able to help and who have given me so much

5   more than I could ever possibly give back.

6           To the good people at Greenpoint -- I never heard of

7   Greenpoint until 2019, but what an amazing place.  They took

8   me in and supported me at my lowest.

9           I'm grateful for the humanity shown to me by the

10  various AUSAs and FBI officers I have encountered over my

11  journey, many of whom are here.  As Ms. Cahill told you, I've

12  been treated with nothing but the greatest of humanity.  I am

13  super grateful for that.  Thank you.

14          To a few, I owe a debt that I can never repay and

15  without whose empathy, wisdom, and guidance I doubt I would be

16  here today.

17          But your Honor, I now happily live and work amongst

18  the working class people of the United Kingdom where honesty,

19  loyalty, and family are valued more highly than money, where

20  hard work is rewarded with respect.  I am committed to living

21  my life in this vein; to play an active part in society, to

22  work hard, and earn an honest living; and to work even harder

23  at regaining the trust of those I let down most.

24          In doing so, your Honor, I hope that one day I'll be

25  remembered not as the poster child for greedy immoral bankers

*Proceedings*                                                    29

1   but as an example of what can be achieved by accepting

2   responsibility, telling the truth, and accepting the

3   consequences with dignity; and that by setting a good example

4   to my children, hopefully one day I'll make them proud again.

5           Thank you, your Honor.

6           THE COURT:  Thank you.

7           Is there anything else from the Government before I

8   sentence the Defendant?

9           MR. SIEGEL:  No.  Thank you, your Honor.

10          THE COURT:  Thank you.

11          Anything else from defense?

12          MS. CAHILL:  No, your Honor.

13          THE COURT:  Yesterday, I participated in a program

14  at Fordham University School of Law with 20 other federal

15  judges from this district.  And we attended classes, we spoke

16  at a community gathering where we were asked questions about

17  being judges.

18          And one of the subjects that we discussed was

19  sentencing.  And I mentioned in my response to the question

20  from one of the students that it's important to get different

21  perspectives on a difficult sentencing from people.  Judges

22  sometimes consult other judges and we sometimes ask our law

23  clerks, who are beginning their legal careers, unencumbered by

24  years and years of sentencing, their views.

25          And my law clerk here, Aio, a recent graduate of

*Proceedings*                                                          30

1   Harvard Law School, is my law clerk on this case, and I asked

2   him to look at the sentencing materials so that we might have

3   a conversation about how to deal with this, a difficult

4   sentencing.  It involves someone who committed a very serious

5   white collar crime which had, as Mr. Pearse said, great

6   consequences for various individuals and communities, and to

7   look at the whole picture.

8             And, so, I thank him for his thoughts on this.

9             And I say this because my view is that it's easy to

10  follow the rules and get the numbers right and understand the

11  law and get that right so you can do justice.  But it's more

12  important to do what's right, to do what's right under the

13  circumstances.  Sometimes by doing what's right the

14  Defendant's not happy.  Sometimes doing what's right makes the

15  Government unhappy.

16            I'd like to think that whatever is done here is for

17  that; within the law, the purpose of doing what's right, and

18  what will have the most positive and fewest negative

19  consequences as a result of the sentence.

20            That's where I am.  And I've done sentences more

21  than a thousand times in this courtroom in 25 years.  And

22  every sentence, every sentence, is a great personal challenge

23  for me.  And this is no different.

24            I've reviewed the parties' sentencing submissions,

25  including the submission by the Defendant, and I've heard from

*Proceedings* 31

1   both sides today in open court.

2          I've reviewed the numerous letters submitted by

3   Mr. Pearse's family, friends, and colleagues.  And for that, I

4   am very thankful of all of their submissions.

5          I've also listened carefully to Mr. Pearse's

6   statement during today's proceeding.

7          The Court is required to impose a sentence that is

8   sufficient but not greater than that necessary to fulfill the

9   purposes of sentencing pursuant to Title 18, United States

10  Code, Section 3553(a).

11         I'm going to grant the Government's motion under 18

12  United States Code, Section 3553(e) and 5K1.1 of the United

13  States Sentencing Guidelines.

14         I will now describe the 3553(a) factors that I've

15  considered in determining the appropriate sentence for

16  Mr. Pearse's offenses.

17         Sentencing is an individualized inquiry requiring a

18  close and nuanced look at the nature and characteristics of

19  the offense as well as the Defendant.

20         The nature and circumstances of this offense are

21  very serious.  Mr. Pearse was a well-paid banker at one of the

22  world's largest international investment banks who used his

23  advanced skill to not only facilitate a brazen international

24  fraud scheme that caused one of the biggest debt and

25  corruption scandals in Africa --

*Proceedings*                                                          32

1          And I believe he was an attorney as well.

2          MS. CAHILL:  Yes, that's right.

3          THE COURT:  While Mr. Pearse and his co-conspirators

4   secured billions of dollars in loans from foreign investors

5   with the goal of developing Mozambique' infrastructure, they

6   simultaneously diverted hundreds of millions of dollars from

7   those loans' proceeds to their own private gain.  Mr. Pearse's

8   relationship to the development project was strictly

9   professional at the start and later devolved into criminality

10  after he accepted a kickback payment in exchange for reducing

11  the fees that should have been paid to his employer, Credit

12  Suisse, in connection with the loan transactions.

13         But Mr. Pearse did not walk away after accepting

14  that kickback payment.  He used his advanced finance knowledge

15  and skill and other skills, professional skills, to further

16  advise Mozambican government on how to raise debt from

17  financial markets, including advising two additional loans

18  that were at the center of the criminal wire fraud and money

19  laundering scheme.

20         On July 22, 2019, Mr. Pearse pleaded guilty to

21  conspiracy to commit wire fraud, in violation of Title 18,

22  United States Code, Section 1343.  Mr. Pearse later testified

23  that he received $45 million in kickback payments.  After

24  receiving these elicit payments, he then doled out millions to

25  two other co-conspirators who assisted him in his efforts,

*Proceedings*                                                    33

1    both of whom reported to him at Credit Suisse.

2            Mr. Pearse was born in Christ Church, New Zealand,

3    and grew up in a middle class household.  When Mr. Pearse was

4    ten years old, his father got a job in the United Kingdom that

5    led his family there.  Through his parents, Mr. Pearse

6    obtained permanent resident status in the United Kingdom and

7    never applied to become a citizen despite his residency there

8    for over 45 years.

9            After high school, Mr. Pearse went on to university

10   and law school and shuttled between prestigious law firms in

11   London and Milan before pivoting to investment banking at

12   Credit Suisse around August 2000.  Mr. Pearse worked for

13   Credit Suisse in London until 2013, working his way up to

14   managing director of emerging markets group, where he managed

15   the bank's investments in Central Eastern Europe, the Middle

16   East, and Africa.

17           After leaving Credit Suisse, Mr. Pearse and two

18   co-conspirators formed Palomar Capital Advisors to advise

19   clients, including governments, on how to raise debt from

20   financial markets for development-related project.  Mr. Pearse

21   was involved with the company up until he forfeited his

22   one-third interest as part of his plea agreement in this case.

23           Mr. Pearse married his former wife in 1996 and they

24   had three children, all of whom are now adults residing in the

25   United Kingdom.

*Proceedings*                                                    34

1        In determining an appropriate sentence for

2   Mr. Pearse, the Court considers the seriousness of

3   Mr. Pearse's offenses and his breach of respect for the laws

4   against this sort of corrupt conduct.  The Court also

5   considered Mr. Pearse's substantial cooperation, invaluable

6   cooperation, and his notable efforts to reintegrate himself

7   into society and rebuild his relationships with his family and

8   community.

9        The Government's submission notes that immediately

10  after he pleaded guilty, Mr. Pearse began providing

11  substantial and exemplary assistance in the investigation and

12  prosecution of many of his co-conspirators over the following

13  six years.  Mr. Pearse participated in hours of interviews and

14  testified at two trials in this courthouse, providing credible

15  information that significantly aided the Government's

16  prosecutions.  The Government notes that, quote, "Mr. Pearse

17  provided unmatched insight into the inner workings of the

18  charged fraud, including details of conversations and conduct

19  for which he was a critical witness," end quote.

20       Mr. Pearse played a key role in securing the

21  convictions of his former employer Credit Suisse and the

22  former Minister of Finance of Mozambique, Mr. Manuel Chang.

23  He also helped the Government secure the guilty plea of his

24  former Credit Suisse colleague Mr. Surjan Singh.

25       Since Mr. Pearse pleaded guilty in 2019, he's

*Proceedings*                                                    35

1    expressed sincere remorse for his actions, has done

2    considerable charitable work, and has had no further issues

3    with the law.  In Mr. Pearse's letter to the Court filed in

4    anticipation of today's sentencing, Mr. Pearse acknowledged

5    that he had quote, "become the poster child for greedy immoral

6    bankers," end quote.

7            The testimony that Mr. Pearse provided at trial not

8    only revealed the extent of his criminal conduct but also led

9    to the breakdown of his marriage and severely damaged his

10   relationship with his children.  However, Mr. Pearse does not

11   regret coming forward.  He instead used this as an opportunity

12   to turn his life around.

13           Mr. Pearse is now an avid volunteer at community

14   organizations.  This started with the food pantry in a church

15   here in Greenpoint, Brooklyn.  The defendant's pastor notes

16   that Mr. Pearse helped make meals and distribute groceries for

17   months, usually signing up for the dirty jobs that no one else

18   wanted.  Mr. Pearse continued this volunteer work at food

19   kitchens when he returned to the United Kingdom.

20           Mr. Pearse's former wife's letter illustrates the

21   devastating effect that Mr. Pearse's actions have had on his

22   family and particularly on the three children they have

23   together.  She notes that throughout this entire saga, even

24   while their children were navigating their own transition to

25   adulthood, they have shown remarkable determination and

*Proceedings*                                                          36

1    resilience.

2             In summary, Mr. Pearse's conduct and attitude since

3    he pleaded guilty make a conclusive showing that Mr. Pearse

4    has been substantially rehabilitated.

5             Sentencing is not a perfect science.  No set of

6    circumstances or defendants are the same and there are

7    competing considerations this Court must consider in

8    determining Mr. Pearse's sentence.

9             The Court believes that a carceral sentence may be

10   necessary to hold Mr. Pearse accountable for the very serious

11   crimes that caused harm to the United States and other

12   international investors.  But the Court also recognizes that

13   Mr. Pearse's clear desire to turn a new leaf and continue

14   rebuilding his relationship with his family in the United

15   Kingdom is very important as well.

16            The Court takes note of Mr. Pearse's otherwise clean

17   criminal record and acknowledges the potential impact that

18   Mr. Pearse's sentence may have on his immigration status in

19   the United Kingdom.  The sentence I impose will reflect, I

20   believe, and take into account Mr. Pearse's conduct but credit

21   his substantial cooperation with the Government in this case.

22            I would want to say something else about the

23   consequences of Mr. Pearse's cooperation in terms of his family.

24            I would hope that his second son, his younger son...

25            THE DEFENDANT:  Yes, your Honor.

*Proceedings*                                                    37

1    THE COURT:  -- who has cut off his relationship with

2    his father would take a look at what his father has done over

3    the last six years to rehabilitate himself and to make himself

4    a stronger, better person, and try very hard to reestablish

5    his relationship with his father.

6    We make mistakes.  Some mistakes are bigger than

7    others.  Families are complicated devices.  And we all look at

8    our families as parents, our children, and we see mistakes we

9    have made.  We have seen mistakes the children have made.  And

10   there are disagreements and there are times when we walk away.

11   But there should be a time when we come back and embrace.

12   And for Mr. Pearse and his family, this is that

13   time.  And the sentence that I am going to impose upon him is

14   going to provide him with the opportunity to do so.

15   Are you ready to be sentenced?

16   THE DEFENDANT:  Yes, your Honor.

17   THE COURT:  Please stand.

18   On Count One of 18-CR-681, conspiracy to defraud, I

19   sentence you to a sentence of time served without any

20   supervised release.

21   Is there anything else?

22   There are three open counts.

23   Oh, there's no fine, by the way, because restitution

24   is a priority.  And I'll hear from the Government on

25   restitution.

*Proceedings*                                              38

1        I need a date, Joe.

2        Within 90 days, you say, Mr. Siegel?

3        MR. SIEGEL:  Your Honor, forfeiture and restitution

4   should be decided within 90 days.

5        THE COURT:  I need to have a suspense date on that,

6   so just one minute.

7        Friday, June 6 -- well, make it Wednesday, June 4,

8   as the suspense date for any submissions on restitution.

9        MR. SIEGEL:  Thank you, your Honor.

10       THE COURT:  Forfeiture, the forfeiture order will be

11  attached to the judgment.

12       Is there a motion?

13       MR. SIEGEL:  Your Honor, we move to dismiss the open

14  counts, which I believe are Two, Three, and Four.

15       THE COURT:  Motion is granted.

16       Other issues for me to discuss before I tell the

17  Defendant his rights?

18       MR. SIEGEL:  I don't know if you mentioned the

19  special assessment.

20       THE COURT:  Oh, there's a $100 special assessment,

21  which is mandatory, which you should pay immediately.

22       Do you understand?

23       THE DEFENDANT:  Yes, your Honor.

24       THE COURT:  $100.

25       Anything else?

W. Name - direct/cross - Atty                                    39

1         MR. SIEGEL:  And your Honor, you indicated the

2    forfeiture would be attached to the judgment.

3         To make sure that I'm clear, the forfeiture you're

4    imposing is the forfeiture laid out in the preliminary order

5    that you --

6         THE COURT:  Have signed, yes, that's right.

7         MR. SIEGEL:  Thank you.  Just one moment.

8         THE COURT:  Sure.

9         (Pause in proceedings.)

10         MR. SIEGEL:  I think that's everything.  Thank you,

11    your Honor.

12         THE COURT:  Is there anything else from the defense?

13         MS. CAHILL:  No, your Honor, thank you very much.

14         THE COURT:  Mr. Pearse, you have the right to appeal

15    your sentence to the United States Court of Appeals for the

16    Second Circuit if you believe the Court has not properly

17    followed the law in sentencing you, but your time to appeal is

18    extremely limited.  You should discuss with Ms. Cahill at once

19    whether an appeal would be worthwhile.

20         Do you understand your right to appeal?

21         THE DEFENDANT:  Yes, I do, your Honor.

22         THE COURT:  In that case, we're adjourned.

23         MR. SIEGEL:  Thank you, your Honor.

24         MS. CAHILL:  Thank you, your Honor.

25         (Matter concluded.)

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
*/s/ Linda A. Marino   April 7, 2025*