```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF VIRGINIA
 2                             Abingdon Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5     UNITED STATES OF AMERICA,        )
                                        )
 6     v.                               )   CRIMINAL ACTION NO.
                                        )   1:24cv45
 7     MARTIN ERIC ELLING,              )
                                        )
 8                     Defendant.       )
                                        )
 9   - - - - - - - - - - - - - - - - - -

10

11                       TRANSCRIPT OF PROCEEDINGS

12                            (SENTENCING)

13                         Abingdon, Virginia

14                           May 22, 2025

15

16   BEFORE:   THE HONORABLE ROBERT S. BALLOU
               United States District Judge
17

18   APPEARANCES:

19   COUNSEL FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE
     WESTERN DISTRICT OF VIRGINIA:
20
          RANDY RAMSEYER
21        Assistant United States Attorney
          180 West Main Street, Suite B19
22        Abingdon, VA  24210

23        KRISTEN ECHEMENDIA
          Senior Trial Counsel
24        Department of Justice, Civil Division
          Commercial Litigation Branch
25
```

2

```
                    ─── United States v. Elling - Sentencing ───
 1    Appearances Cont:

 2          KIMBERLY BOLTON
            KRISTIN GRAY
 3          Special Assistant United States Attorney
            Assistant Attorney General
 4          Medicaid Fraud Control Unit
            Virginia Office of the Attorney General
 5
 6    ALSO PRESENT:

 7          Darren Petri

 8
      COUNSEL FOR THE DEFENDANT:
 9
            GENTRY LOCKE RAKES & MOORE
10          BY:  THOMAS JACK BONDURANT, JR.
            P.O. Box 40013
11          Roanoke, VA  24022

12          BALLARD SPAHR LLP
            BY:  MARJORIE J. PEERCE
13          1675 Broadway, 19th Floor
            New York, NY  10019
14

15

16

17

18

19

20

21

22

23

24

25
```

──────── United States v. Elling - Sentencing ────────

1           (Proceedings commenced at 11:46 a.m.)

2           THE COURT:  Good afternoon everybody.  Let's call

3      our case, please.

4           THE CLERK:  *United States of America v. Martin Eric*

5      *Elling*, criminal action number 1:24cr45.

6           THE COURT:  All right.  Let the record reflect that

7      the government is present by its counsel.  The defendant,

8      likewise, is present by counsel.

9           Before we get going, let me have all of you -- I'm

10     going to say it's for Ms. Bragg's benefit, but it's for my

11     benefit.  If y'all could just introduce your teams so that I

12     know who all is here.

13          Mr. Ramseyer.

14          MR. RAMSEYER:  Randy Ramseyer from the U.S.

15     Attorney's Office.  Seated beside me is Kristen Echemendia,

16     E-C-H-E-M-E-N-D-I-A.  Next to her is Kim Bolton, and next to

17     her is Kristin Gray.  That's Kristin, K-R-I-S-T-I-N.  Kristen

18     Echemendia is E-N.  And at the end is Darren Petri,

19     P-E-T-R-I.

20          All right.  Mr. Bondurant.

21          MR. BONDURANT:  Good morning, sir.  I'm Tom

22     Bondurant with Gentry Locke representing Mr. Elling.  Also at

23     counsel table is Marjorie Peerce from Ballard Spahr, also

24     representing Mr. Elling.

25          THE COURT:  All right.  Thank you very much.  So

4

—————— United States v. Elling - Sentencing ——————

1    we're here today for Mr. Elling's sentencing.  Is the

2    government ready to proceed?

3              MR. RAMSEYER:  We are, Your Honor.

4              THE COURT:  Is the defendant ready to proceed?

5              MR. BONDURANT:  Yes, Your Honor.

6              THE COURT:  So Mr. Elling has previously pled guilty

7    to a violation of 18, United States Code, Section 1519,

8    obstruction of justice; that is, knowingly destroying

9    documents or tangible objects with the intent to impede,

10   obstruct, or influence an investigation or proper

11   administration of a matter within the jurisdiction of the

12   Department of Justice.

13             That has a maximum period of incarceration of up to

14   20 years, a fine of $250,000, and a period of supervised

15   release.  It is an 11(c)(1)(C) plea.  I took acceptance of

16   his plea under advisement and acceptance of the plea

17   agreement under advisement as well.

18             In preparation for today, I have read the

19   presentence report, and I want to thank probation for all

20   their work in putting together the presentence report.  These

21   are always a lot of work, and this one, as well, had many

22   different strings to pull together.

23             I have read the sentencing memoranda and all of the

24   character letters that have been submitted on behalf of

25   Mr. Elling.  If I counted the number right, there are 43.

Cynthia L. Bragg, Official Court Reporter

—— United States v. Elling - Sentencing ——

1    I've also read the attachments to the sentencing memorandum

2    from the Supreme Court of -- I think it was the Supreme Court

3    of New York.  I don't know if it went beyond that.

4            MS. PEERCE:  The appellate division.

5            THE COURT:  Was it the appellate division?

6            MS. PEERCE:  Yes, Your Honor.

7            THE COURT:  Okay.  As well as the transcripts as it

8    relates to Mr. Wada and Mr. Pearse.  I think those are the

9    only two transcripts.  There may have been a third that was

10   attached as well.

11           I've read all of that as well as the letter that was

12   submitted -- I'm not going to even try to pronounce the name

13   -- from the immigration lawyer from Thailand as well.  I

14   appreciate all of that.

15           Does that encompass everything that was submitted

16   beforehand for me to consider?

17           MR. BONDURANT:  Yes, Your Honor.

18           THE COURT:  Very well.  So here is the way that I

19   typically proceed, and I'm happy to do this.  The first thing

20   we'll do is we'll get the presentence report accepted.  I

21   anticipate accepting the plea agreement that will then bind

22   us to the range.  I'll find the guidelines.  I'll then hear

23   any additional evidence that any of the parties want me to

24   consider.  I then have argument from counsel, and I'll have

25   Mr. Elling allocute.  That's the last thing I do before I

──────── United States v. Elling - Sentencing ────────

1    announce my sentence.

2            Any objection to proceeding that way, Mr. Ramseyer?

3            MR. RAMSEYER:  No, Your Honor.

4            THE COURT:  Mr. Bondurant?

5            MR. BONDURANT:  No, Your Honor.

6            THE COURT:  All right.  Very well.  So I do have the

7    final presentence report that was filed on May 14th at docket

8    33.  There have been no objections that have been filed that

9    haven't otherwise already been resolved; is that correct,

10   Mr. Ramseyer?

11           MR. RAMSEYER:  I'm sorry?

12           THE COURT:  As it relates to the presentence report,

13   there have been no objections from the government?

14           MR. RAMSEYER:  That's correct.

15           THE COURT:  Mr. Bondurant?

16           MR. BONDURANT:  That's correct.

17           THE COURT:  All right.  So I'll accept the

18   presentence report.  With that, I will accept the plea

19   agreement and the plea and find Mr. Elling guilty of the

20   violation as charged in the one-count information at 18,

21   United States Code, Section 1519.

22           The plea agreement has a binding period -- a binding

23   sentence range of 0 to 12 months giving the parties the

24   ability to argue within that range or for any alternative

25   sentence that is requested.

—————— United States v. Elling - Sentencing ——————

1          As well, there is a maximum fine of $250,000.  I

2    note that Mr. Elling, I believe on the day of his plea on

3    January 10th, filed into the registry of the court a check in

4    the amount of $250,100 representing the maximum statutory

5    fine and $100 with the -- I think it's in the plea agreement

6    that if I impose a fine of something less than that, then the

7    clerk will then return whatever the balance is to Mr. Elling

8    through his attorneys.

9          All right.  So the guidelines, as I view them, begin

10   with a base offense level under 2J1.2 of 14.  Mr. Elling has

11   no criminal history, so he's a 0 point offender.  He gets a

12   two-point credit under 4C1.1 having met all of the sub parts

13   of that one through ten.  He has accepted responsibility, so

14   he receives two points credit as well as under 3E1.1.  That

15   gives him a total offense level of 10.

16         He's a criminal history category of 1, and the

17   guideline range is 6 to 12 months.  The fine guideline range

18   is $4,000 to $40,000 as well as.

19         MR. RAMSEYER:  No, Your Honor.

20         THE COURT:  Mr. Bondurant?

21         MR. BONDURANT:  No, Your Honor.

22         THE COURT:  All right.  Very well.  Any evidence

23   that the government wants to offer, Mr. Ramseyer?

24         MR. RAMSEYER:  No, Your Honor.

25         THE COURT:  Mr. Bondurant?

—————————— United States v. Elling - Sentencing ——————————

1    MR. BONDURANT:  No, sir.

2    THE COURT:  All right.  So let's hear argument from

3 counsel as to the proper sentence.

4    MR. RAMSEYER:  Thank you, Your Honor.  There is an

5 easy way out for all of us in this case.  We can all just

6 agree that Martin Elling has no criminal record, he's

7 nonviolent, he's unlikely to reoffend, and the Application

8 Note for the guidelines say that for a person in his

9 situation, a sentence other than a sentence of imprisonment

10 is generally appropriate, and give him probation with home

11 detention and all go home.

12    That would be the easy way, and that's what often

13 happens with wealthy, white-collar defendants.  Why does it

14 happen?  It happens in part because white-collar defendants

15 like Mr. Elling, they seem like us.  They are like us.  I

16 mean, we can have a conversation with Mr. Elling.  We have

17 similar interests.  We have similar histories.

18    You know, so many defendants that come before the

19 Court, they're like in a different world.  We try to relate

20 to them, but we can't.  It's hard to relate to them.  They're

21 different.  They've had such a different upbringing.  Their

22 experiences are so different.

23    That's why things have been built in to try to

24 counter that in the system.  You know, when the sentencing

25 guidelines were made mandatory, one of the reasons for it was

——— United States v. Elling - Sentencing ———

1    that white-collar defendants weren't going to jail, and it

2    was because -- it was a recognition that we all just

3    sympathize with white-collar defendants.  They just don't

4    seem as seen different.  Of course, we don't have mandatory

5    guideline sentencing anymore.  That's the easy way.

6          I do want to mention briefly about the Application

7    Note, because in the Western District of Virginia, I looked

8    at the statistics on this, and last year the majority of the

9    case were variances from the guidelines.  So in most cases

10   the Courts in the Western District do not impose a sentence

11   that's within the guideline range.

12         That's the actual guidelines.  That's not even an

13   Application Note.  So it does seem sort of odd to sort of

14   hang your hat on an Application Note and give it some sort of

15   great significance that it needs to be followed when the

16   Courts typically don't even follow the guidelines.  I would

17   note too that when the guidelines were mandatory, application

18   notes were not.

19         Then the most important thing is in this case it

20   says that probation -- basically a sentence other than

21   imprisonment is generally appropriate.  So even on the

22   Application Note it recognizes it's not always appropriate.

23   And there is nothing about this case in any way, shape, or

24   form that is general.  This is not a general case.  It's not

25   a case where it would be appropriate for that sort of

—— United States v. Elling - Sentencing ——

1   sentence.

2          So, again, we could take the easy way, but is the

3   easy way the right way?  We shouldn't do something just

4   because it is easy.  If that was the case, we never would

5   have brought this case.  This case took years, the

6   prosecution of McKinsey and Mr. Elling.  It took a lot of

7   resources, and, frankly, it just wouldn't happen absent some

8   pretty extraordinary investigative team and these prosecutors

9   that I got to work with.

10          We shouldn't take the easy way out at this point.

11   We don't make a difference if we take the easy way out.  It

12   takes bravery to try to do things the right way as opposed to

13   the easy way.  And we know that this Court is not interested

14   in taking the easy way.  The Court wants to do all that it

15   can to be fair.  There is no doubt about that.  The Court is

16   going do that, and that's all we're asking for.

17          So justice.  I work for the Department of Justice,

18   but I'm always reminded of a quote from Clarence Darrow from

19   1936.  He's a famous attorney that did a lot of infamous

20   cases.  He said, "There is no such thing as justice - in or

21   out of court."  Anyone who has been in the criminal justice

22   system for any significant period of time -- I have, I know

23   the Court has, I know defense counsel has -- there is many

24   reasons to think Clarence Darrow is right.

25          Our system is sort of haphazard.  If you have two

---

United States v. Elling - Sentencing

1   defendants who commit the exact same crime and have the exact

2   same criminal history but they are sentenced by two doesn't

3   judges, they're probably not going to get the same sentence.

4   That doesn't seem like justice.

5           Martin Elling got caught.  There is no doubt in my

6   mind there are other people out there who did exactly what he

7   did, and they didn't get caught.  They're not going to face

8   any consequence.  That doesn't seem like justice.

9           One defendant's compassionate release petition gets

10  granted because a certain fudge was assigned to it.  Another

11  defendant has the exact same situation, his petition gets

12  denied.

13          We see injustice all around us.  White-collar

14  defendants routinely get away with crimes.  They just don't

15  get caught.  When they do get caught, often the convictions

16  get overturned on appeal.  When they do get sentenced, they

17  often get probation.  That doesn't seem like justice.  Maybe

18  Clarence Darrow was right.  Maybe there is no such thing as

19  justice in or out of court.

20          So where does that leave us?  What do we do?  Do we

21  just give up?  Do we say so and so committed a worse crime

22  than Mr. Elling did and got away with it, so he shouldn't go

23  to jail?  Do we say that even in Martin Elling gets 12 months

24  in prison that that's still woefully inadequate for what he

25  did, so why bother?  If those are the standards, we might as

---

Cynthia L. Bragg, Official Court Reporter

—————— United States v. Elling - Sentencing ——————

1  well all go home, because under those standards, no case

2  could be brought if the ultimate test is you have to achieve

3  ultimate justice.

4          So the answer to the question of do we just give up

5  is very simply.  No, we don't give up.  There may be no

6  justice, but that doesn't remove or obligation to seek it in

7  every case that we control and that we have a part in.

8          This Court has seen many cases and will see many

9  more, but I suspect this Court will probably never see

10  another one like this.  These cases are kind of unicorns.

11  They're incredibly rare, and they're incredibly rare because

12  of the resources it takes to catch someone like Mr. Elling.

13  In these kind of cases the government is out gunned.  We're

14  up against defense counsel that has resources we don't have.

15          THE COURT:  The Department of Justice is, after all,

16  the largest law firm in the world.

17          MR. RAMSEYER:  It is, and it would be great if I

18  could have all of them work on my cases, Your Honor.

19          There are so many lawyers and so much money on the

20  other side.  Then you have to have some luck.  So you know

21  you want to get justice, and you try to seek it.  This case

22  can make a difference.  This case can be a different

23  statement.

24          Above the entrance to the Supreme Court it

25  says, "Equal justice under law."  That's the motto.  It

—— United States v. Elling - Sentencing ——

1    sounds nice, I think we all agree with that, but in practice

2    do we really have equal justice under law?  When we look

3    around and see who goes to jail and who gets probation, does

4    it look like equal justice?

5            Let's consider a 19-year-old kid from the projects

6    in Bristol.  He's got no criminal history, no history of any

7    violent conduct, but he sells 50 grams of meth to somebody

8    that wants meth.  He has court-appointed counsel.  He doesn't

9    get a bunch of well-paid attorneys.  He has no one writing

10   letters of support for him.

11           He has no family because his parents are both drug

12   addicts.  He was raised by his grandmother and she has now

13   died.  He doesn't have homes in Manhattan and Thailand.  In

14   fact, he has no home.  He lives on the street.

15           Well, he's going to jail for ten years.  That's the

16   law.  And we're not saying there is anything improper about

17   that.  There are lots of people with that background that he

18   had that don't sell meth.  So the 19-year-old kid from

19   Bristol made his choice, and there are consequences to his

20   choice.

21           But when you compare a ten-year prison sentence for

22   that kid from Bristol to a sentence of probation for Martin

23   Elling, is that in any way, shape, or form equal justice

24   under the law?

25           Martin Elling made a choice too.  His choice was

—————— United States v. Elling - Sentencing ——————

1   deliberate.  It was thought out.  It was executed over time.

2   Then he lied about it.  Martin Elling obstructed an

3   investigation into the role McKinsey & Company played in

4   flaming the opioid crisis, a crisis that led to thousands of

5   deaths.

6            I think it's important we briefly look at

7   Mr. Elling's conduct.  McKinsey's relationship with Purdue

8   was longstanding and lucrative, and Mr. Elling was a key

9   player in that.  For 15 years, from 2004 to 2019, McKinsey

10  worked on 75 consulting engagements with Purdue, and many of

11  those engagements focused on improving Purdue's revenues from

12  OxyContin.  McKinsey worked to develop marketing messages and

13  strategies to promote the drug, and over those 15 years

14  Purdue paid McKinsey over $93 million.

15           Martin Elling was a senior partner in McKinsey.  He

16  had extensive experience in the pharmaceutical field and was

17  a leader in the firm's pharmaceutical and medical products

18  practice.

19           He was in touch with Purdue from the very beginning,

20  as far back as 2003, and he was directly involved in more

21  than 30 of the firm's engagements with Purdue, including as

22  the director of client services team.  He led the group of

23  McKinsey personnel assigned to Purdue projects, and he had a

24  hand in more than those.  He served as a senior leader and

25  kind of a coach on other projects.

─── United States v. Elling - Sentencing ───

1          Martin Elling oversaw McKinsey's efforts.  He had

2     the ear of Purdue's C-suite and executives, and at times he

3     engaged directly with Purdue's board of directors, including

4     the Sackler family.

5          He weighed in on not only business strategy but how

6     best to engage with particular executives of Purdue.  Who

7     should be approached with an idea first?  Who should certain

8     ideas be held back from?  How he expected certain

9     personalities to respond to McKinsey's ideas.  Mr. Elling was

10    able to make those judgements because this was a company he

11    knew well with people he knew well.

12         Throughout his work with Purdue and it's executives,

13    Mr. Elling was familiar with Purdue's legal issues, the

14    regulatory environment, and the reality of the opioid crisis,

15    and he knew that Purdue had been convicted of federal crimes

16    related to its opioid promotion.

17         In 2007 a Purdue affiliate pleaded guilty to

18    misbranding OxyContin.  It admitted that it falsely marked

19    OxyContin as less addictive, less subject to abuse and

20    diversion, and less likely to cause dependance and withdrawal

21    than other pain medications.  The company agreed to pay $600

22    million, and three of its executives -- it's president,

23    general counsel, and chief medical officer -- pleaded guilty

24    in their individual capacities.

25         Significantly, that corporate resolution also

Cynthia L. Bragg, Official Court Reporter

───── United States v. Elling - Sentencing ─────

1    included a five-year corporate integrity agreement which

2    placed regulations on Purdue's sales and marketing of

3    OxyContin.  So for five years after that conviction, they

4    were under additional scrutiny.

5          Mr. Elling knew Purdue at this point.  He had a

6    relationship with its executives, including those who pleaded

7    guilty.  This slide shows one example of Mr. Elling's

8    correspondence with his McKinsey colleagues about Purdue's

9    convictions and the press accounts about them.

10         You can see that Mr. Elling exchanged e-mails with

11   Arnab Ghatak about a *New York Times* article covering the

12   Western District of Virginia's investigation of Purdue.

13   Mr. Elling and Mr. Ghatak worked closely together on Purdue

14   engagements over the years.

15         Here in 2009 Mr. Elling again exchanged e-mails with

16   his colleagues about the Purdue convictions.  Here they

17   discuss the *New York Times* article reporting that the three

18   executives who pleaded guilty were barred from participating

19   in federal healthcare programs.  What that means is they

20   could not work in any business or for a business that was

21   billing Medicaid or providing Medicaid services or Medicare

22   services.

23         So he reads this article, and it's interesting

24   because in this article the district court -- excuse me, the

25   administrative law judge imposed a 15-year exclusion on these

─── United States v. Elling - Sentencing ───

1    individuals, and Mr. Elling -- it's kind of telling what his

2    response is, "Saw it.  Suspect they have a good shot on

3    appeal," because he knows how our system works.  He knows

4    that those executives have lots of money, lots of lawyers,

5    and they will probably win on appeal, and he was right.  On

6    appeal the appeals court ruled that the length of exclusion

7    was excessive.

8           Mr. Elling remained close to Purdue in the years

9    after those convictions.  He was one of the relationship

10   partners who maintained McKinsey's bonds with the people at

11   the top of Purdue hierarchy.  As Mr. Elling and his partners

12   took on more and more projects for Purdue, they gained more

13   and more credibility with the company.  McKinsey's knowledge

14   of Purdue mattered.

15          In 2007 Mr. Elling himself wrote a memo to Purdue's

16   leadership emphasizing the deep relationship he had with

17   Purdue, and Mr. Elling used his ties to Purdue's leadership,

18   to its most senior executives and its board of directors, to

19   advance McKinsey's influence with the company.

20          In 2008 and 2009 Mr. Elling and his colleagues

21   worked with Purdue on its response to the FDA's new

22   requirement for Risk Evaluation and Mitigation Strategy, or

23   REMS, for prescription drugs with addictive properties.

24          Mr. Elling and others at McKinsey pushed the FDA for

25   a less restrictive REMS, one that would allow high-dose

──── United States v. Elling - Sentencing ────

1    OxyContin to remain subject to the same level of oversight as

2    lower-dose opioids.  When that project was completed,

3    McKinsey's connection with Purdue continued.

4           As OxyContin faced a patent cliff and a collapse in

5    market shares with the introduction of competition from

6    generics, Purdue developed and abuse-deterrent formulation of

7    OxyContin so they could get patent protection.  That

8    reformulated product was hard to dissolve and a little harder

9    to crush.  Practically, if you bought a cheap coffee grinder,

10   you could still crush it.

11          But in 2009 Purdue engaged McKinsey to help protect,

12   defend, and accelerate OxyContin performance at a time of

13   change, including the new abuse-deterrent formulation launch

14   and new competitor entry.  The goals of that project included

15   developing a set messages and tactics for OxyContin to reduce

16   and potentially turn around the recent volume of share

17   decline, enhance loyalty to OxyContin among the loyalist

18   prescribers, and convert centers into more loyal OxyContin

19   prescribers.

20          McKinsey's memorandum to Purdue's CEO urged that

21   driving a more impactful OxyContin franchise should be your

22   top priority, and McKinsey predicted its sales and marketing

23   plans that they recommended would result in increased revenue

24   of $200 million to $400 million for Purdue.  So just to

25   remind us all what we're talking about, we're talking about

---United States v. Elling - Sentencing---

1    OxyContin.  They wanted more OxyContin to be prescribed in

2    the middle of an opioid crisis.

3          Purdue launched the reformulation in 2010, and it

4    was linked to a decline in sales, in part because pill mill

5    doctors and others who likely facilitated abuse and diversion

6    shifted to prescribing generic OxyContin products.

7          Sales of 80 milligram OxyContin, which was the

8    highest and most abused dosage, dropped significantly.  Those

9    higher-dose tablets generated the most revenue for Purdue, so

10   the decrease had significant repercussions for the company.

11         So by early 2012 Mr. Elling was looking for

12   opportunities for McKinsey to work alongside Purdue to

13   recapture and drive up OxyContin sales.  These opportunities

14   included McKinsey's conducting a diagnostic of oxy so Purdue

15   can get real about the situation, the drivers, and the

16   actions needed, and align the board.  Mr. Elling wrote to

17   Arnab Ghatak that the opportunity "could be a game changer

18   for them and us."

19         That same year Mr. Elling worked on a proposal for

20   an engagement in which McKinsey would conduct a rapid

21   diagnostic of the underlying drivers of OxyContin's current

22   performance and develop hypotheses on specific opportunities

23   Purdue should consider, including by understanding if any new

24   options are available in the near future with expiry of

25   corporate integrity agreement.

———— United States v. Elling - Sentencing ————

1          So the increased scrutiny that the company had been

2    under was going expire, so Mr. Elling was looking into ways

3    to have new opportunities now that there wasn't going to be

4    the increased scrutiny.  That proposal named Mr. Elling as a

5    senior leader of the project and cited his many years of

6    experience serving Purdue.

7          Purdue's corporate integrity agreement expired in

8    January of 2013.  Shortly after that, as said in this e-mail,

9    Mr. Elling corresponded with Arnab Ghatak and Rob Rosiello,

10   another partner at McKinsey, about his conversations with

11   John Stewart, who was then the CEO of Purdue.

12         Mr. Elling noted that he and Mr. Rosiello were

13   meeting with Mr. Stewart, and that public and government

14   pressure on oxy continues to mount.  Of course, the public

15   pressure and the government pressure on oxy was because of

16   the widespread abuse of the drug.

17         Two days later Mr. Elling wrote to a group of

18   McKinsey colleagues to recap a meeting he had had with John

19   Stewart.  "Good longer discussion.  Feeling better about '13

20   than '12," meaning 2013 rather than 2012.  "FDA is moving in

21   the right direction on label.  Eventually opened up a bit and

22   could imagine help at the right time to see if there is an

23   upside.  "

24         By April of 2013 McKinsey had shared a draft

25   proposal for granular growth opportunities for OxyContin with

—— United States v. Elling - Sentencing ——

1    Purdue's vice president of sales.  The proposal highlighted

2    that Mr. Elling and Mr. Rosiello would provide senior

3    leadership for the project.  Purdue retained McKinsey in May

4    2013 to conduct rapid assessment of the underlying drivers of

5    current OxyContin performance, identify key opportunities to

6    increase near term OxyContin revenue, and develop plans to

7    capture priority opportunities.

8            Mr. Elling championed that effort with Purdue's

9    highest level executives.  He urged them to continue

10   McKinsey's engagement after the end of the diagnostic phase,

11   and Mr. Elling was successful in it.  The project continued

12   as the Evolve to Excellence initiative, known as E2E,

13   designed by McKinsey to turbocharge Purdue's sales engine.

14           McKinsey laid out a plan for Purdue to intensify it

15   in-person sales calls to high volume opioid prescribers.

16   McKinsey told Purdue that hundreds of millions, if not tens

17   of millions, were at stake with over $200 million of

18   potential opportunities in a single year, all by pushing more

19   OxyContin onto the market.

20           In the summer of 2013 McKinsey provided three

21   reports to be shared with Purdue's board of directors,

22   including the Sacklers.  Richard Sackler personally arranged

23   for a face-to-face meeting with McKinsey personnel to discuss

24   the reports outside the presence of Purdue's executives.

25           In August 2013 members of the Sackler family who

—— United States v. Elling - Sentencing ——

1    were on the board met with McKinsey personnel to examine

2    McKinsey unvarnished findings and recommendations.  In their

3    correspondence after the meeting, the McKinsey team noted

4    that the meeting was filled with only family -- that is the

5    Sacklers -- and lasted for about two hours.  Mr. Elling

6    underscored it's success, "By the end of the meeting the

7    findings were crystal clear to everyone, and they gave a

8    ringing endorsement of moving forward fast."

9          So what did they move forward with?  Shortly after

10   that meeting, Purdue green lit the Evolve to Excellence

11   initiative, and it implemented McKinsey's guidance to focus

12   in-person targeting on the highest OxyContin prescribers.

13   That was the most essential piece of McKinsey's advice to

14   Purdue during the engagement, that to increase OxyContin

15   prescriptions, Purdue reps should prioritize and focus on

16   sales calls to the highest prescribers, and we know the

17   highest prescribers tend to be the ones who are committing

18   crimes and writing prescriptions that are not for a

19   legitimate medical purpose.

20         The project was a success.  Purdue reported the

21   demand for OxyContin had increased, prescriptions went up,

22   and each of these results were even better than they had

23   anticipated.  Given that success, Purdue continued to rely on

24   those doctor-targeting strategies.  It took McKinsey's advice

25   to focus resources and marketing on high decile prescribers.

—————— United States v. Elling - Sentencing ——————

1          McKinsey knew that its strategies caused the highest

2     prescribers to write more OxyContin prescriptions.  The

3     targeting led to increased OxyContin prescriptions, including

4     those from hundreds of prescribers who wrote prescriptions at

5     an alarming volume.  You can see in this e-mail, this is a

6     doctor that after receiving 18 calls almost doubled the

7     number of prescriptions for OxyContin that were written.

8          Purdue was convicted again, and it admitted that

9     from 2007 to 2017, during this time period that McKinsey was

10    working with them, it continued to market its opioid products

11    to more than a hundred healthcare providers who the company

12    had good reason to believe were diverting opioids.

13         They admitted they conspired with others to aid and

14    a bet healthcare providers dispensing OxyContin and other

15    opioids without a legitimate medical purpose and outside the

16    usual course of professional practice; that is, providers who

17    Purdue had reason to believe were diverting opioids, and that

18    was squarely within the period that McKinsey, and Mr. Elling

19    in particular, worked with Purdue on OxyContin marketing.

20         So in the summer of 2013, the public outcry with the

21    opioid crisis was continuing to rise and enforcement efforts

22    were escalating.  We know that Mr. Elling was a subscriber to

23    the *New York Times* during this period, and just looking at

24    articles from 2018, July and August, of the *New York Times*,

25    there were approximately 30 articles about the opioid crisis.

Cynthia L. Bragg, Official Court Reporter

─────────────────── United States v. Elling - Sentencing ───────────────────

1   Both journalists and law enforcement were pointing to Purdue,

2   not just the company itself and not just the Sackler family,

3   but senior executives and board members.  Mr. Elling knew

4   that.

5           Then on July 3rd of 2018, the *Financial Times*

6   reported that Judy Lewent, who was a former Purdue board

7   member, had been named in a lawsuit filed by the

8   Massachusetts attorney general related to OxyContin

9   marketing.  That lawsuit alleged that by virtue of

10  Ms. Lewent's involvement with Purdue, she had contributed to

11  the opioid epidemic.

12          The very next day, with that article in mind,

13  Mr. Elling sends an e-mail to Arnab Ghatak stating, "Hope

14  you're well.  Can you send me your private e-mail address?

15  Want to send you a note.  M."

16          Then that same day after he gets Arnab Ghatak's

17  Gmail address so it's not going to go to his work e-mail

18  address, he sends this e-mail, "Just saw in the FT" -- that's

19  the *Financial Times* -- "that Judy Lewent is being sued by

20  states attorneys general for her role on the Purdue board.

21  It probably makes sense to have a quick conversation with the

22  risk committee to see if we should be doing anything other

23  than eliminating all our documents and e-mails.  Suspect not,

24  but as things get tougher there, someone might turn to us."

25          This is where we get to the crux of the case.

—————— United States v. Elling - Sentencing ——————

1    Mr. Elling knew how he and McKinsey had been deeply involved

2    with the opioid epidemic and Purdue's role in it, and he knew

3    they were next.

4              THE COURT:  Am I right that he's communicating --

5    Mr. Elling is communicating on his McKinsey's e-mail to

6    Mr. -- how do you pronounce his last name?

7              MR. RAMSEYER:  Ghatak.

8              THE COURT:  Ghatak asking him to go to his Gmail?

9              MR. RAMSEYER:  And that's why we're here.  If he

10   hadn't made that mistake --

11             THE COURT:  Because you got the McKinsey e-mail?

12             MR. RAMSEYER:  That's right.  If he hadn't made that

13   mistake -- clearly, he was asking for Mr. Ghatak's personal

14   e-mail.  He's differently trying to keep it out of work.  He

15   just forgot he was on his own work e-mail.

16             THE COURT:  Right.

17             MR. RAMSEYER:  But it's interesting too that his

18   first thought is "other than destroy all the documents."  Why

19   would that be your first thought?  If you thought you hadn't

20   done anything wrong, if you thought you had nothing to hide,

21   why would your first thought be of course we have to destroy

22   all the documents?

23             As the Court pointed out, he made a mistake.  He

24   didn't use his own personal e-mail.  If he had done so, he

25   would have got away with it.  It's as simple as that.

———————— United States v. Elling - Sentencing ————————

1              So this e-mail is important in the context to what

2      Mr. Elling did in the weeks that followed reading that

3      article.  That summer Mr. Elling was traveling

4      internationally and was beginning to make plans for a move to

5      Thailand to lead McKinsey's Bangkok office.  He had been in

6      Asia and the Middle East in August, and while he was abroad,

7      he remained online and in frequent contact with his friends

8      and colleagues.

9              On August 5th he exchanged e-mails with a McKinsey's

10     colleague about a *Politico* article about the Western District

11     of Virginia's investigation of Purdue in the early 2000s, and

12     Mr. Elling wrote to that colleague that it was a good article

13     about a very, very sad situation.

14             In this article -- this was another time that

15     Mr. Elling was reminded of Purdue's criminal conduct.  The

16     article didn't even discuss the 2007 conviction, it also

17     reported ongoing litigation by states attorneys general

18     against Purdue.

19             Here is part of what that article said:  "The

20     Virginia-led federal investigation culminated in a plea

21     agreement in 2007 and a $634.5 million fine against Purdue's

22     parent company and its top executives for criminally

23     misbranding the drug.  Since then, more than twenty states

24     have sued Purdue Pharma, and recently the company dismissed

25     most of its sales staff in response to mounting allegations

——— United States v. Elling - Sentencing ———

1    over its marketing tactics.  A federal Judge in Cleveland is

2    now presiding over massive multi-jurisdiction litigation

3    against opioid distributors, retailers, and manufacturers,

4    including Purdue."

5            On August 14th the New York state attorney general

6    sued Purdue, and days after that there were press accounts

7    that President Trump had urged Attorney General Jeff Sessions

8    to bring a major federal lawsuit against opioid manufactures.

9            On August 22nd Mr. Elling landed back in the United

10   States at JFK.  On that same day, the *New York Times*

11   published an article with the heading, "Snaring doctors and

12   drug dealers, Justice Department intensifies opioid fight."

13           While he was still at the airport that day, August

14   22nd, Mr. Elling e-mailed himself a to-do list with the

15   subject line "when home."  As you see here, that message

16   listed various tasks, and third from the bottom is "delete

17   old pur" -- P-U-R, meaning Purdue -- "documents from laptop."

18   He sees an article about the investigation and reminds

19   himself he's got to delete his documents.

20           The forensic evidence shows that that's what

21   Mr. Elling did.  Consistent with his e-mails about destroying

22   documents and his reminder to himself, he started the process

23   to move the Purdue folder in his Outlook to the deleted items

24   folder on August 24th of 2018.

25           He sent a second reminder on August 26th.  Now that

1    he put them in his deleted items, he had to remind himself to

2    take them out of the deleted items, "Remove Purdue folder

3    from the garage."

4          The reason I'm going into this in such detail is

5    this wasn't a one-time thing.  This wasn't just he had a

6    five-minute lapse of judgment and deleted something.  This

7    was well thought out over 50 days.

8          THE COURT:  Do you know how many files went into the

9    trash bin that eventually got emptied?

10         MR. RAMSEYER:  I don't know that we know the exact

11    amount, Your Honor.  I think we do know that -- not of the

12    e-mails, but of the other documents, approximately 30 we were

13    never able to recover from anywhere else.

14         THE COURT:  Plus e-mails?

15         MR. RAMSEYER:  I believe for the e-mails we were

16    able to obtain those from another source, is my

17    understanding.

18         THE COURT:  Gotcha.  Okay.

19         MR. RAMSEYER:  He didn't know that necessarily, but

20    we did.

21         Here is the message that popped up on his machine

22    when he decided to -- when he was deleting the folder saying

23    that it was going to be deleted, and he clicked on it so it

24    was deleted.

25         Here are some of the Purdue-related e-mails that

─── United States v. Elling - Sentencing ───

1    were deleted, and you can see that one of them is, "Review

2    document for Craig to share with board members."  So they

3    were significant documents.  Project Scottsdale is a project

4    that was with Purdue.

5          So that's kind of the timeline of his e-mail

6    deletion activity.  So July 4th he talks about eliminating

7    everything.  August 22nd, over a month later, he comes in and

8    he does it.  He reminds himself do it, he deletes it, and

9    they're gone.

10          Now, he also deleted documents that were on his

11    computer.  This, in a lot of ways, was more significant than

12    the e-mail because there wasn't a backup.  You can see these

13    documents.  They're all clearly Purdue documents.  They're in

14    a folder called Purdue, and you can tell by the document

15    names what they are.

16          He made those deletions during this same time

17    period.  We're not able to say the exact date.  We basically

18    know a date when they existed, and we know a date where they

19    didn't exist anymore, but there was not a way forensically to

20    determine the exact date that they were removed.

21          Some of these documents are really significant in

22    that he's talking about Michael Friedman.  That's the name of

23    these documents.  That means that he's had these documents

24    for a long time.  Michael Friedman is one of the CEOs who was

25    convicted in 2007 and hasn't been with the company since

—— United States v. Elling - Sentencing ——

1   then, presumably.  So he's been keeping these Purdue

2   documents for years, and only when he realizes that they're

3   under the gun he decides to delete them.

4          So as the government had started an investigation

5   and McKinsey knew they were under investigation and were

6   producing certain documents to the government in response to

7   those subpoenas; in doing that, they came across this e-mail

8   where Mr. Elling was talking about -- well, they produced to

9   us those e-mails that showed that Mr. Elling was deleting

10  documents.  We talked to them about that, and subsequent to

11  that they launched an internal investigation of Mr. Elling's

12  deletions.

13         As part of that process, McKinsey hired an outside

14  firm to conduct a forensic review of Mr. Elling's devices.

15  That review did not show any deletion.  As we later learned,

16  they did not do a sufficient forensic review.  It showed

17  there was no evidence of deletion, and Mr. Elling was told

18  that, that the review showed no evidence of deletion.

19         So McKinsey in response to the -- excuse me,

20  Mr. Elling in response to McKinsey's professional standards

21  committee process, he told them, "I do not believe that I

22  took steps to eliminate, delete, destroy, remove or otherwise

23  alter any documents or e-mails."

24         This is a couple of years later after he's done it.

25  He had plenty of time to think about it, plenty of time to do

—— United States v. Elling - Sentencing ——

1    the right thing and just admit to it.  He didn't because he

2    thought he could get away with it because he had been told

3    that the forensic review didn't find any deletions, and he

4    said, "This is confirmed by the forensic review that was done

5    by Control Risk, which I understand confirmed that there was

6    no indication of deletion."

7          He goes on, "I do not recall why I wrote 'delete old

8    pur documents from laptop,' but at no time would I have

9    deleted documents in order to prevent the production or hide

10   their existence.  And, again, I do not believe that I located

11   or deleted any documents pursuant to that to-do list."  As

12   I've just shown you, there is ample evidence that that's

13   exactly what he did, so he lied about it.

14         So equal justice under law, the motto above the

15   Supreme Court's portal.  Is it equal justice under law for

16   Mr. Elling to not serve a day in prison while the kid from

17   Bristol serves ten years in prison?  Martin Elling had the

18   benefit of being raised in a good family while the kid from

19   Bristol had parents who were drug addicts.  Martin Elling had

20   degrees from the world's preeminent educational institutions.

21   The kid from Bristol dropped out of high school.  Martin

22   Elling amassed millions of dollars from his employment with

23   McKinsey.  The kid from Bristol had nothing.

24         The kid from Bristol was easy to catch and

25   prosecute.  He wasn't sophisticated.  He wasn't that bright.

─── United States v. Elling - Sentencing ───

1   The chances of catching and successfully prosecuting Martin

2   Elling were astronomically low.  So many things had to break

3   right for Mr. Elling to get caught.  As we've just gone over,

4   he thought he got away with it.  It was only years later when

5   the government obtained the computer itself and did its own

6   forensic analysis and using very sophisticated method were we

7   able to prove that Mr. Elling in fact had deleted the Purdue

8   documents.  So I ask, is it equal justice under law for

9   Mr. Elling to not serve a day in prison while that kid from

10  Bristol gets ten years?

11          The Court has to consider the 3553(a) factors, and

12  there are certain ones that we'd like it highlight to the

13  Court and discuss.  The need to avoid unwarranted sentencing

14  disparities among defendants with similar records who have

15  been found guilty of similar conduct.  We're actually in

16  agreement with defense counsel on this that there are really

17  not many cases on 1519 convictions.

18          They cited a number of cases where you can't even

19  find it in Westlaw where they say that the people got

20  probation for 1519.  We don't really have the context of

21  those cases.  I know at least one of those that I looked at

22  the person was cooperating with the government.  We don't

23  know what the circumstances are.  It's really not very

24  helpful.

25          I was able to find some cases where people were

—— United States v. Elling - Sentencing ——

1    convicted of just 1519 offenses.  There are a lot of them

2    where they get a 1519 and something else, and that's not

3    really very helpful.  There is a case where the defendant,

4    *Juarez Samayoa*, at 827 F. App'x 967 got 24 months in prison

5    for a 1519 conviction related to false identification

6    documents.

7            There is a defendant *Jensen* who got 27 months in

8    prison.  He was a prison employee who obstructed an

9    investigation.  That's at 248 F. App'x 849.  There was a

10   defendant *Waterman* who got 15 months in prison.  He was a

11   police officer who obstructed a child porn investigation.

12           In each one of those cases those defendants received

13   a sentence in excess of what Mr. Elling can receive in this

14   case because he's capped at 12 months by the plea agreement.

15           As the defense stated in their memo, and we agree,

16   there really are no similarly situated defendants to Martin

17   Elling because no other case has the national significance of

18   his obstruction of an investigation that involved hundreds of

19   millions of dollars in ill-gotten gains from causing and

20   feeding the opioid crisis.  There is not another one like it.

21           Let's look at the other 3553(a) factors.  The nature

22   and circumstances of the offense - we've gone over that in

23   quite a bit of detail.  It's a very serious crime.  The need

24   for the sentence imposed to reflect the seriousness of the

25   offense - the thing is not only did he attempt to obstruct

—————— United States v. Elling - Sentencing ——————

1    justice, he obstructed justice.  There are 30 files we've

2    never seen.  We'll never get.

3         THE COURT:  Recognizing that the government doesn't

4    know what it doesn't know, but is there any sense as to what

5    impact, if any, these missing files had on the investigation,

6    the ability to take the investigation down a different path

7    or towards other folks that it was not able to otherwise

8    prosecute?

9         MR. RAMSEYER:  Well, I will tell the Court that it's

10   been very difficult in our investigation to find out what

11   actually happened in that meeting with the Sacklers that all

12   the other Purdue employees were thrown out of and it was just

13   the McKinsey's folks talking to the Sacklers.

14        Obviously, if there was a document in there that was

15   destroyed that had to do with that, that could have had

16   significant impact.  We'll never know.

17        THE COURT:  Right.

18        MR. RAMSEYER:  But he successfully hid at least 30

19   documents from the government that we don't know.  So it's

20   serious crime that he got away with in terms of that.  Maybe

21   there was stuff in there that would have caused him to have

22   more criminal exposure, not just for obstruction but for

23   other things.

24        Next is the need for the sentence imposed to promote

25   respect for the law.  It's hard to overstate the importance

———— United States v. Elling - Sentencing ————

1    of this factor in this case.  The world is literally watching

2    to see what happens to a multi-million dollar McKinsey &

3    Company partner.  A sentence of probation will not promote

4    respect for the law.  It will be seen as just another example

5    of a wealth, well-connected person getting a slap on the

6    wrist.

7              The next factor, provide just punishment for the

8    offense.  I would argue that Martin Elling acted rationally.

9    Now, he made a mistake by not going to his Gmail account to

10   send that e-mail, but it was a rational move to try to delete

11   evidence.

12             He had documents that may have implicated him, his

13   clients, or his fellow employees, and rather than have the

14   government look at them, he destroyed them.  Because of his

15   actions, many of those documents are not available.  He

16   achieved his objective.  If all he gets is probation, then he

17   will be rewarded for his conduct.  Probation does not provide

18   just punishment for this offense.

19             The final factor is the most important factor,

20   affording adequate deterrence to criminal conduct.  Will a

21   sentence of probation deter any executive or similar type

22   person from destroying documents?  Of course not.

23             The one thing that sort of does make white-collar

24   defendants different than blue-collar defendants is that they

25   usually act rationally.  If they know that they will go to

—————— United States v. Elling - Sentencing ——————

1    jail if they destroy documents, they may be deterred.  On the

2    contrary, if they know that the worst case scenario is if

3    they get caught, which is very rare, they are going to get

4    probation.  In the best case situation, they're never going

5    to get caught, the documents they destroyed are never going

6    to be seen by anybody, so of course they will commit the

7    crime.  A sentence of probation will not afford any

8    deterrence.  In fact, a sentence of probation will encourage

9    destruction of evidence.

10          Sentencing a person has to be the most difficult

11    thing a federal district judge does, it just has to be.

12    There is a human being here that's going to be affected by

13    the Court's actions, and nobody on the government's side

14    underestimates how difficult that is for the Court.  That's

15    hard.  A court's compassion for the defendant often conflicts

16    with the court's duty to consider the implications beyond a

17    particular defendant before the court.

18          There are two big considerations of sentencing.  One

19    is the individual, Martin Elling.  He has no criminal

20    history, and he's not going to reoffend.  So if that is all

21    that is being considered, maybe it's easy and the Court just

22    imposes probation.

23          But let's not forgot his lack of a record has

24    already been taken into account in the guidelines

25    calculations.  It has reduced his offense level.  It has put

─────── United States v. Elling - Sentencing ───────

1  him at the lowest possible criminal history category.  It has

2  put his guidelines at 6 to 12 months.  And it was a big

3  factor in the government's decision to agree to an

4  11(c)(1)(C) range that caps his prison exposure at 12 months.

5  That's already been taken into account.

6        Then there is the personal side, but we believe the

7  dominating factor in a case like this is not personal.  There

8  are very important societal interests in this case that have

9  very little to do with the nature and characteristics of the

10 defendant.  That is that the sentence has to answer these

11 things:  What does the sentence imposed do to reflect the

12 seriousness of the offense?  Does probation reflect that this

13 is a serious crime?

14       What does the sentence do to promote respect for the

15 law?  Does probation promote respect for the law?

16       What does the sentence do to provide general

17 deterrence to others?  Does probation provide general

18 deterrence to others?

19       One thing that's often brought up with white-collar

20 defendants is they've already suffered enough.  Their

21 reputation has been tarnished.  That just seems unfair that

22 the fact that they've got a great reputation somehow gives

23 them a get-out-of-jail card because now their reputation has

24 been tarnished.  That seems wrong.

25       You know, another big factor that's in the

─── United States v. Elling - Sentencing ───

1    defendant's sentencing memo is this issue about Thailand.

2    Well, you know, the kid from Bristol doesn't have that

3    option, and most defendants don't have that option where they

4    own houses in different places in the world and a place that

5    they want to go to, and they say the law is going to make it

6    hard for them to go back if they want to.  That's sort of a

7    privileged position that he has that we don't think is a

8    reason to not impose an appropriate sentence.

9         As the Court knows from looking at the presentence

10   report, he's got tens of millions of dollars.  He's got a

11   business in Thailand.  You know, there is a way he could go

12   back to Thailand.  Even if he gets convicted and serves jail

13   time, my guess would be that with the money he's got, the

14   connections he's got, he will be able to go back to Thailand.

15   But, again, that's not something that other people can argue

16   to the Court, because they don't have the privilege of that.

17   They don't have money where they can be in different places.

18        We know the Court takes its job very seriously, and

19   no matter what sentence the Court imposes, we know it won't

20   be because the Court took the easy way.  The Court is not

21   going to do that.  These cases are really hard, but, you

22   know, there is an irony when we talk about how hard these

23   cases are.  We're agonizing over the difference between 0

24   months in jail and 12 months in jail, and you think about how

25   many defendants the Court sees who would love to be facing 0

Cynthia L. Bragg, Official Court Reporter

─────── United States v. Elling - Sentencing ───────

1   to 12 months.  They would think they've gotten the biggest

2   Christmas gift in the world.

3          We know the Court will fully consider all of these

4   issues and will impose a sentence that the Court believes is

5   the right and just sentence.

6          Martin Elling is not evil, he's not violent, he's

7   not going to reoffend, but the need for the sentence to

8   reflect the seriousness of the offense, promote respect for

9   the law, which in our view includes a sense that there is

10  equal justice under law, and the need to deter others

11  requires a sentence of imprisonment.  We ask the Court to

12  impose a sentence of imprisonment of 12 months.  Thank you

13  for the Court's time.

14          THE COURT:  Do you want to speak to any fine?

15          MR. RAMSEYER:  Your Honor, I have to be candid about

16  that.  The fine is sort of irrelevant in the government's

17  view.  This guy has millions of dollars.  I mean, whether he

18  pays $250,000 or he pays $40,000, that's not going to be any

19  kind of a punishment.  So we don't have a strong view as to

20  that, Your Honor.

21          THE COURT:  All right.  Thank you, Mr. Ramseyer.

22          MR. RAMSEYER:  Thank you.

23          THE COURT:  All right.  Mr. Bondurant.

24          MR. BONDURANT:  Your Honor, when I walked in the

25  courtroom today, I noticed there was this PowerPoint up on

—— United States v. Elling - Sentencing ——

1   the screen.  I asked Mr. Ramseyer if I could take a look at

2   it, and he said no, which kind of reminded me of the early

3   days in the '70s and '80s where ambush tactics and

4   sandbagging was the rule of the day.

5        The last several decades it seems there is more

6   transparency in federal sentencing, and states sentencing, as

7   far as that goes.  The purpose of a sentencing memo is to put

8   your argument out so the Court can have full, you know,

9   thought pattern about what to do and the arguments you made

10  there.

11       So we were sandbagged.  Is there a remedy?  No.  It

12  just happened.  The Court a was sandbagged.  Is there a

13  remedy?  Well, you're the Court.  You're a federal judge and

14  you can do about anything you want to do, so there is a

15  remedy there.

16       THE COURT:  I can give you more time if you want it.

17       MR. BONDURANT:  What's that?

18       THE COURT:  I can give you more time.

19       MR. BONDURANT:  Well, my point is, I don't think

20  what he said really affects the core of this case.  I just am

21  opposed to the tactics, and I think they should be noted.

22       For example, the first part of this PowerPoint was

23  like a greatest hits of the McKinsey prosecution.  Well,

24  let's point out -- he says all this time and effort went into

25  it.  The time and effort went into investigating the company

──────── United States v. Elling - Sentencing ────────

1    McKinsey.  They got a $600 million fine or whatever.

2            They got a non-prosecution agreement.  They were not

3    criminally charged like Martin was.  In fact, Martin was an

4    afterthought.  He was low-hanging fruit.  Once they saw the

5    e-mails on McKinsey, the case was proven for the government.

6            I'm sure they spent years going after the

7    corporation itself.  I'm sure it was a hard case to do, but

8    Martin Elling was not a hard case to do.  He was not hard to

9    catch.  It was right in his own e-mails the basis of this

10   case.

11           Part of them trying to go through the history of

12   McKinsey is basically to try to dirty up Martin Elling with

13   the corporation's problems.  It was the corporation's fault,

14   who was not charged.  They got a non-prosecution agreement.

15           All this stuff going back in time with McKinsey and

16   Purdue has nothing to do with the obstruction of justice

17   case.  It has nothing -- whether they were selling to high

18   prescribers or the other things he brought up, that was on

19   the company.

20           If they thought that Martin Elling, they had enough

21   evidence to charge him with misbranding, which they didn't

22   charge the company with, they did a non-prosecution

23   agreement, but if they thought they had enough evidence to

24   charge Martin Elling with misbranding like they got a

25   non-prosecution agreement with the company, he would have

——————— United States v. Elling - Sentencing ———————

1    been charged.  They're not shy about charging somebody.

2         The fact of the matter is he's trying to bootstrap a

3    simple obstruction act with stuff that don't apply to Martin.

4    That's sandbagging, and it's uncalled for in today's

5    criminal -- I realize in the '70s and '80s it was a different

6    world, but it's not the '70s or '80s anymore.

7         He never brought up that stuff during the guilty

8    plea.  He didn't bring it up in his sentencing memo.  He

9    wouldn't share the information with us before he got up here

10   and talked.  That's sandbagging and it should be ignored for

11   the purpose of determining the facts about the obstruction of

12   justice itself.

13        He also says --

14        THE COURT:  Let me go to the point, and I think this

15   is Mr. Ramseyer's point.  I mean, to be clear, you're right.

16   We're here on an obstruction charge, not for the sins of

17   McKinsey and not for the sins of Purdue, but it goes to

18   Mr. Ramseyer's point, and I think the government's point, and

19   that is that to obstruct you need to know you're obstructing,

20   to underscore that Mr. Elling was aware of the legal jeopardy

21   that Purdue was possibly in, and that that may be reaching

22   into McKinsey.  That's what I took it to be.

23        You're right.  Mr. Elling will not be sentenced

24   because of the opioid crisis.

25        MR. BONDURANT:  Thank you.

——————— United States v. Elling - Sentencing ———————

1          THE COURT:  I won't do that.

2          MR. BONDURANT:  I think, with all due respect, you

3     might be mistaken.  There is not a materiality requirement

4     for 1519.

5          THE COURT:  I agree there is not a materiality, but

6     it goes to the seriousness of the offense if you know what

7     you're obstructing.  I think that's what --

8          MR. BONDURANT:  Yes, I agree with that, and

9     Mr. Elling said that he knew in his statement to the Court

10    during his guilty plea hearing, so that's not in dispute.

11    We're not trying to dispute that.  We're not arguing that.

12         We're just saying he's trying to paint Mr. Elling

13    with a brush with stuff that doesn't apply to him in terms of

14    what he's being sentenced for today.  It makes good theatre,

15    obviously, but it is irrelevant to what he's doing.

16         Also, a couple of things to just fill in the rest of

17    the thing.  At the end of his argument Mr. Ramseyer brought

18    up the internal investigation by the company and the

19    statement by Mr. Elling.  I believe we can dig it out and

20    find it for the Court, but throughout that thing there are

21    comments like, "this is to the best of my ability.  I don't

22    remember the details at this time."  I mean, it wasn't just

23    absolutely -- I mean, there were comments that he wasn't sure

24    about that.  After he saw the e-mails and whatnot, obviously

25    he was sure about it, and he pled guilty, you know.  I mean,

———— United States v. Elling - Sentencing ————

1    he admitted to it.  So I don't think that should be held

2    against him either.

3           Mr. Ramseyer also said the reason white-collar

4    defendants catch a break is they remind us of us.  That might

5    be true in some cases.  In Mr. Elling's case, he doesn't

6    remind me of me.  He doesn't remind me of Mr. Ramseyer.

7    Mr. Elling just happens to be one the most charitable people

8    I've ever met, and I'll get into that in more detail.

9           The point is you can't take the broad brush of

10   general deterrence and use that as the only factor to decide

11   a man's fate.  You have to look at all the factors.  And if

12   you look at all the other factors, which I'll get into

13   momentarily, that outweighs the sole theme of deterrence,

14   general deterrence the government seems to present in this

15   case.

16          Now, Your Honor, to follow along the same line, he

17   is not just another white-collar defendant.  He is very

18   unique, I think, from his history.  He's obviously highly

19   educated, Harvard, Yale, Chicago, international courses.

20   He's multilingual, tremendously successful in his work.  It's

21   quite an experience to engage in conversation with him.  He's

22   the epitome of a world traveler.  He's been to every country

23   on earth, which puts him in a small group.

24          But he's most unique that for his entire life he's

25   used his intelligence, his education, his understanding of

---
United States v. Elling - Sentencing
---

1    various cultures, his money, and his time to engage in good

2    deeds, both big and small.  The government argues that it's

3    common for white-collar defendants to engage in charities,

4    that it's not that big of a deal and should not be used as a

5    get-out-of-jail-free card is what they said in their

6    sentencing memorandum.  Well, this is just not any everyday

7    acts of writing a check and giving money by Mr. Elling.

8            Under the guidelines, of course, extraordinary acts

9    of charity and good will can result in a downward departure

10   and in a variance.  Of course, the nature and characteristics

11   of the defendant can result in a variance from the guideline

12   sentence.  I believe that's what we have here.

13           And to repeat, to focus exclusively on general

14   deterrence does not do justice to the sentencing which should

15   be based on the individualize acts of the defendant.  Once

16   you take all these individualized factors about charity and

17   the other matters we'll get into in a moment, that vastly

18   outweighs general deterrence in the defendant's mind.

19           Just to repeat a few, he's very generous.  He's

20   given to the Rotary Club of Bangkok, Nature Conservancy, food

21   banks, Habitat for Humanity, disaster relief organizations,

22   healthcare organizations for impoverished children and

23   orphans.

24           He makes financial contributions there, but he also

25   does things on hand.  There is evidence he delivers water

--- United States v. Elling - Sentencing ---

1   purification systems to the hinterlands of Thailand.  There

2   is evidence he supports the orphan organizations in Thailand

3   by personally going there.  He personally goes to Buddhist

4   monasteries and makes much-needed donations.

5           And he fundraises.  I suggest that's different than

6   just paying money to something.  He actually goes out and

7   spends his time, effort, and money to get other people to

8   give money.  I think that's a distinction that is set apart

9   from Mr. Ramseyer's view of every white-collar defendant does

10  this so you should ignore it.

11          The 39 character letters -- I believe you said 43,

12  and I thought 39.  If I miscounted, I'll agree with your -- a

13  bunch.  A bunch of the character letters came in, and it

14  shows Mr. Elling is probably the best possible friend you

15  could have.  You know, if have a mother with cancer, he

16  contacts you and visits the mother on a regular basis in the

17  hospital we read in a letter.

18          He's a perfect mentor to a lot of young people, be

19  they employees in the company or be they children of friends

20  or be it just people he met.  He read those letters about

21  that.

22          He's a perfect godparent.  Not only does he help out

23  his godchildren financially to give them a good education,

24  but they wrote extensively about him always being there to

25  talk to him, to give advice on all matters, be it education

───────── United States v. Elling - Sentencing ─────────

1    or personal decisions of life.

2          He supports family members, and he doesn't do this

3    like a lot of people I think Mr. Ramseyer might think about.

4    He doesn't get his name in the news.  Most of these gifts and

5    acts are done in an anonymous fashion, and it's not for any

6    business reason.  It's because he thinks that's what he

7    should do.

8          He has a very strong sense of right and duty as a

9    person and to share what he has.  So it's unlike a lot of

10   other people that might come in here.  I mean, simply put,

11   Martin's character is defined by kindness, duty, and service

12   to others.

13         Now, the guidelines, as we talked about earlier,

14   he's a criminal history of zero, a guideline offense level of

15   10, and the advisory range is 6 to 12 months.  The government

16   wants a year of incarceration, and we want probation.

17         The government says that anything less than a

18   sentence of 12 months of incarceration would cause an

19   unwarranted disparity in sentencing because white-collar

20   defendants convicted of 1519 should be imprisoned.

21         I suggest, Your Honor, that the guidelines and the

22   facts themselves are just the opposite.  Guideline 5C1.1

23   expressly endorses probation in Martin's situation.  It

24   says, "A sentence other than a sentence of imprisonment is

25   generally appropriate for a Zone B zero-point offender."

—————— United States v. Elling - Sentencing ——————

1        And it's not just the Application Note.  That
2   Application Note is based upon a congressional directive at
3   28 U.S.C. 994(j) which says specifically, "The Commission
4   shall ensure the guidelines reflect the general
5   appropriateness of a sentence other than imprisonment in
6   cases in which the defendant is a first offender who has not
7   been convicted of a crime of violence or otherwise serious
8   offense."  Martin has not committed a crime of violence, and
9   he's not convicted of an otherwise serious offense as that
10  term is defined in 4C1.1.
11       The point is it's not just a throw-away Application
12  Note like Mr. Ramseyer would have you believe.  It was a
13  directive of Congress to do this.  And it's not a directive
14  for Congress to do something new in the future.  It's a
15  directive of Congress understanding that that is the usual
16  sentence in this kind of case and they wanted to memorialize
17  it.  They directed the Sentencing Commission to memorialize
18  that in the guidelines, and they did.
19       So to not follow this direction of Congress, to not
20  follow how it's memorialized in 10(a), is in itself a
21  disparity in sentence, I would argue, and it would be a
22  violation of this very directive at the ill thought of Mr.
23  Elling.  So I believe the disparity in sentencing argument is
24  just the opposite of what Mr. Ramseyer would have you
25  believe.

——— United States v. Elling - Sentencing ———

1          Although this Application Note is relatively new, it

2     has been relied upon for downward departure in a few cases we

3     cited in the sentencing memo.  And whether it's based on

4     downward departure or variance, we listed, I believe, 17

5     cases where probation was given in 1519 obstruction cases.

6          Yes, it's just a list.  No, it is not an analytical

7     piece like Mr. Ramseyer says.  I agree with him on that.  But

8     the fact is it happens all the time, and we list a bunch of

9     cases where it happened.

10          The government argues that Application 10(a) and the

11     directive of Congress should not apply in this case because

12     Martin did not engage in a one-act lapse of judgment as

13     they've described in their sentencing memo, that it took him

14     more than one step to achieve the goal of deletion.

15          Basically, he sent the material to trash and then

16     deleted the trash.  I would argue that is one act of

17     deletion.  It might take two parts, but it is one act of

18     deletion.  I would argue, given Mr. Elling's background, it

19     is out of character.  It is bad judgment.  And I would argue

20     that, there again, just to go back to what I originally said,

21     it was low-hanging fruit in this case.  It was not the

22     subject of all of this intense time and effort to prove.

23          By wording, if 10(a) and the direction of Congress

24     is only confined to one-acts lack of judgment, as

25     Mr. Ramseyer would define it, well, then they would have said

—— United States v. Elling - Sentencing ——

1   so.  They would have said so.  Congress is not shy about

2   making exceptions to laws.  The Sentencing Commission is not

3   shy about making exceptions.  You read some of the

4   Application Notes, and the exceptions tend to overcome what

5   the Application Note really says.

6          So if that was the intent of Congress and the intent

7   of the Sentencing Commission, they would have said so.  The

8   fact of the matter is it applies exactly to what Congress

9   wanted and the Sentencing Commission carried out.  It applies

10  exactly to what we have in Mr. Elling here.

11         The seriousness of the offense, Mr. Ramseyer said

12  another factor is the need for the sentence to reflect the

13  seriousness of the offense, promote respect for the law,

14  provide just punishment, and afford adequate deterrence to

15  protect the public.  The government argues that these cases

16  are extremely hard to prove.  I've been over that in this

17  case so I won't go over it again.

18         The fact of the matter is the government argues the

19  principal is specific and general deterrence requires an

20  imposition of a term of imprisonment.  Given Mr. Elling's

21  background, and I believe Mr. Ramseyer agrees with this, no

22  one in this courtroom thinks Mr. Elling needs to be

23  incarcerated to protect the public from future criminal acts.

24  It was an aberration in his life.

25         The only thing a prison sentence would do in this

─── United States v. Elling - Sentencing ───

1    case is to prevent and halt Mr. Elling from the good deeds

2    and charity works he's engaged in in his entire life and

3    prevent him from returning to his home in Thailand.

4            He was terminated from his dream job, one that he

5    held for over 30 years.  He lost his law license.  He lost

6    his reputation.  His employment opportunities are extremely

7    slim.  This conviction means he's toxic to any company that

8    might want to hire him.  These facts themselves are

9    punishment.  If he needs additional, you know, make

10   additional amends or additional restrictions, that can easily

11   be handled in conditions of probation.

12           The immigration attorney in Thailand who was

13   discussed earlier between you and Mr. Ramseyer, he issued an

14   opinion that if Martin receives any term of imprisonment at

15   all, no matter how short, he'll be barred from entering

16   Thailand, and that the discretionary reentry after this case

17   is over is uncertain.

18           I want to specifically read what the lawyer said.

19   "If Martin is sentenced to any term of imprisonment, he'll be

20   prevented from returning to Thailand.  If an appeal is made

21   to the Minister of the Interior requesting permission to be

22   allowed to return to Thailand, the process will take time, be

23   complicated, and the outcome is uncertain."

24           Mr. Ramseyer seems to believe Martin has enough

25   money that he'll get back into Thailand one way or the other.

––––––––– United States v. Elling - Sentencing –––––––––

1    Well, we can have all kinds of thoughts and beliefs, but
2    that's not the evidence.  That's not the facts.  The law is
3    as the immigration lawyer stated.  Unless somebody brings up
4    other facts that denies that, I think -- I would ask, rather,
5    that the Court accept the legal opinion that we've put before
6    you.
7            These things should be based on evidence.  Like when
8    you ask him about the deleted e-mails, were they important to
9    anything else, Mr. Ramseyer said, "Well, you know, we had
10   this one meeting, and they could have been important to
11   that."  That's guesswork.  We don't know.  They have no idea
12   whether that's true or not.  It's just guesses.  So I'd ask
13   the Court to keep the legal opinion from the immigration
14   lawyer in mind when you make this decision.
15           Now, the Fourth Circuit cases deal with deportation
16   and immigration issues in terms of a variance grounds.
17   Mr. Elling's specific situation does not apply to any Fourth
18   Circuit case we were able to find.  However, the Fourth
19   Circuit is clear on the deportation issues that the courts
20   can't consider immigration status and issues determining a
21   variance to the guidelines.
22           We cited other cases to that effect in other
23   circuits, and we attached two transcripts, especially the
24   *Wada* case, a Southern District of New York case, that
25   basically said to add this immigration thing about not being

────── United States v. Elling - Sentencing ──────

1   able to return to your home in a foreign country is punitive

2   and more harsh than necessary to achieve the goals of a

3   sentence.  I would ask the Court to consider the *Wada* case in

4   that concern too.

5           Martin bought a home in Bangkok, started a small

6   company, and emersed himself in the culture and social fabric

7   of Thailand.  He learned to speak Thai.  He's learning to

8   write Thai, which I'm told is a very difficult thing to do.

9           He's known by many in Bangkok throughout the

10  socioeconomic strata.  He regularly travels to the

11  hinterlands and introduces himself to people and is doing

12  good deeds and contributions.

13          He joined the Rotary Club of Bangkok and became one

14  of the organization's largest donors to that organization,

15  many of the donations being of an anonymous fashion.  He used

16  the Rotary Club to springboard to contribute money and his

17  time and his efforts to community service projects throughout

18  Thailand.

19          He personally travels around the country to visit

20  and support orphans.  He funds an effort to eradicate polio.

21  He visits Buddhist temples, as I said before, and makes

22  much-needed donations.

23          He donates to Thailand's Red Cross, the Mercy Centre

24  for orphans, and charted the Forest Education Program, which

25  is basically orphaned, stateless children in the hinterlands

———— United States v. Elling - Sentencing ————

1    of Thailand that really don't have a home, trying to support

2    them, let them live, and especially in this particular

3    charity, try to educate them for a better life.  He's

4    mentioned before he's in the process of dedicating part of

5    his estate to fund schools in Thailand, so that's something

6    in progress right now.

7         He's simply not the type of guy that made a bunch of

8    money and just sat back on some Caribbean island to relax.

9    I'm not saying he doesn't enjoy his money, of course he does,

10   but he does other things with it.  He's lived a life devoting

11   his money and his time and effort to help those less

12   fortunate.  And those people that he runs into, be they

13   strangers, family, employees or whatever, he makes their life

14   better.

15        You know when someone thinks of an important

16   corporate official with an organization like McKinsey like I

17   think Mr. Ramseyer does, there are certain stereotypical

18   traits that come to mind, some which are not all that

19   favorable.  Martin Elling is not that guy.  I think

20   everything in the sentencing memo and how I briefly

21   summarized it is he is not that kind of man.

22        As I said before, the courts have held that

23   immigration consequences to prevent somebody from returning

24   home is excessively punitive, which moves Martin out the

25   heartland of a typical case.  He is not the typical

──────── United States v. Elling - Sentencing ────────

1   white-collar defendant.  This is not the typical case where

2   you have such a broad spectrum of charitable good work.

3        Your Honor, I believe the evidence is clear that

4   there are substantial grounds for downward departure and/or a

5   variance in this case through a sentence of probation.  In

6   the jargon of the statute, "Probation is sufficient, but not

7   greater than necessary, to reflect the seriousness of the

8   offense and promote respect for the law," and we ask the

9   Court to do so.

10        I'd like to conclude my observations here, a quote

11   one of the character letters of Lori Winters, tab

12   A39, "Martin is an immensely positive force in the world,

13   which would be better off if there were more people like

14   him."

15        I think in the total scheme of things and the total

16   of looking at all of the factors that go into sentencing, not

17   just general deterrence, it's better for the world and better

18   for society to have Martin continue his good works, his

19   charitable activities, than to stop all of that with a

20   sentence of incarceration.  Thank you, sir.

21        THE COURT:  A couple of questions, Mr. Bondurant.

22        MR. BONDURANT:  Yes, sir.

23        THE COURT:  First of all, do you want to speak to

24   the fine issue as to what would be the proper fine?

25   Secondly, whether it be probation or supervised release, have

——United States v. Elling - Sentencing ——

1   you gone through the mandatory and standard conditions with

2   Mr. Elling such that the count doesn't have to go through

3   them?

4           MR. BONDURANT:  We read through the presentence

5   report -- yes, okay.

6           Yes, we went through the presentence report with

7   him.  In fact, we made him read them himself.

8           THE COURT:  The evolution of the Fourth Circuit case

9   law has been that if the defendant has not gone through them

10  and understands and agrees to them, they have to be read by

11  the Court.

12          MR. BONDURANT:  This came up a few weeks ago.  I

13  promise I'll do it in every other case I have.

14          THE COURT:  Very well.  Do you want to speak to the

15  fine?

16          MR. BONDURANT:  I agree with Mr. Ramseyer.  That's

17  not why we're here.  That's not why we're asking for mercy

18  from the Court.

19          We believe that the best thing for not only

20  Mr. Elling but for society itself, the people around him, the

21  people who have come to rely upon him, is to put him on

22  probation and let him continue his good works.

23          He's not with McKinsey anymore.  He's not in a

24  position to ever do this again.  No corporation is going to

25  hire him with a conviction like this.  That's just putting a

——————— United States v. Elling - Sentencing ———————

1    bullseye for a U.S. attorney to come after you if you do

2    something like that, and they're not going to do it.  So I

3    believe that no harm could come, and I believe he should be

4    on probation.  Thank you, sir.

5          THE COURT:  Thank you very much.

6          MR. RAMSEYER:  Your Honor, may I speak briefly to

7    the impugning of my integrity by Mr. Bondurant?

8          THE COURT:  Sure.

9          MR. BONDURANT:  I did not impugn your integrity.  I

10   just pointed out the facts.

11         MR. RAMSEYER:  Mr. Bondurant said that I

12   misrepresented statements that Mr. Elling has given to the

13   Professional Standards Committee, that I had taken them out

14   context.  I'd like to introduce this as Exhibit 1 to the

15   Court so the Court can see that it was not taken out of

16   context.

17         THE COURT:  This is -- do you have a copy of that

18   now, Mr. Bondurant?

19         MR. BONDURANT:  It was just handed to me.

20         THE COURT:  Okay.

21         MR. BONDURANT:  Okay.

22         THE COURT:  What I'll do is -- I'm going to probably

23   take a break after Mr. Elling allocutes, and then I'll let

24   y'all speak to it afterwards.  Is there anything else you

25   want to say?

—United States v. Elling - Sentencing—

1          MR. RAMSEYER:  Yes, Your Honor.  Also, there was

2   some insinuation that I sandbagged defense counsel.  They saw

3   almost that entire PowerPoint before.  It was presented to

4   them, and they were allowed to take notes from it.

5          Now, there are certain parts, the part about the

6   3553(a) factors, the equal justice, those things, they did

7   not see that.  But the stuff about the conduct, pretty much

8   all of that they had seen before, Your Honor.

9          I think it was about five minutes before the hearing

10  started I was hooking up my laptop and he asked if he could

11  see it, but I knew the Court wanted to start the hearing.  So

12  that's what happened.  Thank you.

13         THE COURT:  All right.  Mr. Bondurant.

14         MR. BONDURANT:  I don't remember seeing a lot of

15  that, but that's neither here nor there.  I don't think it

16  makes any difference in this case.

17         As far as this thing, you'll notice in footnote one

18  it says, "The contents are stated to the best of my personal

19  knowledge and recollection at the present."

20         There is also a question and answer statement that

21  he made, and in there on several occasions he says, "The best

22  I can recollect.  To the best of my ability.  I don't

23  remember," comments like that.  So this is not the complete

24  statement.

25         THE COURT:  All right.

──────── United States v. Elling - Sentencing ────────

1          MR. BONDURANT:  There again, I don't think it makes

2     that much difference, you know.

3          THE COURT:  All right.  I'll accept it as

4     Government's Exhibit Number 1.  I'll let y'all read it.  I'm

5     going to take a break after Mr. Elling allocutes, and if

6     there is anything else you want to speak to about it,

7     Mr. Bondurant, I'll give you the opportunity to do so.

8          (Government Exhibit 1 was admitted.)

9          THE COURT:  All right.  Mr. Elling, how are you

10    today?

11         THE DEFENDANT:  I'm okay.

12         THE COURT:  Good.

13         THE DEFENDANT:  First, I want to advise counsel we

14    don't call the providences of Thailand the hinterlands.

15         MR. BONDURANT:  This is like talking to him all the

16    time, Judge.

17         THE DEFENDANT:  I do want to say I'm very

18    sympathetic to the government's point about equal justice.  I

19    think that's actually an important issue in our country.

20         With that said, as I said in January when I appeared

21    before you, I deeply regret the actions I took, the decisions

22    I made.  I understand how serious they are.  I think everyone

23    understands that at this point, and rightly so.  I understand

24    how severe they are.  I'm also very aware of already the

25    consequences, but also the potential consequences.  I knew

──────── United States v. Elling - Sentencing ────────

1   that when I pled guilty, and I fully accept whatever decision

2   Your Honor makes.

3           I would like to apologize to you, the Court, to the

4   government of the United States and its representatives, but

5   more to the people who put great trust in me over many, many

6   years, friends, family, clients, colleagues.  I hope, aside

7   from this one set of very, very bad decisions, that their

8   faith in me is warranted.

9           Then I would just say regardless of what you decide,

10  I will continue to try to live my life in a way that

11  contributes to society and to earn back the trust of those

12  who might have lost it in this case.  Thank you.

13          THE COURT:  Thank you very much.

14          Why don't we take a break.  We've been going about

15  an hour and a half.  Let's take about a ten-minute break.

16  I'll collect everything that I have and be back.

17          We'll stand in recess.

18          (A recess was taken at this time.)

19          THE COURT:  All right.  Y'all please have a seat.

20          Let the record reflect we're back on the record in

21  *United States v. Elling*.  The government is present by its

22  counsel.  The defendant, likewise, is present by counsel.

23          First of all, before we go any further, is there

24  anything, Mr. Bondurant, you want to say with respect to

25  Government's Exhibit number 1?

—————— United States v. Elling - Sentencing ——————

1           MR. BONDURANT:  No, Your Honor.

2           THE COURT:  All right.  Very well.  So the way I

3    typically proceed in these cases is I'll give you the

4    rational for my sentence.  If there is any objection to how I

5    arrived at my sentence, we'll then address that.  Then we'll

6    set the sentence.

7           So, first of all, before we kind of get into the

8    overall rational, let me address the concerns raised with the

9    defense as to whether -- it's not really sandbagging.  I know

10   Mr. Ramseyer and Mr. Bondurant have a long history with each

11   other, a very productive history of being colleagues and

12   working with each other, so I know everything that was said

13   was out of great respect for one another.

14          But, you know, the facts are, I would imagine -- I

15   don't have the government's discovery in this case, but all

16   the discovery that was shared with the defense.  So from a

17   factual standpoint, my expectation is there really was

18   nothing that was new, and that it was offered not to try to

19   influence the Court.

20          As I said, I'm not going to sentence Mr. Elling

21   because of what Purdue Pharma has done or what McKinsey has

22   done.  Mr. Elling is here because of what he has done.  But

23   this goes to the scope of the knowledge that Mr. Elling had

24   and his knowledge of the potential problems that lay ahead

25   for McKinsey and/or partners at McKinsey when this action was

———— United States v. Elling - Sentencing ————

1    taken, so I take it in that vein.

2         Mr. Elling, when I impose a sentence, the case law

3    teaches that you begin with the sentencing guidelines.  That

4    is the starting point.  In your particular case, the

5    guidelines yield a range of 6 to 12 months, but that is only

6    the starting point, and the guidelines are advisory.

7         From there you then look at the other factors that

8    are set out in 3553.  They begin with the nature and

9    circumstances of the offense, and they go to the history and

10   characteristics of the person.  You've heard it at length,

11   but I think it's important that the record shows that they

12   reflect the seriousness of the offense, promote respect for

13   the law, provide for just punishment, afford adequate

14   deterrence, protect the public from future crimes, and

15   consider the different types of sentences that are available.

16        I think everyone agrees that the factor of

17   protecting the public from future crimes is not what we're

18   really arguing here, but the other factors are at play.

19        Importantly, in the case of *Koon v. United States*,

20   an oft-cited quote from Justice Kennedy, both by other judges

21   in this district and by lawyers in sentencing memoranda, is

22   particularly apt, especially in this case.  He said, "It's

23   been uniform and constant in the federal judicial tradition

24   for the sentencing judge to consider every convicted person

25   as an individual and every case as a unique study in the

─────── United States v. Elling - Sentencing ───────

1    human failings that sometimes mitigate and sometimes magnify

2    the crime and the punishment to ensue."  I think that's

3    particularly appropriate in this case.

4           As I thought about this over the past couple of

5    weeks, it materialized that in some respects we can boil this

6    case down to the quote of, "A person's character is sometimes

7    revealed by how they act when no one is looking," and that's

8    essentially what the government's argument is in this

9    particular case.  That is, when no one was looking, these

10   documents were destroyed when there was potential pressure

11   that was to come.

12          So the government's argument -- I'm just going to go

13   through the arguments that each side has made and is making,

14   and if I overlook anything, y'all please make sure that I've

15   covered everyone's arguments.

16          So I begin with the government.  Mr. Ramseyer argued

17   that while-collar criminals that are frequently given

18   probation and that there is not justice punishment.  When I

19   look at the government's argument, it boils down to this:

20   Mr. Elling was aware of the dangers of OxyContin and aware of

21   the legal jeopardy that Purdue Pharma was in and had been

22   facing since it was prosecuted, as well as some of its

23   executives, in this court before a different judge back in

24   2007.

25          Mr. Elling was actively involved with McKinsey and

—— United States v. Elling - Sentencing ——

1    the work that it did for Purdue Pharma for 30 of the 75

2    engagements, if you will, that related to promoting the

3    product, related to assisting Purdue to be able to get and

4    keep OxyContin in the market, whether it be because it went

5    off patent or whether it be because of the publicity that it

6    had.  That part is not exactly clear to me.

7         In 2013 he was involved in what's called the Evolve

8    to Excellence, if I remember the name correctly, and that

9    ends up kind of being the focus here, and that was to get the

10   drug to market.  Whether any of that was wrong, that's

11   between McKinsey and the government, and that's between

12   Purdue and the government, not between Mr. Elling and the

13   government.  That's not what he's charged with, but it gives

14   him knowledge, if you will.

15        Because of his position, he was then familiar with

16   Purdue, and when it became clear in 2019 that the

17   government's focus was perhaps broader than Purdue in July of

18   2019, July 4th --

19        MR. RAMSEYER:  Your Honor, it's 2018.

20        THE COURT:  2018.  Excuse me.  Let me get my own

21   timeline out since I have it.  On July 3, 2018.  Excuse me.

22   I misstated the year.

23        The *Financial Times* article comes out on July 4th.

24   Then Mr. Elling sends the e-mail that was shown that says,

25   "Is there anything else to do other than to delete the

─────────── United States v. Elling - Sentencing ───────────

1    documents?"

2           And nothing happens immediately when we look at the

3    process and how this unfolds.  In fact, it's not until the

4    end of August of 2018 that Mr. Elling gives himself reminders

5    to delete documents and to get documents out of the trash,

6    the garbage, whatever they want to call it.  He then deletes

7    those document from his computer, deletes the e-mails.

8           It's my understanding the e-mails are ultimately

9    clawed back probably because other recipients have the

10   e-mails and the government was able to get the second half of

11   that e-mail, but there are approximately 30 files that the

12   government was not able to recover.

13          So with the knowledge that Mr. Elling had about

14   Purdue and OxyContin and its history, he knowingly deleted

15   folders, documents, and e-mails from his McKinsey laptop.

16          With respect to Exhibit Number 1, it doesn't have a

17   date on it.  Do y'all know the date that that statement was

18   given?

19          MR. BONDURANT:  I believe it was January 2021.

20          THE COURT:  That's when the investigation of

21   McKinsey was ongoing in 2021 right before he was let go.

22          MR. RAMSEYER:  Yes, Your Honor.

23          THE COURT:  So two, two-and-a-half years later a

24   statement was made in which Mr. Elling denies or does not

25   recall exactly what was done, and he certainly indicates he

——— United States v. Elling - Sentencing ———

1    would not have intentionally done anything to -- he doesn't

2    use the word obstruct justice, but to delete files to have an

3    impact upon an investigation.

4            Ultimately that is somewhat inconsistent.  I didn't

5    pull up the statement of facts that supports this, but it's

6    inconsistent with obstruction of justice where someone

7    deletes documents in connection with an investigation.

8            So the government argues that, you know, through the

9    nature and circumstances of the offense, knowing that the

10   investigation is ongoing, he destroys the documents.  And the

11   seriousness of the offense and the extent of the obstruction,

12   while its difficult to discover, I'm not going to speculate

13   that had those documents been made available that the

14   government would have had other targets, would have sought

15   greater penalties or not, but we know that these documents

16   were gone.

17           The government also argues that a sentence of

18   incarceration should take into account the deterrent effect

19   because white-collar criminals make a risk-benefit analysis,

20   if you will, before they act; that is, if they know they can

21   pay a fine and live their life on probation but not go to

22   jail, they'll take the chance that they're not going to get

23   caught.

24           I don't know that when someone is committing a

25   criminal act, whether it be some type of fraud or whatever,

—— United States v. Elling - Sentencing ——

1    that they're thinking about jail in the back of their mind,

2    but I do think that the prospect of punishment is always

3    something that is part of any risk/benefit that they

4    ultimately do engage in.

5           The government also argues today that probation will

6    not provide for just punishment because in many respects, and

7    we're going to talk about this, Mr. Elling has lived -- they

8    don't argue this directly, but I think this is what the

9    argument is.  He's living the same life.  He moved to

10   Thailand in 2019.  He stepped back from McKinsey in 2016 from

11   the day-to-day operations, and he is set up and has lived his

12   life unabated since that time.  Mr. Elling has a response to

13   that, but this sentence needs to be able to reflect that.

14          On Mr. Elling's side of the ledger, I think we can

15   begin with the stipulation that Mr. Elling has lived a good

16   life.  Mr. Elling has lived a life in which he is a good

17   person.  He's a good brother, he's a good son, he was a good

18   friend, he was a good worker and a good coworker, and he did

19   a lot of good, and continues to do a lot of good.

20          The letters that were submitted, whether it be 43 or

21   38 -- as Mr. Bondurant said, there were a bunch -- they all

22   underscored that since college, and even before, Mr. Elling

23   has been a good and steadfast friend in that regard.

24          Mr. Elling, as you go through his sentencing

25   memorandum, certainly regrets his actions, and his allocution

──────── United States v. Elling - Sentencing ────────

1    stands for that.  He lost his job.  He lost his -- he gave up

2    his law license.  It's unclear as to whether Connecticut has

3    taken any action at this point in time, but it's anticipated

4    that he will lose his law license.

5            We're going to talk about the immigration issue here

6    in a moment, but the argument is incarceration will be unduly

7    disproportionate here because of the effect that it has on

8    his immigration status in Thailand.

9            He's lived a life of integrity.  He grew up in a

10   loving home.  He lost his mother at a young age.  He lost his

11   brother at an early age.  He was with his father through 2018

12   when he lost him as well.

13           He's been motivated throughout his life to improve

14   his community and improve things for those people around him

15   as well.  He has a good education, having attended the

16   University of Chicago where he was engaged as a student and

17   founded a community credit union.  Frankly, it's the first

18   time I've ever seen a student beginning a bank, and he's to

19   be applauded for not just the work that it takes to do that

20   but the foresight and thought to do that.

21           He went to Yale and earned a master's in

22   international relations and earned a Fulbright Scholarship.

23   After that he graduated from Harvard Law School where he was

24   the president of the International Law Society.

25           He came to McKinsey in 1993.  I'll note that at

——————————— United States v. Elling - Sentencing ———————————

1    least what I know about McKinsey is throughout the '90s and

2    2000s, and maybe even today, it was the standard-bearer in

3    the type of work that it did for consulting.  It always got

4    the best and the brightest, and to land someone such as

5    Mr. Elling is consistent with that.

6            He's traveled the world and engaged with people,

7    regardless of their station in life, and the letters bear

8    that out.  It doesn't matter whether you were at the top of

9    the letterhead or at the bottom of the pay grade, Mr. Elling

10   treated you as his friend.

11           In 2019 he moved to Bangkok, and then in 2021 he was

12   terminated from -- actually, he was in Bangkok in -- I'm not

13   exactly sure when McKinsey took him to Bangkok, but he was

14   there in 2019.  Since that time, he's made Bangkok his home.

15           He's been active in charitable matters over there

16   through the Rotary Club.  He has a business.  It's never been

17   fully clear to me, but the sense I get is it's to assist

18   those with housing issues be able to have housing.  He's to

19   be applauded for his devotion to civic and charitable work.

20           He supported family members, both his -- I believe

21   the nieces and nephews he has are from his deceased brother,

22   and he's assisted them.  He's assisted many godchildren.  I

23   was able to count at least two, if not three, families

24   Mr. Elling is godparent for.

25           He seeks probation as an appropriate sentence

———— United States v. Elling - Sentencing ————

1   relying primarily upon the direction under Application Note

2   10(a) for 5C1.1, if I remember correctly, and points to many

3   cases where probation is an appropriate sentence.

4        I'm pointed to the *Wada* case and also the *Pearse*

5   case for how the Court -- for a way the Court can and should

6   consider immigration issues.  In the *Wada* case I believe the

7   defendant was of Japanese origin and had family that remained

8   over in Japan.  He was charged with -- I believe he was an

9   accountant and was charged with embezzlement, and I believe a

10  sentence -- I forget exactly the length of the sentence, but

11  it was going to prevent him from being able to ever go back

12  to see him family and take his children over to Japan, and

13  the Court shaped a sentence that would allow him do that.

14       In the *Pearse* case -- and in that particular case

15  Mr. Wada had lost his job, as Mr. Elling has, and lost his

16  career.  It may be debatable as to whether Mr. Elling lost

17  his career because he was stepping back and has continued his

18  charitable work and lived a fulsome life since that.

19       Mr. Pearse, if I'm pronouncing it correctly, had

20  family in the UK.  He was involved in a substantial financial

21  fraud crime.  It's unclear exactly how much the restitution

22  was in that particular case.  At one point in time the judge

23  said among the three defendants it was $650 million, but at

24  one point probation suggested it may only be $63 million.

25  The point being, it was a substantial amount of loss.

──────── United States v. Elling - Sentencing ────────

1          Mr. Pearse cooperated extensively.  He testified in

2    the case.  He had lost his career, lost all of his money, and

3    also had lost his relationship with at least one of his

4    children.  He wanted to be able to travel to the UK where I

5    believe his wife was living to be able to live there, and the

6    Court shaped a sentence that would allow him to do that.

7          So based upon all of these factors, the defense asks

8    that I take these into consideration and impose a sentence

9    that is for probation, and leaving it to the discretion of

10   the Court as to how long that should be.

11         So I'll just kind of run down through the factors,

12   and then I have a couple of other things to say before I

13   impose the sentence.  The nature and circumstance of the

14   offense - this is a serious offense because of the knowledge

15   of the federal investigation that is ongoing, the actions

16   that were taken, and the actions that were taken over the

17   course of about six weeks.

18         The sentence that I will impose will reflect the

19   seriousness of the offense.  It must promote respect for the

20   law, and when I -- what we see with respect to Mr. Elling is

21   he's lived a law-abiding life up to this point, there is no

22   doubt with that.  But, again, this is a case that's about how

23   we act when nobody is looking.

24         The sentence must provide for just punishment and

25   take into account Mr. Elling's not only good works, but also

—— United States v. Elling - Sentencing ——

1    what an appropriate punishment is for this offense and

2    impacting this investigation and what the punishment should

3    be in that regard.

4         To avoid unwarranted sentencing disparities - we all

5    agree that the JSIN data doesn't give us any guidance, so it

6    makes it difficult to see how this stacks up because you

7    don't see many obstruction cases like this.

8         Mr. Elling, I'll say this:  Most individuals who

9    come before this Court arrive under markedly different

10   circumstances.  Many of the criminal defendants that I see

11   here in Abingdon are here because their lives have been

12   consumed by opioid addiction, an addiction that led them to

13   commit crimes as a result of their substance abuse disorder

14   spiraling into desperation.

15        I sentence the same person down here time and time

16   and time again that has begun to abuse substances at an early

17   age.  Frequently those substances involve prescription

18   opioids and then evolve into other drugs.

19        But your case is different.  You're not a victim of

20   the opioid academic.  By contrast, you were a participant in

21   the business strategies that contributed to its spread.

22   There are books that have been written about it.  We all know

23   Beth Macy's *Dopesick* and *Demon Copperhead* written by Barbara

24   Kingsolver.  While fiction, she is a product of Lee County

25   down here and knows what the opioid epidemic has done.

—————— United States v. Elling - Sentencing ——————

1           But let me be clear, you are not charged with

2    creating or contributing to the opioid epidemic.  You're not

3    charged with the sins of Purdue.  You're not charged with the

4    sins of McKinsey.  But you are charged with your efforts to

5    obstruct the government into their investigation regarding

6    those matters.

7           And you knew, or at the very least you should have

8    known, that your work with McKinsey in advancing Purdue's

9    marketing and aggressive promotion of OxyContin was at best

10   deeply suspect.  Long before McKinsey signed its first

11   contract with Purdue, its conduct was already under scrutiny.

12          In 2003 the General Accounting Office found that

13   Purdue's marketing strategy for OxyContin was overly

14   aggressive and contributed to the drug's abuse and diversion.

15          In 2004 McKinsey entered into a master consulting

16   agreement that followed a 15-year relationship with 75

17   different engagements in the United States collecting over

18   $93 million in fees.  You personally directed the client

19   services team for approximately 30 of those, and you profited

20   handsomely from your work because you were very good at your

21   job.  That is clear from all the letters that I see.

22          In 2007 Purdue pled guilty to the criminal

23   misbranding of OxyContin, falsely claiming between '96 and

24   2001 that the drug was less addictive, less prone to abuse,

25   and less likely to cause dependence or withdrawal from other

─────────── United States v. Elling - Sentencing ───────────

1   opioids.

2           Purdue was consequently compelled to enter a

3   five-year corporate integrity agreement with the Office of

4   Inspector General from the Department of Health and Human

5   Services, and, significantly, some of McKinsey's own

6   consultants were named as responsible persons under that

7   agreement.  Your firm, your colleagues, knew what Purdue had

8   done.

9           As OxyContin sales began to fall following the

10  introduction of an abuse-deterrent formulation in 2010 and

11  after the corporate integrity agreement expired, we had the

12  Evolve to Excellence program, a plan designed to reform --

13  not just to reform, but to turbocharge OxyContin sales.

14          You targeted high-volume prescribers, including

15  those writing prescriptions for uses that were unsafe,

16  ineffective, and medically unjustifiable.  This resulted in

17  maximized corporate and personal profit with limited regard

18  for whether these prescribers were ethically practicing

19  medicine or operating corrupt pill mills that devastated

20  communities.

21          The consequences of that conduct, and conduct like

22  it, have been severe.  We know that the scope of the opioid

23  epidemic that has plagued the nation, Appalachian, Southwest

24  Virginia, and communities throughout, and I won't go through

25  that.

——— United States v. Elling - Sentencing ———

1          Like I said, I'm not sentencing you for the
2     existence or the scale of the opioid crisis.  Nor am I
3     sentencing you for your past work at McKinsey with Purdue
4     Pharma, regardless of whether we agree with it or not.  I'm
5     sentencing you for your decision once it became clear that
6     the Department of Justice and the states' attorneys general
7     were investigating these entities, the efforts that you took
8     to obstruct to hold corporations and individuals accountable
9     for their role in the opioid epidemic.  You chose to destroy
10    and conceal evidence relevant to these investigations.  That
11    decision was deliberate, calculated, and unlawful.
12          It is especially enlightening with your training in
13    the law.  You come from the best schools, have the best
14    education, and achieved in all of those.  You understand the
15    seriousness of the choice.
16          McKinsey, I'm sure, had not only a corporate
17    integrity office, it had a legal office, and we know it had a
18    risk management office.  I'm sure that advice you gave over
19    the years to your clients included when they had questions
20    about what was the next right thing to do, that you said,
21    "What would legal say?  Consult your legal department."  And
22    when you had the opportunity to ask yourself that question --
23    what is the next right thing to do? -- you didn't do the same
24    thing.
25          Our justice system functions only when evidence is

—— United States v. Elling - Sentencing ——

1    preserved and when the truth can be brought to life.  The

2    destruction of evidence is not a mere administrative offense.

3    It is an act that strikes at the foundation of legal

4    accountably.  It compromises the public's faith in the

5    process and signals that rules can be bent or broken when

6    inconvenient.  It is the foundation of the rule of law that

7    we as citizens act in good faith at all times, and when we

8    fail do so, regardless of our position, the rule of law

9    compels that we are held accountable.

10          So today you come before the Court from a position

11   of considerable privilege, and I don't sentence you because

12   of that.  You've had educational access and opportunities,

13   circumstances that stand in sharp contrast to many others who

14   suffer the consequences of the very epidemic that your

15   actions helped to shield from scrutiny.

16          It should not be lost on you that the rule of law

17   can only survive when the truth is safeguarded.  And when the

18   deliberate destruction of that truth occurs, the Court must

19   respond in a manner that is both firm and just.

20          So with that, Mr. Elling, the sentence that I'm

21   going to impose today is I'm going to impose a fine of

22   $40,000, which is at the top end of the guidelines.

23          Because I believe that when I look at the

24   circumstances that evolved and what has been shown up to this

25   point, that only a sentence of incarceration is a sentence

—— United States v. Elling - Sentencing ——

1   that reflects the seriousness of the offense.  I'm going to

2   impose a sentence of six months followed by a period of two

3   years of supervised release.

4            During the period of supervised release, you are to

5   complete 1,000 hours of community service in the field of

6   substance abuse and substance abuse recovery, and your

7   supervised release is to be completed in the United States.

8            If you complete your supervised release early, I

9   will entertain a motion, subject to you remaining of good

10  behavior, that you come off supervised release after you've

11  served at least 50 percent of that.

12           So you're going to serve at least a year of

13  supervised release, and you must do 1,000 hours of community

14  service.  It ends up being, if you take it out two years, ten

15  hours a week of community service, which I believe is

16  sufficient but no greater than necessary.  There will be a

17  $100 special assessment as well.

18           Mr. Ramseyer, any objection to how I arrived at my

19  sentence?

20           MR. RAMSEYER:  No, Your Honor.

21           THE COURT:  Mr. Bondurant and Ms. Peerce?

22           MR. BONDURANT:  May I have a moment, please?

23           THE COURT:  Yes.

24           MR. BONDURANT:  No, Your Honor.

25           THE COURT:  Very well.  Mr. Elling, if I can get you

──────────────── United States v. Elling - Sentencing ────────────────

1    to stand, I'll be most obliged.

2          Mr. Elling, pursuant to the Sentencing Reform Act of

3    1984 and having considered the factors in 18, United States

4    Code, Section 3553 and having consulted the Advisory

5    Sentencing Guidelines, it is the judgment of the Court that

6    you're sentenced to a period of incarceration of six months

7    with the Bureau of Prisons followed by a two-year period of

8    supervised release subject to the mandatory and standard

9    conditions.

10         We addressed earlier that you've read and understand

11   and agree to the mandatory and standard conditions; is that

12   correct?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Okay.  So I will not go back through

15   those again.

16         You're also subject to the following special

17   conditions as well.  First of all, during your period of

18   supervised release, that you complete 1,000 hours of

19   community service in the -- I always say with any 501(c)(3)

20   organization.  I did not direct the organization, but an

21   organization that's in the area of substance abuse and

22   substance abuse recovery.

23         You shall reside in a residence -- and your

24   supervised release is to be fulfilled in the United States.

25   I'm not saying that -- probation is going to be able to treat

—————— United States v. Elling - Sentencing ——————

1    you like any other defendant.  If you request permission to
2    travel internationally, you can travel.  What I'm saying is
3    that you must maintain your residence in the United States
4    during that time.
5         You shall reside in a residence free of firearms,
6    ammunition, destructive devices, and dangerous weapons.  You
7    are to pay a special assessment of $100, which is due and
8    payable immediately.
9         You're ordered to pay a fine of $40,000.  I will
10   note that you have already paid into the court more than the
11   total fine and special assessment, so I will direct the clerk
12   to refund to you, through your attorneys, the balance of
13   that.
14        Anything else, Mr. Ramseyer?  I'm going to deal with
15   the waiver of appeal in just a minute.
16        MR. RAMSEYER:  Your Honor, just so there's something
17   in terms of self-report, but I think you'll deal with that
18   later.
19        THE COURT:  Yeah, we'll deal with that.  No
20   objection to allowing Mr. Elling to self-report?
21        MR. RAMSEYER:  Well, I was going to explain to the
22   Court that in the plea agreement the parties agreed that if
23   he was sentenced to imprisonment, which he has been, he would
24   surrender all of his passports and not leave the United
25   States after sentencing until he has served his sentence of

——————— United States v. Elling - Sentencing ———————

1    imprisonment.

2         And the United States agreed that if he's taken no

3    actions that raise a concern of flight or danger to the

4    community, which he has not, the government does not oppose

5    that he be permitted to surrender voluntarily to serve his

6    sentence.

7         THE COURT:  Okay.  Mr. Bondurant, do y'all have a

8    request for placement?

9         MR. BONDURANT:  Yes, Your Honor, the satellite camp

10   in Otisville, New York.

11        THE COURT:  Where is that?

12        MR. BONDURANT:  Otisville is --

13        MR. PEERCE:  It's about 90 months above New York

14   City.

15        THE COURT:  But in New York?

16        MR. PEERCE:  Yes, it's in New York.  It's above New

17   York City.

18        THE COURT:  All right.  Consistent with the plea

19   agreement, I'll require Mr. Elling to surrender his

20   passports.  Do you have those with you?

21        THE DEFENDANT:  It's at the hotel, but within an

22   hour I can give it to the government.

23        THE COURT:  All right.  Do you want to set a time

24   for him to come see you tomorrow, Mr. Thayer?

25        THE DEFENDANT:  I can bring it --

——————— United States v. Elling - Sentencing ———————

1          MR. PEERCE:  Counsel can bring it to probation this

2    afternoon, Your Honor.

3          THE COURT:  Okay.  So what we'll do is probation may

4    need to see you right afterwards to surrender your passports.

5    You'll be allowed to self-report.

6          Is there anything that you have to get done such

7    that I will put a date in there that you not be required to

8    report before a certain date?

9          THE DEFENDANT:  I've never been sent to jail before,

10   so I don't --

11         THE COURT:  I don't know whether you have any --

12   commitment is not the write word, but -- Go ahead, Mr.

13   Bondurant.

14         MR. BONDURANT:  We were advised by somebody that

15   deals with the Bureau of Prisons that because of DOGE

16   activities processing is not as fast.  Instead of the

17   standard 30 days, we ask that you give him 60 days.

18         THE COURT:  No objection to him not being required

19   to report any earlier than 60 days from now?

20         MR. RAMSEYER:  No objection, Your Honor.

21         THE COURT:  Okay.  I'll recommend that he serve at

22   the camp in Otisville, New York, and that he be allowed to

23   self-report no earlier than 60 days from today's date.

24         MR. PEERCE:  Your Honor, if we could make it no

25   later than 60 days, because if there is a designation before

——— United States v. Elling - Sentencing ———

1    then, Mr. Elling may want to surrender earlier?

2              THE COURT:  Okay.  Well, do you want me -- do you

3    want it no later than 60 days?

4              MR. PEERCE:  Yes.

5              THE COURT:  Okay.  So no later than 60 days from

6    today's date.  Then if you get a designation earlier, I'm

7    sure they'll take you.

8              All right.  Anything else, Mr. Ramseyer?

9              MR. RAMSEYER:  Your Honor, I'm a little unclear

10   about the no later than 60 days.  If something happens and

11   the marshals don't designate him within 60 days, what happens

12   at that point?  I guess it doesn't matter.  I mean, the Court

13   is trying to make that happen, so I guess we'll deal with it.

14             THE COURT:  I don't know how long it's taking to

15   designate people.  I just don't know.

16             MR. PEERCE:  We were advised by a consultant that 60

17   days would do it; 30 days might be difficult.  I'm presuming,

18   Your Honor, if there is still not a designation within 60

19   days that we could come back to the Court and ask for a

20   further extension.

21             THE COURT:  I would think so.  I'm also happy to

22   leave it blank and just say that he be allowed to self-report

23   upon a designation from the BOP.  What I don't know is what

24   will hurry them along the way, if that's what you want.  I'm

25   happy to put in there whatever you like.

—————— United States v. Elling - Sentencing ——————

1      MR. PEERCE:  Yeah, it could be within 30 to 60 days.

2      THE COURT:  Okay.  So I'll say no later than 60

3  days, if that's what the request is.

4      MR. PEERCE:  Your Honor, as a New York lawyer, I

5  just have one request.  I know that probation generally

6  requires people to stay within New York City while on

7  probation or supervised release.  If Your Honor would be

8  willing to put on the record that it's subject to probation's

9  discretion, I would request that Your Honor give Mr. Elling

10  more flexibility, or at least let probation give more

11  flexibility when he comes out.

12      THE COURT:  I don't have any problem with that.  My

13  guess is what will happen is that when he comes out, I

14  presume he's going to live in the city, is if New York

15  will -- correct me if I'm wrong, Mr. Thayer -- if New York

16  will accept him, they'll probably transfer the case up there,

17  and then he would just be subject to supervision in New York

18  as opposed to having supervision down here and courtesy

19  supervision up in New York.  I would presume that's what's

20  likely to happen.

21      PROBATION OFFICER:  That's correct, Your Honor.

22      THE COURT:  If it is transferred, what I would like

23  is at least six-month updates as to the community service

24  work that's being done so that I know that's being done.  I

25  have no doubt, given the work you've done in the past,

1    Mr. Elling, that you will continue to do that.

2         Mr. Elling, I will close with this:  I've said what

3    I'm going to say with respect to the scope of your work.  You

4    have indeed led a life that would be the envy of many people,

5    and you have the greatest respect from many people, as you

6    can see from the letters that you received, or that we

7    received.

8         My guess is that your lawyers would be hard pressed

9    to be able to identify someone else, probably with relative

10   ease, that they would be able to get as many letters of

11   support that are heartfelt.  You know, that's a remarkable

12   legacy.  So build upon that legacy and put this in the past.

13   With that, I wish you good luck.

14        THE DEFENDANT:  Thank you, Your Honor.

15        THE COURT:  All right.  We'll stand in recess.

16        MR. RAMSEYER:  Your Honor, did the Court inform him

17   of his right to appeal?

18        THE COURT:  No.  I always do that at the end.  Thank

19   you very much, Mr. Ramseyer.

20        Mr. Elling, I will advise you that you waived your

21   right to appeal your sentence, and that waiver is binding

22   unless the sentence exceeds the statutory maximum or is based

23   upon a constitutionally impermissible factor.

24        If you undertake to appeal despite your waiver, you

25   may lose the benefits of your appeal.  If a right to appeal

─────── United States v. Elling - Sentencing ───────

1    does exist, a person who is unable to pay the cost of an

2    appeal may apply for leave to appeal without prepayment of

3    such cost.

4         Any notice of appeal must be filed within 14 days of

5    the entry of judgment or within 14 days of a notice of appeal

6    by the government.  If requested, the clerk will prepare and

7    file a notice of appeal on your behalf.

8         Good luck to you, sir.

9         MR. RAMSEYER:  Your Honor, if I may.

10        THE COURT:  Oh, one more.

11        MR. RAMSEYER:  I'm sorry.  I think the court said he

12   might lose the benefits of his appeal.  I think the Court

13   meant he would lose the benefits of his plea agreement.

14        THE COURT:  Yes, you may lose the benefits of your

15   plea agreement.

16        MR. RAMSEYER:  Thank you, Your Honor.

17        THE COURT:  All right.  Now we'll be in recess.

18        (The proceedings concluded at 2:14 p.m.)

19                      CERTIFICATION

20      I certify that the foregoing is a correct transcript

21    from the record of proceedings in the above-entitled matter.

22

23        _____/s/_____

24                   Cynthia L. Bragg

25                   May 27, 2025